Patrick J. McDonnell (PM 8062)
Michael Giordano (MG 9958)
McDONNELL & ADELS PLLC
401 Franklin Avenue
Garden City, New York 11530
(516) 328-3500

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

*Plaintiffs*:
LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, THE FIRST LIBERTY INSURANCE CORPORATION, LM INSURANCE CORPORATION, LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY, LIBERTY COUNTY MUTUAL INSURANCE COMPANY, AND LM PROPERTY AND CASUALTY INSURANCE COMPANY, SAFECO INSURANCE COMPANY OF ILLINOIS, AMERICAN STATES INSURANCE COMPANY, SAFECO INSURANCE COMPANY OF AMERICA, SAFECO INSURANCE COMPANY OF INDIANA, GENERAL INSURANCE COMPANY OF AMERICA

Docket No.: _____ ( )

**Plaintiff Demands a Trial by Jury**

- against -

*Provider Defendants*:
COMPAS MEDICAL, P.C., JCC MEDICAL, P.C., ALLEVIATION MEDICAL SERVICES, P.C., JGG MEDICAL CARE, P.C., JULES FRANCOIS PARISIEN, M.D., FLATBUSH CHIROPRACTIC, P.C., T&J CHIROPRACTIC, P.C., ISLAND LIFE CHIROPRACTIC PAIN CARE, PLLC, ACTION POTENTIAL CHIROPRACTIC, PLLC, ADELAIDA PHYSICAL THERAPY, P.C., MASIGLA PHYSICAL THERAPY, P.C., CHARLES DENG ACUPUNCTURE, P.C.,

*Nominal Owner Defendants*::
JEAN CLAUDE COMPAS, MD, JAMIE GABRIEL GUTIERREZ, MD, ROBERT SUPER, D.C., DARREN THOMAS MOLLO, DC, ADELAIDA M. LAGA, P.T., MARIA MASIGLA, P.T., CHARLES DENG, L.AC.,

*Management Defendant*:
PAVEL SOLTANOV A/K/APAULSOLTONOV A/K/A PAUL DADA

---

## COMPLAINT

Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, and LM Property and Casualty Insurance Company (collectively, "Liberty" or "Plaintiffs"), by their attorneys, McDonnell & Adels, PLLC, as and for their Verified Complaint against the defendants, allege upon information and belief as follows:

## INTRODUCTION

### A.    Nature of Action

1.     This is an action for a declaratory judgment and to recover monies paid to the Defendant professional corporations, professional limited liability companies and sole proprietorships (collectively, the "Provider Defendants") pursuant to New York's Comprehensive Motor Vehicle Insurance Reparations Act and related regulations (the "No-Fault Laws").

2.     Plaintiffs seek a declaration that they have no obligation to pay any of the currently pending No-Fault claims submitted to them by the Provider Defendants (the "pending claims") or any future No-Fault claims the Provider Defendants may submit to Plaintiffs.

3.     The Provider Defendants are ineligible to receive No-Fault payments because (i) they are not really owned and/or controlled by licensed health care professionals; (ii) they engage in unlawful fee splitting with unlicensed persons; (iii) the services billed through the Provider Defendants are not medically necessary and are performed pursuant to a fraudulent, pre-determined treatment protocol; (iv) the billing codes used by the Provider Defendants inflate and exaggerate the level of services

2

provided; (v) the services billed through the Provider Defendants are performed pursuant to illegal "kickback" arrangements; (vi) the Provider Defendants have billed Plaintiffs for rendered by independent contractors; and (vii) in many cases, the services billed through the Provider Defendants are not provided at all.

4.      To date, the pending claims amount to more than $1,431,372.31.

5.      Plaintiffs also seek to recover more than $283,185.14 in No-Fault billing they already paid to the Provider Defendants (the "paid claims"). The Defendants wrongfully obtained this money by misrepresenting to Plaintiffs that the Provider Defendants were eligible for No-Fault payment when they were not.

6.      As identified in the caption, the Defendants fall into the following three categories:

  i.   *The Provider Defendants:*               The "Provider Defendants" are, collectively, Compas Medical, P.C. ("Compas Medical"), JCC Medical, P.C. ("JCC Medical"), Alleviation Medical Services, P.C. ("Alleviation Medical"), JGG Medical Care, P.C. ("JGG Medical"), Jules Francois Parisien, M.D. ("Parisien"), Flatbush Chiropractic, P.C. ("Flatbush Chiropractic"), T&J Chiropractic, P.C. ("T&J Chiropractic"), Island Life Chiropractic Pain Care, PLLC ("Island Life Chiropractic"), Action Potential Chiropractic, PLLC ("Action Potential Chiropractic"), Adelaida Physical Therapy, P.C. ("Adelaida PT") , Masigla Physical Therapy, P.C. ("Masigla PT") and Charles Deng Acupuncture, P.C. ("Deng Acupunture"). The Provider Defendants are New York professional corporations, limited liability companies and sole proprietorships, through which health care services were purportedly performed and billed to Liberty and other New York insurance companies. The Provider Defendants operate out 1468 Flatbush Avenue, Brooklyn, New York ("1468 Flatbush Avenue");

  ii.  *The Nominal Owners:*               The "Nominal Owners" are, collectively, Defendants Jean Claude Compas, M.D. ("Compas"), Jamie Gutierrez, M.D. ("Gutierrez") Robert Super, D.C. ("Super"), Darren Thomas Mollo ("Mollo"), Adelaida M. Laga, P.T. ("Laga"), Maria Masigla, P.T. ("Masigla") and Charles Deng, L.Ac.

3

("Deng"). The Nominal Owners are licensed physicians, chiropractors, acupuncturists and physical therapists. Although they do not actually own the corporate Provider Defendants, the Nominal Owners are variously listed as the Provider Defendants' sole owners in their respective Certificates of Incorporation and Articles of Organization. The Nominal Owners claim to perform many of the services that are billed through the Provider Defendants to Liberty and other New York insurance companies;

iii. *The Management Defendant:* The "Management Defendant" is Paul Soltanov a/ka/ Pavel Soltanov a/k/a Paul Dada ("Dada"). Although not a licensed health care professional, Dada is the Provider Defendants' true owner. With the knowing and willful participation of the Nominal Owners, Dada illegally created the Provider Defendants and engineered the Defendants' scheme of using the Provider Defendants for the sole purpose of submitting fraudulent claims for No-Fault reimbursement to Liberty and other New York insurance companies.

7.    Detailed below, the Defendants do not have, and never had, any right to be compensated for the bills they submitted to Liberty through the Provider Defendants. The charts annexed as **Exhibits "1"** through **"16"** summarize, in part, the fraudulent charges identified to date that the Defendants have submitted to Liberty.

B.    <u>Overview of Defendants' No-Fault Insurance Scheme</u>

8.    Under New York's No-Fault Laws, every vehicle registered in the state is required to have No-Fault automobile insurance, which enables the driver and passengers of a registered and insured vehicle to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault ("<u>No-Fault Benefits</u>").

9.    The No-Fault Laws require prompt payment for health care treatment, generally within 30 days, thereby eliminating the need for injured claimants to file personal injury lawsuits in order to be reimbursed for health care costs and certain other

4

personal injury lawsuits in order to be reimbursed for health care costs and certain other incidental expenses they have incurred as a result of injury sustained in a motor vehicle accident.

10.    Under the No-Fault Laws, patients can assign their right to reimbursement from an insurance company to others, including the health care providers that provide their treatment.

11.    However, New York State law requires that all professional health care corporations and limited liability companies be owned and controlled by appropriately licensed health care professionals.  A professional health care corporation or limited liability company that is not actually owned or controlled by an appropriately licensed professional is not eligible to receive No-Fault payments.

12.    To get around this restriction and exploit the patient-friendly provisions of the No-Fault Laws, Dada — who is not licensed to practice any health care profession — created a complex, fraudulent scheme in which he essentially purchased use of the names and licenses of the Nominal Owners.  With the Nominal Owners acting as "fronts," Dada then illegally formed, owned and controlled the Provider Defendants under the facially valid cover of licensed professionals.

13.    The Defendants then billed insurance companies, including Liberty, for medically unnecessary health services performed through the unlawfully formed Provider Defendants, with Dada siphoning most, if not all, of the profits.

14.    Dada undertook extensive efforts to increase the profits he took in from his unlawful control over the 1468 Flatbush Avenue location.

15.    For example, on information and belief, Dada had the chiropractic, acupuncture and physical therapy practices operating at 1468 Flatbush Avenue pay him

kickbacks for patient referrals. In exchange for the kickbacks, Dada had the medical practices he controlled at the location automatically steer their patients to these providers for medically useless treatment. In this way, the chiropractic, acupuncture and physical therapy practices at 1468 Flatbush Avenue had access to a steady stream of patients, which, in turn, generated increased profits for Dada.

16. However, New York State law prohibits the payment of kickbacks for patient referrals and health care providers are not eligible to receive No-Fault payments if they pay or receive kickbacks for patient referrals.

17. To further maximize profits, Dada also used independent contractors to provide some or most of the services rendered. By using independent contractors to perform the services billed by the Provider Defendants, the Defendants could avoid paying taxes, workers' compensation and malpractice insurance, maximizing their illicit gains.

18. However, the use of independent contractors by a health care provider renders the health care provider ineligible to receive No-Fault payments. Independent contractors contract to do certain work according to their own methods, not subject to the control of an employer. Because independent contractors are not employees, when No-Fault services are provided by an independent contractor, the professional health services corporation that hired them is not permitted to bill for their services pursuant to the No-Fault Laws.

19. At times, the Defendants did not even bother with the charade of providing useless and unnecessary treatment and simply billed Liberty for services that were never rendered at all.

20. To conceal that the Provider Defendants were engaged in a range of

unlawful activity that rendered them ineligible for No-Fault Benefits, the Defendants took advantage of the fact that Liberty is required by statute to process No-Fault claims quickly and to pay No-Fault claims promptly within 30 days.

21.    The Defendants exploited this strict timeframe by submitting No-Fault bills to Liberty that were designed to appear facially valid — thereby arousing no suspicion — when, in reality, the Provider Defendants had no entitlement to payment for the bills they submitted.

22.    To further cover up their scheme, Dada operated the clinic at 1468 Flatbush Avenue as a "revolving door," repeatedly changing the names of the professional corporations and limited liability companies there as well as the identity of the "paper" owners.   At times, Dada dispensed with the corporate form altogether and just had providers at 1468 Flatbush Avenue, such as Compas, Gutierrez, Parisien, Laga and Masigla, submit bills under their own names and social security numbers as a further act of concealment.

23.    By using multiple health care providers set up in multiple ways, the billing submitted to insurers from any one Provider Defendant would be minimized, making it more difficult for insurers to identify any pattern of improper billing.   Whenever Plaintiffs investigated an existing health care provider at 1468 Flatbush Avenue, Dada would simply replace it with a new health care provider.

24.    As a consequence, the Defendants' submission of seemingly valid bills and documents resulted in Liberty's payment of the Defendants' fraudulent claims.

25.    The Defendants' enterprise was designed to, and did, induce Liberty to pay No-Fault Benefits to the Provider Defendants by misrepresenting that the Provider Defendants were in compliance with New York law and were eligible for such

payments, when, in fact, they were not.

## THE PARTIES

### The Plaintiffs

26.    Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal places of business in Boston, Massachusetts.  Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue automobile insurance policies in New York.  Liberty Mutual Insurance Company maintains offices in the State of New York, County of Nassau.

27.    Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal places of business in Boston, Massachusetts.  Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue automobile insurance policies in New York.

28.    Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue automobile insurance policies in New York.

29.    Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts. Liberty County Mutual Insurance Company is authorized to conduct business and to issue automobile insurance policies in New York.

30.    Plaintiff LM Property and Casualty Insurance Company is an Indiana corporation with its principal place of business in Boston, Massachusetts. LM Property

and Casualty Insurance Company is authorized to conduct business and to issue automobile insurance policies in New York.

31.   Plaintiff Safeco Insurance Company of Illinois is an Illinois corporation with its principal place of business in Boston, Massachusetts.   Safeco Insurance Company of Illinois is authorized to conduct business and to issue automobile insurance policies in New York.

32.   Plaintiff American States Insurance Company is an Indiana corporation with its principal place of business in Boston, Massachusetts.   American States Insurance Company is authorized to conduct business and to issue automobile insurance policies in New York.

33.   Plaintiff Safeco Insurance Company of America is a New Hampshire corporation with its principal place of business in Boston, Massachusetts.   Safeco Insurance Company of America is authorized to conduct business and to issue automobile insurance policies in New York.

34.   Plaintiff Safeco Insurance Company of Indiana is an Indiana corporation with its principal place of business in Boston, Massachusetts.   Safeco Insurance Company of Indiana is authorized to conduct business and to issue automobile insurance policies in New York.

35.   Plaintiff General Insurance Company of America is a New Hampshire corporation with its principal place of business in Boston, Massachusetts.   General Insurance Company of America is authorized to conduct business and to issue automobile insurance policies in New York.

**The Defendants**

**Provider Defendants:**

36.    Defendant Compas Medical is a New York medical professional corporation through which the Defendants have billed many of the fraudulent services at issue in this action.  Compas Medical was incorporated on or about March 12, 2009 with its principal place of business in New York.

37.    Defendant JCC Medical is a New York medical professional corporation through which the Defendants have billed many of the fraudulent services at issue in this action.  JCC Medical was incorporated on or about April 27, 2011 with its principal place of business in New York.

38.    Defendant Alleviation Medical is a New York medical professional corporation through which the Defendants have billed many of the fraudulent services at issue in this action.  Alleviation Medical was incorporated on or about April 4, 2011 with its principal place of business in New York.

39.    Defendant JGG Medical is a New York medical professional corporation through which the Defendants have billed many of the fraudulent services at issue in this action.  JGG Medical was incorporated on or about September 27, 2011 with its principal place of business in New York.

40.    Defendant Parisien resides in and is a citizen of New York.  Parisien was licensed to practice medicine in New York on January 25, 1972.  Parisien operates as a sole proprietorship through which the Defendants have billed many of the fraudulent services at issue in this action.

41.    Defendant Flatbush Chiropractic is a New York chiropractic professional corporation through which the Defendants have billed many of the fraudulent services

at issue in this action. Flatbush Chiropractic was incorporated on July 26, 2001 with its principal place of business in New York.

42. Defendant T&J Chiropractic is a New York chiropractic professional corporation through which the Defendants have billed many of the fraudulent services at issue in this action. T&J Chiropractic was incorporated on March 5, 2009 with its principal place of business in New York.

43. Defendant Island Life Chiropractic is a New York chiropractic professional limited liability company through which the Defendants have billed many of the fraudulent services at issue in this action. Island Life was organized on September 2, 2010 with its principal place of business in New York.

44. Defendant Action Potential Chiropractic is a New York chiropractic professional limited liability company through which the Defendants have billed many of the fraudulent services at issue in this action. Action Potential Chiropractic was organized on July 6, 2012 with its principal place of business in New York.

45. Defendant Adelaida PT is a New York physical therapy professional corporation through which the Defendants have billed many of the fraudulent services at issue in this action. Adelaida PT was incorporated on or about September 27, 2011 with its principal place of business in New York.

46. Defendant Masigla PT is a New York physical therapy professional corporation through which the Defendants have billed many of the fraudulent services at issue in this action. Masigla PT was incorporated on or about June 12, 2012 with its principal place of business in New York.

47. Defendant Deng Acupuncture is a New York acupuncture professional corporation through which the Defendants have billed many of the fraudulent services

at issue in this action.  Deng Acupuncture was incorporated on or about October 24, 2000 with its principal place of business in New York.

**Nominal Owner Defendants:**

48.    Defendant Compas resides in and is a citizen of New York.  Compas was licensed to practice medicine in New York on January 25, 1980 and has served as the nominal or "paper" owner of Provider Defendants Compas Medical and JCC Medical. Compas has also billed many of the fraudulent services at issue in this action under his own name and social security number.

49.    Defendant Gutierrez resides in and is a citizen of New York.  Gutierrez was licensed to practice medicine in New York on December 23, 2010 and has served as the nominal or "paper" owner of Provider Defendants Alleviation Medical and JGG Medical.  Gutierrez has also billed many of the fraudulent services at issue in this action under his own name and social security number.

50.    Defendant Super resides in and is a citizen of New York.  Super was licensed to practice chiropractic in New York on August 4, 1998 and has served as the nominal or "paper" owner of Provider Defendants Flatbush Chiropractic and T&J Chiropractic.

51.    Defendant Mollo resides in and is a citizen of New York.  Mollo was licensed to practice chiropractic in New York on September 23,1999 and has served as the nominal or "paper" owner of Provider Defendants Island Life Chiropractic and Action Potential Chiropractic.

52.    Defendant Laga resides in and is a citizen of New York.  Laga was licensed to practice physical therapy in New York on January 16, 2009 and has served

as the nominal or "paper" owner of Provider Defendant Adelaida PT. Laga has also billed many of the fraudulent services at issue in this action under her own name and social security number.

53.    Defendant Masigla resides in and is a citizen of New York. Masigla was licensed to practice physical therapy in New York on March 24, 1999 and has served as the nominal or "paper" owner of Provider Defendant Masigla PT. Masigla has also billed many of the fraudulent services at issue in this action under her own name and social security number.

54.    Defendant Deng resides in and is a citizen of New York. Deng was licensed to practice acupuncture in New York on January 3, 1994 and has served as the nominal or "paper" owner of Provider Defendant Deng Acupuncture.


**Management Defendant:**

55.    Defendant Dada resides in and is a citizen of New York. Dada is not and has never been a licensed to practice any health care profession, yet has owned, controlled, and/or derived economic benefit from the Provider Defendants in contravention of New York law.


**Other Relevant Individuals/Entities Not Named As Defendants**

56.    Zenaida Reyes-Arguelles, M.D. ("Arguelles") is or was a citizen of the State of New York who was licensed to practice medicine on April 28, 1986. Detailed below, in an April 13, 2011 Determination and Order, the New York State Department of Health Board for Professional Medical Conduct determined, among other things, that Arguelles had committed 54 specifications of misconduct, including gross negligence,

gross incompetence, unwarranted tests and treatments, fraudulent practice, willfully making and filing false reports and moral unfitness, all while purporting to treat No-Fault insureds at 1468 Flatbush Avenue. Arguelles surrendered her medical license on October 31, 2011. Arguelles is not named as a defendant in this action.

57. Uptodate Medical Services, P.C. ("Uptodate Medical") was a fraudulently incorporated New York professional corporation with its principal place of business in the State of New York. Uptodate Medical PC operated at 1468 Flatbush Avenue from approximately 2001-2004 with Arguelles serving as straw owner. Uptodate Medical is not named as a defendant in this action.

58. Vincent Medical Services, P.C. ("Vincent Medical PC") was a fraudulently incorporated New York professional corporation with its principal place of business in the State of New York. Vincent Medical PC operated at 1468 Flatbush Avenue from approximately 2004 to 2006 with Arguelles serving as straw owner. Vincent Medical PC is not named as a defendant in this action.

59. Arguelles M.D., P.C. ("Arguelles PC") was a fraudulently incorporated New York professional corporation with its principal place of business in the State of New York. Arguelles PC operated at 1468 Flatbush Avenue from approximately 2006 to 2009 with Arguelles serving as straw owner. Arguelles Medical PC is not named as a defendant in this action.

## JURISDICTION AND VENUE

60. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) as the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought

under 18 U.S.C. § 1961 *et seq.* (the "Racketeer Influenced and Corrupt Organizations" or "RICO" Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367 and the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202.

61.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

62.    Upon information and belief, all of the defendants regularly transact business in New York.

63.    None of the parties to this suit is an infant or incompetent to manage themselves or their affairs.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION: RELEVANT STATUTORY AND REGULATORY FRAMEWORK

64.    Insurance Regulation 11 NYCRR 65-3.16(a)(12) provides:

A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

65.    The Insurance Department has stated that this regulation "has been added to clarify that a health care provider must be *properly* licensed to be eligible for reimbursement under No-Fault." 2001-19 N.Y. St. Reg. 17 (May 9, 2001) (emphasis added).

66.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 319, 794 N.Y.S.2d 700, 701 (2005), the Court of Appeals held that on the strength of this regulation, insurance carriers may look beyond the face of a health care provider's licensing documents to identify willful and material failure to abide by state and local law. Specifically, a unanimous Court of Appeals held that health care providers that fail to comply with New York licensing requirements are ineligible to collect No-Fault Benefits.

67.    Under New York law, a professional corporation or professional limited liability company can be owned only by individuals (i) who are licensed to practice a profession which the corporation or company is authorized to practice; and (ii) who are engaged in the practice of that profession in the corporation or company. See Bus. Corp. Law §§ 1503, 1507; Limited Liability Company Law §§ 1203, 1207.

68.    If a health services professional corporation or limited liability company operates in violation of either of these requirements, it is not entitled to reimbursement of No-Fault Benefits under the No-Fault Law. See State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y. 3d 313, 320, 794 N.Y.S.2d 700, 702 (2005). In this case, neither of these requirements is met. The Provider Defendants are really owned and/or controlled by Dada and the Nominal Owners are not engaged in the practices they purport to own.

69.    The State of New York regulates the practice of health care professions and restricts the ownership of such practices to appropriately licensed professionals in order to protect consumers and the public health. New York law bars persons such as Dada — who is not a health care professional — from controlling, exercising undue influence over or deriving economic benefit from, a health care practice. The threat to the public safety inherent in health care treatment being directed by someone who is not a

health care professional is obvious.

70.      Likewise, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it pays or receives kickbacks for patient referrals, which is prohibited by, among other provisions, 8 NYCRR § 29.1 and 8 NYCRR § 29.12.

71.      8 NYCRR § 29.1(b)(3) prohibits "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

72.      Under 8 NYCRR §29.1(b)(4), New York's prohibition on sharing professional fees also "include[s] any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a professional licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice . . ."

73.      To safeguard the public health, safety and welfare, New York State has made it a felony offense for anyone to circumvent these laws, as well as an act of professional misconduct for any licensed individual or professional corporation to do so. See New York Penal Law § 175.10; Education Law § 6509; 8 NYCRR §29.1.

74.      Furthermore, for a health care provider to be entitled to bill for services, it must be the actual provider of the services.

75.      The use of independent contractors or other non-employees by a health care provider renders the health care provider ineligible to receive reimbursement of assigned No-Fault Benefits.

76.      Because independent contractors are not employees, when No-Fault services are provided by an independent contractor, the professional health services

corporation or company that hired them is not considered to be the "licensed provider" authorized to bill under the No-Fault Laws.

77.    11 NYCRR § 65-3.11(a) states that an insurer may only pay benefits "directly to [the] providers of [the] health care services." A professional services corporation or limited liability company is not a "provider" within the meaning of 11 N.Y.C.R.R. § 65-3.11(a) if it or its employees did not render the services. A.B. Med. Servs., P.L.L.C. v. State FarmMut. Ins. Co., 9 Misc.3d 36, 801 N.Y.S.2d 690 (App. Term 2d Dep't 2005); A.B. Med. Servs., P.L.L.C. v. New York Cent. Mut. Fire Ins. Co., 8 Misc.3d 132(A), 801 N.Y.S.2d 776 (App. Term, 2d Dep't 2005).

78.    No-Fault claims are also paid pursuant to the fees authorized in the New York Workers Compensation Fee Schedule (the "Fee Schedule"). Insurance Law § 5108(a); 1 NYCRR 68.1(a). A health care provider is expressly forbidden from seeking any payment in excess of the charges authorized by the Fee Schedule. Matter of Medical Society of the State of New York v. Serio, 100 N.Y.2d 854, 768 N.Y.S.2d 423 (2003); Jamil Abraham, M.D., P.C. v. Countrywide Ins. Co., 3 Misc.3d 130(A), 787 N.Y.S.2d 678 (App. Term 2004).

79.    Further, the No-Fault Laws expressly limit reimbursable health care costs to those that are medically necessary. See Insurance Law § 5102(a)(1); 11 NYCRR 65-1.1.

## THE PROVIDER DEFENDANTS ARE PART OF ONE ILLEGAL ENTERPRISE CONTROLLED BY THE UNLICENSED DADA

80.    Although the Nominal Owners are listed as the Provider Defendants' owners in their respective certificates of incorporation and articles of organization, they do not exercise any control over the management or operations of the Provider

Defendants. Instead, the day-to-day operations of the Provider Defendants are firmly controlled by Dada.

81.     The Nominal Owners are nothing more than the straw owners of the Provider Defendants and are merely employees of Dada.

82.     Although the Provider Defendants at 1468 Flatbush Avenue were changed routinely, Dada remained a constant presence.

83.     Further illustrating that the Provider Defendants are part of a single enterprise, the supposedly separate and independent health care providers use the same telephone number of 718-421-1705; the same fax number of 718-421-1723; and substantially the same forms and reports.

**A.     Establishment of Defendants' Fraudulent Scheme at 1468 Flatbush Avenue: Vincent Medical PC and Arguelles PC**

84.     Dada and the location of 1468 Flatbush Avenue have a long connection to illegally formed health care clinics.

85.     To implement the scheme, Dada first approached Arguelles to enable him to illegally incorporate a facility by the name of Uptodate Medical PC at 1468 Flatbush Avenue.

86.     In exchange for a designated salary or other compensation, Arguelles agreed to falsely represent in Uptodate Medical PC's Certificate of Incorporation that she was the true owner of Uptodate Medical PC and that she controlled the corporation.

87.     In reality, true ownership and control of Uptodate Medical PC was vested in Dada at all times.

88.     For example, Aguelles invested no money in Uptodate Medical PC — the facility she supposedly owned — and incurred no costs in establishing the facility.

89.     All costs and investments in Uptodate Medical PC were provided by Dada.

90.     Dada then used Uptodate Medical PC to submit fraudulent No-Fault billing to Liberty and other insurers.

91.     Once the amount of fraudulent No-Fault billing reached the point where it began to draw notice from insurers, Dada simply ceased billing through Uptodate Medical PC and illegally incorporated another facility with a new name and a new taxpayer identification number, thereby attempting to avoid scrutiny from insurance companies.

92.     In 2004, Dada again used Arguelles to enable him to illegally incorporate a facility by the name of Vincent Medical PC at 1468 Flatbush Avenue.

93.     In exchange for a designated salary or other compensation, Arguelles agreed to falsely represent in Vincent Medical PC's Certificate of Incorporation that she was the true owner of Vincent Medical PC and that she controlled the corporation.

94.     In reality, true ownership and control of Vincent Medical PC was vested in Dada at all times.

95.     For example, Aguelles invested no money in Vincent Medical PC — which she supposedly owned — and incurred no costs in establishing the facility.

96.     All costs and investments in Vincent Medical PC were provided by Dada.

97.     Dada then used Vincent Medical PC to submit fraudulent No-Fault billing to Liberty and other insurers.

98.     Once the amount of fraudulent No-Fault billing reached the point where it began to draw notice from insurers, Dada simply ceased billing through Vincent Medical

PC and illegally incorporated still another facility with a new name and a new taxpayer identification number, thereby attempting to avoid scrutiny from insurance companies.

99.     Once again, Dada used Arguelles' name and license, with her knowledge, consent and cooperation, and this time set up Arguelles PC.

100.     Just as with Uptodate Medical PC and Vincent Medical PC, Arguelles served as the front while Dada was the true owner of Arguelles PC.

101.     Arguelles had no control over or ownership interest in Uptodate Medical PC, Vincent Medical PC or Arguelles PC.

102.     All ownership and control of Uptdodate Medical PC, Vincent Medical PC and Arguelles PC rested entirely with Dada.

103.     To conceal his ownership and control over the facilities, Dada had Uptodate Medical PC, Vincent Medical PC and Arguelles PC enter into various management, billing, marketing and lease agreements with him. These agreements required inflated and outrageous payments for these routine office services, thus allowing Dada to funnel the facilities' profits to himself and to exercise complete control over the facilities' operations.

104.     Aside from occasionally rendering some of the fraudulent services billed by the facilities, Arguelles had no role in the practices she supposedly owned. She was just an employee of Dada.

105.     For example, Arguelles took no part in the finances of Uptodate Medical PC, Vincent Medical PC or Arguelles PC; played no part in the hiring or supervision of their staff; and had no knowledge of the most basic aspects of their operations.

106.     Indeed, in one No-Fault collection action commenced by Uptodate Medical PC in the Civil Court, Queens County, the unlicensed Dada admitted in

discovery that he was "the sole owner of the Plaintiff" and "the primary physician who treated the Assignee in connection with his injuries." Uptodate Medical Services, P.C. v. State Farm Mut. Auto. Ins. Co., Index No. 156747/06 (Civ. Ct. Queens Co. 2006); see also Allstate Ins. Co. v. TMR Medibill Inc., 2000 WL 34011895 (E.D.N.Y. 2000) (finding that Arguelles had only a nominal interest in the professional corporations she allegedly owned and that those professional corporations were really owned and controlled by unlicensed persons); Uptodate Med. Servs., P.C. v. State Farm Mut. Auto. Ins. Co., 23 Misc.3d, 879 N.Y.S.2d 695 (App. Term 2009) (noting that Uptodate Medical PC was found to be a fraudulently incorporated medical facility in a prior arbitration and dismissing action on grounds of collateral estoppel).

107.    In 2009, Arguelles was investigated by the New York State Department of Health Board for Professional Medical Conduct (the "Board") for numerous instances of professional misconduct.

108.    With Arguelles now a liability and the volume of fraudulent billing by the facilities she supposedly "owned" attracting attention, Dada terminated her and illegally incorporated a new facility, with a new name, a new taxpayer identification number and a new physician to serve as the straw owner.[1]

109.    On April 13, 2011, the Board fined Arguelles $10,000.00, suspended her medical license, placed her on probation and restricted her practice (the "April 2011 Order").

110.    The Board determined that, among other things, Arguelles committed 54 specifications of misconduct, including negligence on multiple occasions, incompetence on multiple occasions, gross negligence, gross incompetence, unwarranted tests and

---

[1] However, Dada still retained control over Uptodate Medical PC, Vincent Medical PC and Arguelles PC, maintaining patient and billing files, receiving their mail and collecting payment on their outstanding No-Fault bills.

treatment, fraudulent practice, willfully making and filing false reports, failing to maintain patient records and moral unfitness.

111.    The Board noted that all of Arguelles' misconduct was committed while purporting to treat No-Fault patients at 1468 Flatbush Avenue.

112.    On September 29, 2011, Arguelles applied to the Board for a modification of the April 2011 Order, waiving any right to contest the April 2011 Order, agreeing to limit her practice to existing patients and agreeing to surrender her medical license the following month.  In exchange, Arguelles asked the Board to waive the $10,000.00 fine, the five-year probationary period and the probationary restrictions on her medical license. On October 5, 2011, the Board modified the April 2011 Order as Arguelles requested.

113.    On October 31, 2011, Arguelles surrendered her license to practice medicine.

**B.    Continuation of Defendants' Fraudulent Scheme at 1468 Flatbush Avenue: Illegal Incorporation of Compas Medical, JCC Medical, Alleviation Medical and JGG Medical**

*Compas Medical*

114.    After terminating Arguelles, Dada sought out a new physician to serve as the front for the fraudulent enterprise operating at 1468 Flatbush Avenue.

115.    In 2009, Dada recruited Compas to enable him to illegally incorporate a facility by the name of Compas Medical.

116.    In exchange for a designated salary or other compensation, Compas agreed to allow Dada to use Compas' name and medical license to set up Compas Medical.

117.    Just like Arguelles, Compas agreed to falsely represent in Compas Medical's Certificate of Incorporation that he was the true owner of Compas Medical and

that he controlled the corporation, when neither was true. At all times, actual ownership and control of Compas Medical rested with Dada.

118.    As with its predecessors Vincent Medical PC and Arguelles PC, Compas invested no money in Compas Medical and incurred no costs in establishing the facility.

119.    All costs and investments in Compas Medical were provided by Dada.

120.    Dada then used Compas Medical to submit fraudulent No-Fault billing to Liberty and other insurers.

121.    Once again, to conceal his ownership and control over Compas Medical, Dada had the facility enter into various management, billing, marketing and lease agreements with him. As with Vincent Medical PC and Aguelles PC, these agreements required inflated and outrageous payments for these routine office services, thus allowing Dada to siphon off Compas Medical's profits for himself and to exercise complete control over the facility's operations.

122.    Just as with his predecessor Arguelles, Compas was merely an employee of Dada. Compas' sole function as straw owner was to occasionally perform some of the fraudulent services billed to Liberty and other insurers.

123.    On information and belief, Compas had no control over the finances, books or records of Compas Medical.

124.    On information and belief, Compas never hired any of Compas Medical's employees, he simply inherited all existing employees at 1468 Flatbush Avenue.

125.    On information and belief, Compas never supervised any of Compas Medical's employees or independent contractors.

126.    On information and belief, Compas played no role in and had no knowledge of even the most basic aspects of Compas Medical's operations.

*Alleviation Medical*

127.    In keeping with the Defendants' scheme to evade detection by minimizing the billing submitted by any one Provider Defendant, Dada decided to wind down Compas Medical in 2011.

128.    In early 2011, Dada looked for another physician to serve as the front for a new medical facility.

129.    At that time, Dada recruited Gutierrez to enable him to illegally incorporate a new clinic by the name of Alleviation Medical.

130.    Just like Arguelles and Compas, Gutierrez agreed to falsely represent in Alleviation Medical's Certificate of Incorporation that he was the true owner of Alleviation Medical and that he controlled the corporation, when neither representation was true.  At all times, actual ownership and control of Alleviation Medical rested with Dada.

131.    In exchange for a designated salary or other compensation, Gutierrez agreed to allow Dada to use Gutierrez's name and medical license to set up Alleviation Medical.

132.    As with his predecessors, Gutierrez invested no money in Alleviation Medical and incurred no costs in establishing the facility.

133.    All costs and investments in Alleviation Medical were provided by Dada.

134.    Dada then used Alleviation Medical to submit fraudulent No-Fault billing to Liberty and other insurers.

135.    Once again, to conceal his ownership and control over Alleviation Medical, Dada had the facility enter into various management, billing, marketing and

lease agreements with him. As with Vincent Medical PC, Arguelles MD, PC and Compas Medical these agreements required inflated and outrageous payments for these routine office services, thus allowing Dada to siphon off Alleviation Medical's profits for himself and to exercise complete control over the facility's operations.

136. On information and belief, Gutierrez exercised no control over or ownership interest in Alleviation Medical.

137. On information and belief, Gutierrez had no control over the finances, books or records of Alleviation Medical.

138. On information and belief, Gutierrez inherited all existing employees at 1468 Flatbush Avenue.

139. On information and belief, Gutierrez never supervised any of Alleviation Medical's employees or independent contractors.

140. On information and belief, Gutierrez played no role in and had no knowledge of even the most basic aspects of Alleviation Medical's operations.

141. For example, on information and belief, at a June 14, 2011 examination under oath ("EUO") conducted by another carrier, Gutierrez testified that he could not explain how he obtained patient referrals at 1468 Flatbush Avenue.

142. He did not know the name of the receptionist at 1468 Flatbush Avenue even though the receptionist was the person responsible for informing him of his treatment schedule.

143. He could not identify the owner of 1468 Flatbush Avenue and indicated that Alleviation did not pay rent to anyone for use of the facility.

144. He could not identify any of the other health care providers operating in conjunction with Alleviation Medical at 1468 Flatbush Avenue, except for Compas.

145.     He did not know who leased the equipment to Alleviation Medical.

146.     Just as with Arguelles and Compas, Gutierrez was merely an employee of Dada and his sole function as straw owner was to occasionally perform some of the fraudulent services billed to Liberty and other insurers.

### JCC Medical

147.     To increase the Defendants' fraudulent billing while still minimizing the amount of bills submitted by any one Provider Defendant, Dada next illegally incorporated another medical clinic at 1468 Flatbush Avenue with a new name and new taxpayer identification number.

148.     Winding down Compas Medical, Dada again used Compas's name and medical license, with Compas' knowledge and consent, to establish JCC Medical in April 2011.

149.     To minimize the billing submitted by Alleviation Medical, JCC Medical would bill together with Alleviation Medical.

150.     Once again, in exchange for a designated salary or other compensation, Compas agreed to falsely represent in JCC Medical's Certificate of Incorporation that he was the true owner of JCC Medical and that he controlled the corporation.

151.     Just as with Compas Medical, though, actual ownership and control of JCC Medical rested with Dada at all times.

152.     Again, Compas invested no money in JCC Medical and incurred no costs in establishing the facility.

153.     All costs and investments in JCC Medical were provided by Dada.

154.    Dada then used JCC Medical to submit fraudulent No-Fault billing to Liberty and other insurers.

155.    Just as with the other professional corporations Dada illegally incorporated at 1468 Flatbush Avenue, Dada had JCC Medical enter into various management, billing, marketing and lease agreements with him at exorbitant rates.  These agreements allowed Dada to siphon off JCC Medical's profits for himself and to exercise complete control over the facility's operations.

156.    Compas exercised no control over or ownership interest in JCC Medical, just as he exercised no control over or ownership interest in Compas Medical.

157.    On information and belief, Compas had no control over the finances, books or records of JCC Medical.

158.    On information and belief, Compas never supervised any of JCC Medical's employees or independent contractors.

159.    On information and belief, Compas had no involvement in JCC Medical's billing.

160.    On information and belief, Compas played no role in and had no knowledge of even the most basic aspects of JCC Medical's operations.

161.    Once more, Compas was merely an employee of Dada and his sole function as straw owner was to occasionally perform some of the fraudulent services billed to Liberty and other insurers.


*JGG Medical*

162.    In late 2011, as the fraudulent billing submitted by Alleviation Medical increased to the point where Dada thought it might attract attention to their scheme, Dada

decided to wind down Alleviation Medical and replace it with a new professional corporation to bill along with JCC Medical.

163.    Dada again used Gutierrez' name and medical license, with Gutierrez' knowledge and consent, to establish JGG Medical in September 2011.

164.    Once again, in exchange for a designated salary or other compensation, Gutierrez agreed to falsely represent in JGG Medical's Certificate of Incorporation that he was the true owner of JGG Medical and that he controlled the corporation.

165.    However, just as with Alleviation Medical, actual ownership and control of JGG Medical rested with Dada at all times.

166.    Gutierrez invested no money in JGG Medical and incurred no costs in establishing the facility.

167.    All costs and investments in JGG Medical were provided by Dada.

168.    Dada then used JGG Medical to submit fraudulent No-Fault billing to Liberty and other insurers.

169.    Just as with the other professional corporations Dada illegally incorporated at 1468 Flatbush Avenue, Dada had JGG Medical enter into various management, billing, marketing and lease agreements with him at exorbitant rates. The inflated and outrageous payments for routine office services provided by these agreements allowed Dada to siphon off JGG Medical's profits for himself and to exercise complete control over the facility's operations.

170.    Once more, Gutierrez was merely an employee of Dada and his sole function as straw owner was to occasionally perform some of the fraudulent services billed to Liberty and other insurers.

*Individual Billing*

171.    As a further act of concealment, Dada at times dispensed with the corporate form altogether and had physicians Compas, Gutierrez and Parisien submit No-Fault bills under their own names, as opposed to through corporations.

172.    However, Dada still controlled all aspects of these "practices" and still siphoned all or most of the profits generated for services allegedly provided by Compas, Gutierrez and Parisien individually.

173.    Operating as a sole proprietorship, Parisien is the most recent medical provider operating as part of the enterprise at 1468 Flatbush Avenue.

174.    Just as with his predecessors, Parisien invested no money and incurred no cost in establishing a practice at the location.  All such costs and investments were provided by Dada.

175.    On information and belief, Dada had Parisien enter into various management, billing, marketing and lease agreements with him at exorbitant rates.  These agreements allowed Dada to siphon off the profits from Parisien's supposed practice.

176.    On information and belief, Parisien exercised no real control over the practice he supposedly owned at 1468 Flatbush Avenue and had no control over the finances, books or records relating to the practice.

176.    Parisien engaged in fee splitting with the unlicensed Dada; billed for services that were not medically necessary; billed for services performed pursuant to a pre-determined, fraudulent treatment protocol; billed for services rendered by independent contractors; billed inflated charges for services; and, in many cases, billed for services that were not provided at all.  As with the other Provider Defendants, Parisien's "practice" exists for the purpose of submitting fraudulent charges to insurers.

177.    Once more, Parisien was merely an employee of Dada and his sole function was to occasionally perform some of the fraudulent services billed to Liberty and other insurers.

## ILLEGAL KICKBACKS

178.    Dada also increased the amount of money generated by the illegal enterprise he runs at 1468 Flatbush Avenue by charging "kickbacks" to the health care providers at the location.

179.    For example, part of the illegal enterprise operating at 1468 Flatbush Avenue consists of several chiropractic, physical therapy and acupuncture providers: Defendants Flatbush Chirpractic, T&J Chiropractic, Island Life Chiropractic, Action Potential Chiropractic, Laga PT, Masigla PT and Deng Acupuncture.

179.    As a further act of concealment, Dada also at times had Laga and Masigla submit physical therapy billing in their own names as opposed to through corporations.

180.    As with the other Provider Defendants, these Defendants do not really advertise or market their services to the general public.

181.    Instead, they obtain access to a steady stream of patients by paying kickbacks to Dada for fraudulent patient "referrals."

182.    As part of the kickback component of his scheme, Dada directed Compas, Gutierrez, or, in some cases, just the front desk staff, to automatically refer patients to the chiropractic, acupuncture and physical therapy providers at 1468 Flatbush Avenue.

183.    The amount of the kickbacks that the chiropractic, acupuncture and physical therapy Provider Defendants pay to Dada is based on the volume of patients referred to them.

184.    To cover up this aspect of the scheme, the kickbacks are disguised as legitimate fees for "rent" for space, equipment or the use of personnel at 1468 Flatbush Avenue.    In actuality, the chiropractic, acupuncture and physical therapy Provider Defendants neither lease nor own any space at 1468 Flatbush Avenue.

185.    The kickback arrangement was highly lucrative.  For example, (i) Dada derived direct financial gain from the kickbacks; and (ii) the fraudulent treatment reports generated by the chiropractic, acupuncture and physical therapy providers were used to justify more useless and unnecessary treatment provided by the medical providers at 1468 Flatbush Avenue, further increasing profits for Dada.

## PROVIDER DEFENDANTS ENGAGED IN ILLEGAL FEE SPLITTING WITH UNLICENSED PERSONS

186.    Because the Provider Defendants are not legitimate health care providers, they do not advertise or market their services to the general public.  Upon information and belief, Dada secured virtually all of the patients seen by the Provider Defendants through a network of "runners," individuals who, for a fee, would steer accident victims to the Provider Defendants for unnecessary medical treatment.

187.    The runners were paid a fee by Dada for each accident victim they procured for the Provider Defendants.

188.    Further, as the actual owner and operator of the Provider Defendants, Dada was able to, and did, siphon from the Provider Defendants professional fees for health care services rendered or purportedly rendered by the Provider Defendants.

189.    As stated, to maintain the appearance that the Nominal Owners owned the Provider Defendants, Dada caused the Provider Defendants to hire management, billing and collection services (provided by Dada), which billed the Provider Defendants inflated

rates for routine services. In this manner, the actual profits did not go to the Nominal Owners but were channeled to Dada, who provided the management, billing and collection services.

190.    However, under New York State law, a licensed health care professional is prohibited from sharing professional fees with unlicensed persons. See e.g. 8 NYCRR § 29.1(b)(4).

191.    Separately, the illegal kickbacks that the Provider Defendants pay to Dada for patient referrals also violate New York's prohibition on fee splitting. 8 NYCRR 29.1(b)(4); see also Necula v. Glass, 231 A.D.2d 457, 647 N.Y.S.2d 501 (1st Dep't 1996).

192.    As the amount of the kickbacks is based on the volume of patients referred to the Provider Defendants for "treatment," the kickbacks also come squarely within New York's prohibition on illegal fee splitting.

193.    The Defendants are not eligible for No-Fault reimbursement because they have failed to comply with New York State licensing requirements which bar health care providers from sharing fees for professional services and from paying kickbacks for patient referrals.

## THE DEFENDANTS' FRAUDULENT TREATMENT AND BILLING PROTOCOL

194.    The Defendants' treatment protocol is exactly what is expected from health care directed by someone who is not a licensed health care professional and whose sole concern is maximizing his illegal profits.

195.    Regardless of age, condition, injuries or symptoms — or even in the complete absence of any injury or symptoms — almost every one of the patients

"treated" by the Defendants was subjected to the same medically useless course of treatment.

196.    The Defendants' "one size fits all" treatment protocol is clearly not designed to benefit the patient.  It is designed to maximize the Defendants' billing and the profits to Dada.


A.    **The Initial Examination and Consultation**

197.    The Defendants' fraudulent billing protocol begins with an initial examination or consultation, which is usually performed by Compas, Gutierrez, Super, Mollo, Deng or Parisien, either through the various Provider Defendants they supposedly "own" or individually.

198.    The initial consultation is usually billed under the same Current Procedural Terminology ("CPT") Codes [2]: (i) 99203, which usually results in charges ranging from $54.74 to $80.00; (ii) 99204, which usually results in charges ranging from $148.69 and $236.94; and (iii) 99244, which usually results in charges ranging from $182.18 and $236.94.

199.    These charges are fraudulent in the first instance because they are medically unnecessary and are performed, if they are performed at all, pursuant to a pre-determined treatment protocol.

200.    Further, the charges billed under CPT Code 99244 are also fraudulent because they materially misrepresent the services billed.

---

[2] CPT Codes, or Current Procedural Terminology Codes, are a set of uniform numbers assigned to every task and service a health care provider may provide to a patient.  The numbers are used by insurers to determine the amount of reimbursement for which a health care provider is entitled.  CPT Codes were developed and are maintained by the American Medical Association.

201.    For example, under the Fee Schedule applicable to No-Fault Benefits, CPT Code 99244 requires that the consultation is being performed at the request of another practitioner or appropriate source requesting advice regarding the evaluation and/or management of a specific problem.

202.    In reality, the initial examination or consultation is never performed at the request of another physician or other appropriate source.

203.    It is performed, when it is performed at all, solely pursuant to the Defendants' fraudulent treatment protocol in order to generate maximum billing for the Defendants, kickbacks to Dada and fees for runners.

204.    The Defendants' billing under CPT Code 99244 further misrepresented that the Defendants who provided consultations submitted written reports to the physicians who supposedly requested the consultations.

205.    CPT Code 99244 requires that after a consultation is performed, the practitioner must prepare a written report of his or her findings, which is to be provided to the referring practitioner.

206.    In reality, no written consultation report was ever submitted to any referring health care provider because the initial consultations were never conducted at the request of any referring health care provider.

207.    The Defendants' billing also exaggerates the level of services provided.

208.    For example, CPT Code 99244 typically requires that physicians spend 60 minutes face-to-face with the patient and/or the patient's family, while CPT Codes 99203 and 99204 typically require that physicians spend 30 minutes and 45 minutes, respectively, with the patient and/or the patient's family.

209.    However, the initial examinations and consultations almost never last anywhere near that length of time.

210.    No Defendant, or any other practitioner associated with the Defendants, ever spent 30 minutes or more on an initial examination or consultation.

211.    The Defendants' use of CPT Codes 99204 and 99244 also falsely represented that the Defendants performed medical decision making of moderate to high complexity.

212.    In actuality, the initial examinations and consultations involved no medical decision making whatsoever as each patient was treated pursuant to a pre-determined protocol consisting of medically unnecessary physical therapy, chiropractic, acupuncture and pain management treatment along with useless diagnostic tests.

213.    The "treatment" and "testing" prescribed for virtually all patients was essentially the same, regardless of whatever condition or symptoms patients had or even if patients had no problems at all relating to any automobile accident.

214.    The Defendants' representation that they performed complex medical decision making is fraudulent.


**B.      Defendants' Use of Boilerplate Reports**

215.    As part of the initial examinations and consultations, the Defendants prepare fraudulent, boilerplate reports that provide the same "treatment plan" to virtually every patient.

216.    For example, regardless of whatever symptoms are checked off on the "Initial Evaluation" reports submitted by Guttierez, Compas, Compas Medical, JGG

Medical and JCC Medical, the reports nonetheless reach the identical conclusion stated in the same boilerplate language:

> **I recommend for maximal benefit that the following treatment plan be implemented.   Such action will prevent the formation of fibro muscular tissue adhesions secondary to chronic inflammation.  It will increase range of motion, decrease pain and improve [patient's] quality of life.**

217.    From one patient to another, the same "plan" is then prescribed, with the same three boxes checked:

> **Because of the above findings the following are necessary for proper management of the patient: . . . ☑ Chiropractor     ☑ Acupuncture ☑ Pain Management**

218.    A representative sample of the Provider Defendants' initial evaluation and consultation forms is attached as **Exhibit "17"**.

219.    Moreover, although the Provider Defendants are supposedly separate and independent corporations, the fact that their reports have similar letterhead and contain many of the same grammatical errors and misspellings further underscores that they are really part of one enterprise.

220.    For example, the "Initial Evaluation" reports submitted by JCC Medical, Compas Medical, Gutierrez and Compas all contain the heading "PHYSIAL [sic] EXAMINATION" with the word "physical" misspelled as "physial." **Exhibit "17"**.

221.    Forms submitted by JCC Medical, Compas Medical, Gutierrez and Compas list under the heading "Plan" that: "The patient is advised to start on a course of Therapeutics [sic] Injection." **Exhibit "17"**.

222.    Forms submitted by Compas, JCC Medical and Compas Medical contain the phrase "Patient was treated wand [sic] released" under the heading "Accident History." **Exhibit "17"**.

223.    Forms submitted by JCC Medical, Compas Medical, Gutierrez and Compas contain the phrase "Difficulty of Breathing" instead of "difficulty breathing" under the heading "Present Complaints." **Exhibit "17".**

224.    Initial examination forms submitted by Deng Acupuncture contain the same misspelling of "PASSENGER-REER [sic] SEAT" as contained in forms submitted by Natural Group Therapy, P.C./Shanga Zhai, L.Ac., the predecessor acupuncture practice, with a different straw owner, at 1468 Flatbush Avenue. The format of the initial evaluation and physical examination forms used at 1468 Flatbush Avenue also remained identical from 2002-2010, despite the change in acupuncture providers from Natural Group Therapy, P.C. to Deng Acupuncture.[3] **Exhibit "18".**

225.    A comparison of Bioelectric Medicine/Synaptic treatment notes submitted by Masigla and Parisien reveal that both use substantially the same one-page typewritten form with handwritten findings inserted. **Exhibit "19".**

226.    The use of the same telephone number, the same fax number, the same address and substantially the same forms — including the same misspellings and grammatical errors — further illustrates that the supposedly separate and independent Provider Defendants are under common control.

## C.    Fraudulent Billing for Trigger Point Injections

227.    One component of the Defendants' billing scheme includes fraudulent billing for trigger point injections.

228.    In general terms, a "trigger point" is a small patch of tightly contracted muscle that can often be felt under the skin. Trigger points are commonly referred to as

---

[3] The only change to the forms came in 2012 when the lines "Additional Points" were added to the form.

"muscle knots." Painful on compression, trigger points can produce referred pain that is felt in another part of the body.

229. Trigger point injections involve the insertion of a needle into a patient's trigger point. The needle usually contains a local anesthetic. If use of a certain drug is contraindicated, "dry needling" involving no medication can be used.

230. Trigger point injections should not typically be utilized unless a patient does not first respond to conservative treatment methods. Trigger point injections may be indicated when noninvasive medical management, such as physical therapy, ultrasound and analgesics, are unsuccessful. Trigger point injections should not be administered until after gauging whether a conservative physical therapy program and oral analgesia are working. Typically, trigger point injections are not necessary unless consistently observed trigger points are not responding to specific, noninvasive, myofascial interventions within an approximately six-week timeframe.

231. However, because the Defendants "treated" patients pursuant to a fraudulent, pre-determined protocol designed solely to maximize billing, the Defendants routinely subjected patients to trigger point injections early on, typically within approximately four weeks of a patient commencing treatment and sometimes within just a few days of commencing treatment.

232. To the extent the services were provided at all, the Defendants' billing for trigger point injections was fraudulent in several respects.

233. For example, trigger point injections to one or two muscles are billed under CPT Code 20552. CPT Code 20552 allows a total maximum charge of $107.65 for trigger point injections to one or two muscles, whether to single or multiple trigger points.

234.    Trigger point injections to three or more muscles are billed under CPT Code 20553.  CPT Code 20553 pertains to the muscle group and not the individual muscles.  For example, a provider can inject 20, 30 or 40 muscle groups in one day and CPT Code 20553 can still only be billed once.  It cannot be billed multiple times.  However, the Defendants did so routinely.

235.    Prior to 2012, CPT Code 20553 was a "by report" code.  "By report" procedures are procedures that are too variable or unusual to have a Fee Schedule value assigned to them.

236.    To justify its charges for a "by report" procedure, a health care provider submits a report to the carrier concerning the nature of the "by report" procedure for which it is billing.  Under the Fee Schedule, a health care provider billing for a "by report" procedure is required to restrict its charges to an amount that is consistent with other fees allowed for similar procedures in the Fee Schedule.  However, the Defendants consistently disregarded this requirement, instead submitting grossly inflated and excessive charges often at the rate of up to 50 times what is allowable under CPT Code 20552 and 20553.

237.    For example, as of 2012, CPT Code 20553 now allows a total maximum billing amount of $119.10 for trigger point injections to three or more muscles regardless of the number of injections administered.

238.    In contrast to that amount, when the Defendants submitted bills under CPT Code 20553, they charged Liberty thousands of dollars at a time.

239.    For instance, under Claim No. LA275-020323795-003, the Defendants billed Liberty under CPT Code 20553 (i) $5,600.00 for trigger point injections

purportedly provided to the insured on 10/6/11; and (ii) $6,000.00 for trigger point injections purportedly provided to the insured on 10/10/11.

240.    Under Claim No. LA203-019525178-0004, the Defendants billed Liberty under CPT Code 20553 (i) $5,600.00 for trigger point injections purportedly provided to the insured on 7/28/11; (ii) $3,000.00 for trigger point injections purportedly provided to the insured on 8/10/11; and (iii) $4,400.00 for trigger point injections purportedly provided to the insured on 10/14/11.

241.    Under Claim No. 019902782-0008, the Defendants billed Liberty under CPT Code 20553 (i) $3,600.00 for trigger point injections purportedly provided to the insured on 10/5/11; and (ii) $3,600.00 for trigger point injections purportedly provided to the insured on 12/8/11.

242.    The Defendants' multiple billing under CPT Code 20553 for trigger point injections administered to the same patient on the same day is patently fraudulent.

243.    The Defendants' billing for trigger point injections was fraudulent in other respects as well.

244.    For example, patients that did not present with any symptoms of trigger points were administered trigger point injections nonetheless.

245.    Trigger point injections were often administered when a patient had no trigger points present and there were no specific findings that would suggest that actual trigger points were present.

246.    Examinations performed prior to administering trigger point injections were brief and limited.  There was no assessment of strength, sensation or reflexes.

247.    In some cases, Liberty-insured patients testified that they never received trigger point injections at all, although the Defendants submitted bills for thousands of dollars to Liberty in those instances.

248.    The Defendants' billing for trigger point injections also misrepresents the identity of the person performing the services.

249.    For example, although the trigger point injections are typically billed under either Gutierrez' or Compas' name, the services were actually provided, when they were provided at all, by unsupervised independent contractors.

250.    Several Liberty-insured patients testified at EUOs that the trigger point injections they received were administered by individuals other than Guttierez or Compas, despite the services being billed in their names.

251.    Quite apart from being medically useless, the Defendants' trigger point injections were also potentially harmful to the patients that actually received them.

252.    The warning label for Depo-Medrol states: *"The initial dosage of parenterally administered DEPO-MEDROL will vary from 4 to 120 mg depending on the specific disease entity being treated.[4] However, in certain overwhelming, acute, life-threatening situations, administrations in dosages exceeding the usual dosages may be justified and may be in multiples of the oral doses."*

253.    Adverse reactions from Depo-Medrol can be serious and include cardiac arrest; cardiac arrhythmia; circulatory collapse; congestive heart failure; pulmonary edema; thromboembolism; pancreatitis; convulsions; and visual impairment, including permanent blindness, among other severe and life-threatening reactions.

---

[4] "Parenteral" refers to medication taken into the body or administered in a manner other than through the digestive tract, as by intravenous or intramuscular injection.

254.    However, none of the Liberty-insured patients who received trigger point injections from the Defendants had any acute life-threatening condition. They were allegedly involved in minor automobile collisions. Their injuries, to the degree they were even injured, were restricted to soft-tissue injuries.

255.    Still, as expected with medical treatment directed by someone who is not a medical doctor, the Defendants administered enormous quantities of Depo-Medrol to these patients without regard to their condition.

256.    For example, in Claim No. 18237232-03, the patient was administered 800 mg of Depo-Medrol on 3/29/11; another 800 mg of Depo-Medrol on 4/5/11 (just seven days later); another 800 mg of Depo-Medrol on 4/12/11 (just seven days since the last round); and still another 400 mg of Depo-Medrol on 5/10/11.

257.    In Claim No. 19097080-02, the patient was administered 800 mg of Depo-Medrol on 6/2/11 and another 360 mg of Depo-Medrol on 7/18/11.

258.    In Claim No. 19525178-04, the patient was administered 360 mg of Depo-Medrol on 7/28/11; another 480 mg of Depo-Medrol on 8/10/11; another 360 mg of Depo-Medrol on 9/22/11; and another 360 mg of Depo-Medrol on 10/14/11.

259.    These dosages were not merely high. They were potentially dangerous.

260.    However, none of this mattered to the Defendants because their sole concern was maximum financial profit, not the proper care and treatment of patients.

## D.    Fraudulent TENS Billing

261.    Another part of the Defendants' fraudulent billing scheme includes submitting charges for unnecessary transcutaneous electrical nerve stimulation ("TENS").

262.    In general terms, TENS is a form of therapy that uses low-voltage electrical current for pain relief. In TENS therapy, a pad or electrode is placed on the area of injury or at key points along the nerve pathways. A small, battery-powered generator then emits electrical stimulation via wires connected to the electrodes.

263.    The TENS sessions billed by the Defendants were usually performed, when they were performed at all, by Laga, Masigla, Gutierrz, Compas or Parisien, either under their own names and taxpayer identification numbers or through the professional corporations they supposedly owned.

264.    These TENS sessions were billed under CPT Code 64550 which resulted in charges of $73.30 per session.

265.    However, CPT Code 64550 may be billed only once per claim or per patient. CPT Code 64550 pertains to the application of a surface transcutaneous stimulator. CPT Code 64550 is used only for the initial application of a TENS unit. After the first visit, the patient then uses the TENS unit at home.

266.    For example, the CPT assistant manual, which is incorporated into the Fee Schedule, states that CPT Code 64550 "is intended to report the initial application of a [TENS] unit in which electrodes are placed on the skin by the physician and the patient then takes the unit home."

267.    Likewise, the Centers for Medicare and Medicaid Services ("CMS") exclude from coverage TENS treatment provided by a health care provider in his or her office as patients are expected to employ the device at home after the provider instructs them on its use. The CMS holds that "it is inappropriate for a patient to visit his/her physician, physical therapist, or an outpatient clinic on a continuing basis for treatment of pain with electrical nerve stimulation."

268.     The proper CPT code to be used when the health care provider does perform the application of electrical stimulation to one or more areas of the patient is CPT Code 97014.

269.     However, CPT Code 97014 is only reimbursable at the total rate of $22.47 per session.

270.     Thus, in a deliberate attempt to inflate the charges they submitted to Liberty, the Defendants fraudulently billed the electrical stimulation they claimed to provide as TENS sessions, which resulted in charges more than triple the amount of what was actually allowed.

271.     Moreover, although the $73.30 payable under CPT Code 64550 is a one-time charge, the Defendants submitted bill after bill under CPT Code 64550.

272.     As an example, in Claim No. 19630363, the Defendants, through Laga, submitted charges under CPT Code 64550 for dates of service ranging from 7/26/11 to 9/8/11, resulting in total charges of $2,565.50 — 35 times what is actually allowable.

273.     The Defendants repeated this pattern in one claim after another, billing Liberty for grossly inflated and impermissible charges for TENS sessions.


E.     **Fraudulent Billing for Range of Motion & Muscle Testing**

274.     The Defendants' fraudulent billing scheme also includes billing for computerized range of motion and muscle testing.

275.     The Defendants' billed Liberty for useless and unnecessary computerized range of motion and muscle testing under CPT Code 95831, which typically resulted in charges of $43.60; CPT Code 95851, which typically resulted in charges of $45.71; and CPT Code 95833, which typically resulted in charges of $114.32 for each date of service.

275.    Under the Fee Schedule, manual range of motion and muscle testing are reimbursed as an element of the initial and/or follow-up examinations, as a component of the evaluation of a patient's injury, treatment and progress.

276.    A health care provider may not conduct and bill for an initial and/or follow-up examination which necessarily includes manual range of motion and muscle testing and then bill again separately for range of motion and muscle testing performed at or around the same time.  Billing for the same services on different dates does not justify their medical necessity as separate and distinct services.

277.    However, to maximize their billing, the Defendants did just that.

278.    Despite the fact that the Defendants had already been reimbursed by Liberty for manual range of motion and muscle testing that was necessarily a component of the initial and/or follow-up examinations, the Defendants would routinely schedule Liberty insureds for separate computerized range of motion and muscle testing.

279.    The computerized range of motion and muscle testing purportedly performed by the Defendants was virtually identical to the manual tests performed during the initial and follow-up examinations, the only difference being that the computerized test produced a digital printout while the manual test required the provider to document the result.

280.    Moreover, the tests are useless.  Regardless of the results obtained by the computerized range of motion and muscle testing, the treatment of the patients does not change because the Provider Defendants treat patients according to a pre-determined, fraudulent protocol.

F.    **Fraudulent Billing for Functional Capacity Evaluations**

281.    The Defendants' billing scheme also includes submitting fraudulent bills for Functional Capacity Evaluations ("FCEs").

282.    In general terms, an FCE evaluates an individual's capacity to perform work activities related to his or her specific employment. The FCE process compares the individual's health status and physical condition to the demands of his or her job and work environment. The primary purpose of an FCE is to evaluate a person's ability to participate in work but can also be useful for determining an individual's disability status.

283.    Pursuant to the Fee Schedule, an FCE may only be used to determine an individual's ability to undertake or to return to work.

284.    Specifically, Ground Rule 14 of the Fee Schedule states that:

*Indications*
The FCE is used for the following purposes:

> i. To determine the level of safe maximal function at the time of maximal medical improvement.
>
> ii. To provide a prevocational baseline of functional capabilities to assist in the vocational rehabilitation process.
>
> iii. To objectively set restrictions and guidelines for return to work.
>
> iv. To determine whether specific job tasks can be safely performed by modification of technique, equipment, or by further training.
>
> v. To determine whether additional treatment or referral to a work hardening program is indicated.
>
> vi. To assess outcome at the conclusion of a work hardening program.

285.    Ground Rule 14 of the Fee schedule mandates, in relevant part, that the FCE may only be performed where (i) a patient is preparing to return to a previous job;

(ii) a patient has been offered a new job (which has been verified); or (iii) a patient is working with a rehabilitation provider and a vocational objective is established.

286.    Ground Rule 14 of the Fee Schedule also mandates, in relevant part, that the FCE may only be performed by (i) a licensed physical therapist; (ii) a licensed occupational therapist; or (iii) other licensed provider qualified by scope of practice and that constant supervision by the licensed provider is required.

287.    The FCEs performed by the Defendants met none of the criteria set out by the Fee Schedule because the tests were only done to financially benefit the Defendants.

288.    First, the FCEs were medically unnecessary and were duplicative of the manual range of motion and muscle testing that was purportedly administered at every initial and follow-up examination or consultation performed by the Defendants.

289.    Much like the difference between the manual range of motion and muscle testing and the computerized range of motion and muscle testing, the only material difference between the manual range of motion and muscle testing and the FCEs performed by the Defendants is that the FCE generated a digital printout.

290.    Further demonstrating the uselessness of the FCE is that fact that the results the test generated were almost never incorporated into a patient's "treatment" plan.

291.    Second, the FCEs purportedly rendered by the Defendants were administered, when they were administered at all, without regard to patients' employment or occupational status.

292.    For example, in almost all cases where the Defendants billed Liberty for an FCE, the patient was not employed at the time of the underlying automobile collision and therefore (i) had no job to return to; (ii) lost no time from work as a result of the

collision; (iii) had no new offer of employment; and (iv) had no vocational objective requiring the measurement of his or her functional capacity.

293.    To hide this fact, the Defendants would just omit information concerning the patient's employment status on the FCE reports they would submit to Liberty.

294.    Third, the Fee Schedule authorizes one FCE, which is to be administered at the point of "maximal medical improvement."

295.    Because the point of "maximal medical improvement" is unlikely to be reached shortly after an accident, Ground Rule 14 further provides that an FCE "should not be prescribed prior to three months post-injury unless there is a documented change in the patient's status which justifies earlier utilization."

296.    Nonetheless, the Defendants have billed Liberty for multiple FCEs performed on the same patient, including billing for tests performed less than three months post-injury.

297.    Fourth, on information and belief, the FCEs the Defendants purportedly provided were not performed by a licensed physical therapist, a licensed occupational therapist or any other qualified health care provider, as required by the Fee Schedule.

298.    The FCEs performed by the Defendants were not performed by any kind of licensed health care provider at all but rather by unlicensed technicians who were not supervised by the Defendants or any other licensed health care provider associated with the Defendants.  The Defendants' representation to the contrary is false.

299.    In an effort to circumvent the restrictions and requirements concerning FCEs — and knowing that their fraudulent FCE charges were not reimbursable — the Defendants attempted to disguise their FCE billing.

300.    Instead of billing for FCEs under the correct CPT Code of 97800, the Defendants typically submitted charges for their FCEs under CPT Code 97750, which is reserved for "physical performance" tests, not FCEs.

301.    The Defendants used CPT Code 97750 because "physical performance" tests are not subject to the restrictions to which FCEs are subject.

302.    However, the Defendants use of CPT Code 97750 fraudulently misrepresented the services the Defendants were billing.

303.    The services the Defendants billed under CPT Code 97750 were really FCEs which purported to evaluate patients' functional capacity relative to work and occupation standards.

304.    The Defendants' use of CPT Code 97750 was also fraudulent because it grossly inflated and exaggerated the level of service provided.   CPT Code 97750 represents that the FCE test took between 45 minutes to one and a half hours to perform. On information and belief, the FCEs never took more than 15 minutes to perform.

305.    Further, no written reports interpreting the FCEs were ever prepared.  The "Physical Capacity Test" reports merely consisted of test scores with the same boilerplate explanations about the nature of the test that was duplicated from one patient to the next with no variation.

G.    **Fraudulent Billing for Electrodiagnostic Testing**

306.    The Defendants' fraudulent, pre-determined "treatment" protocol also included subjecting most patients to medically useless and unnecessary electromyography ("EMG") tests, nerve conduction velocity and ("NCV") tests.

307.  EMG refers to the recording and study of electrical activity of muscle using a needle electrode inserted into various muscles in the spinal area and in the arms and/or legs.  EMG measures the electrical activity of muscles at rest and during contraction.  Legitimate EMG testing is performed to diagnose and/or monitor abnormalities of muscles, peripheral nerves and nerve roots.

308.  NCV measures the speed at which electrical signals move through a nerve, typically by using surface patch electrodes placed on a patient's skin over the nerves at various locations.  Legitimate NCV testing is performed to assess the integrity and diagnose diseases of the peripheral nervous system.[5]

309.  As with the other purported tests and treatments to which the Defendants subjected patients, the electrodiagnostic tests were medically unnecessary and useless.

310.  The Defendants' electrodiagnostic testing was typically purportedly performed to determine whether Liberty-insured patients had radiculopathies. Radiculopathies are pinched nerves which occur when there is compression on a nerve.[6]

311.  However, Liberty-insured patients subjected to electrodiagnostic testing rarely, if ever, presented with any radicular component to their alleged complaints or presented any other neurologic abnormality that would necessitate electrodiagnostic testing.[7]

---

[5] NCVs are sometimes referred to as Nerve Conduction Studies ("NCS").

[6] Radiculopathies can cause symptoms such as pain, numbness or difficulty controlling specific muscles.

[7] Radiculopathies are rare in the general population and barely any higher in people involved in motor vehicle accidents.  In a peer-reviewed study of almost 25,000 patients conducted in 2009, researchers Randall L. Braddom, M.D., Lawrence Sptiz, M.D. and Michael H. Rivner, M.D. found that just 6% of the general population had a radiculopathy in the neck and only 12% in the back.  Despite the fact that the motor vehicle accident population studied consisted of a group of severely injured patients, the population involved in motor vehicle accidents had only a small, 2% increase in the neck and no difference at all in the back.  The results demonstrate that the frequency of cervical and lumbar radiculopathies is low after a motor vehicle accident.  The Defendants' routine testing for and/or diagnoses of radiculopathies in patients involved in minor automobile accidents further illustrates the fraudulent nature of the Defendants' pre-determined treatment protocol.

312.    Underscoring the fact that the Defendants' electrodiagnostic testing was fraudulent and useless, the Defendants often failed to perform EMG tests along with the NCV tests they administered.

313.    However, NCV and EMG tests should never be dissociated from each other when they are legitimately indicated.    See e.g. Guide to Performing Nerve Conduction Studies, Weiss, Silver and Weiss, 2004, Butterworth-Heineman at 87; American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM"), Physician Statement, Muscle and Nerve, Vol. 33 at 436-439, March 2006.[8]

314.    In a position statement published by the AANEM, entitled Recommended Policy for Electrodiagnostic Medicine (the "Recommended Policy"), the AANEM also notes that both NCV tests and EMG tests are normally required to diagnose nerve system disorders and that NCV "should not be performed without needle EMG except in unique circumstances."    The    AANEM    Recommended    Policy    specifically    notes    that "[r]adiculapathies cannot be diagnosed by NCS alone; needle EMG must be performed to confirm a radiculopathy". [9] A copy of the Recommended Policy is attached as **Exhibit "20"**.

315.    The Defendants' bills for electrodiagnostic testing also inflated the level of services billed.

316.    For example, the AANEM Recommended Policy notes that in 90% of all patients, the maximum number of NCV tests necessary to diagnose a radiculopathy is (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-

---

[8] The AANEM was founded in 1953 and currently numbers over 5,000 physicians, primarily neurologists and physiatrists.

[9] The AANEM's Recommended Policy is also endorsed by the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitiation.

reflex studies.[10]  The maximum number of EMG tests to diagnose a radiculopathy in 90% of all patients is EMG tests of two limbs.

317.    However, the Defendants routinely billed for NCV testing far in excess of the AANEM's Recommended Policy.  To hide this fact, the Defendants would split their charges for these excessive NCV tests onto two bills to minimize the number of NCV charges on any one bill they submitted for a patient.

318.    The AANEM guidelines regarding electrodiagnostic medicine also hold that electrodiagnostic testing must be individually tailored to address the unique circumstances of each patient.  However, the Defendants' pre-determined package of testing is not tailored to the unique circumstances of any insured.

319.    For example, the Defendants performed NCV testing of the same peripheral nerves and nerve fibers for almost every Liberty-insured patient subjected to the tests.

320.    Without regard to individual circumstance and presentment, the Defendants merely tested combinations of the same peripheral nerves and nerve fibers, specifically: (i) left and right peroneal motor nerves; (ii) left and right tibial motor nerves; (iii) left and right sural motor nerves; (iv) left and right median motor nerves; (v) left and right medial motor nerves; and (vi) left and right ulnar sensory motor nerves.

321.    The Defendants took the same approach with respect to EMG testing.

322.    The sole purpose of the electrodiagnostic testing purportedly rendered by the Defendants was to maximize the Defendants' fraudulent billing.[11]

---

[10] In general terms, F-waves and H-reflex studies are performed to evaluate nerve conduction in portions of the nerve more proximal (near the spine) and therefore inaccessible to direct assessment using conventional techniques. Electrical stimulation is applied on the skin surface near a nerve site in a manner that sends impulses both proximally and distally.

[11] At times, the Defendants purported to render SEP testing in combination with NCV or EMG testing. However, the Recommended Policy does not recommend SEP as a method of diagnosing radiculopathies.

**H.      Fraudulent Billing for Videonystagmography Testing**

323.    Another component of the Defendants' billing scheme is fraudulent billing for videonystagmography testing ("VNG").

324.    VNG is a series of tests used to determine the cause of a patient's dizziness or balance disorders.  VNG is a diagnostic test; it is not a treatment for dizziness or balance disorders.

325.    There are four main parts to the test.  The saccade test evaluates rapid eye movements.  The tracking test evaluates movement of the eyes as they follow a visual target.  The positional test measures dizziness associated with positions of the head.  The caloric test measures responses to warm and cold water circulated through a small, soft tube in the ear canal.  Eye movements are recorded and displayed on a computer screen.

326.    The Defendants typically bill for VNG testing allegedly performed by Guttierez through Alleviation.

327.    The Defendants usually bill the procedure under CPT Code 92540, which results in charges of $107.14; CPT Code 92543, which results in charges of $377.20; CPT Code 92546, which results in charges of $70.05; and CPT Code 92548, which results in charges of $80.00, for a total charge of $634.39 per VNG test.

328.    However, VNG testing is reserved for cases where the cause of patient's dizziness or vertigo is unknown.  In all cases where the Defendants billed Liberty for VNG testing the cause of the patient's purported dizziness or vertigo was already known: the patient's dizziness or vertigo was allegedly caused by an automobile collision.

---

In any event, SEP testing to diagnose radiculopathies would be duplicative as NCV/EMG testing would be sufficient to diagnose radiculopathies.

329.    Thus, the VNG testing performed by the Defendants, to the extent it was performed at all, was medically unnecessary.

330.    Further, VNG testing requires proper preparation of the patient undergoing the test.  Among other things, a patient must refrain from taking medication 72 hours before the test (except essential medication such as heart/diabetic/thyroid/seizure medication); fast for three to six hours before the test; and abstain from consuming alcohol or stimulants like caffeine for 48 hours before the test.

331.    As expected with useless testing performed pursuant to a fraudulent, pre-determined protocol, neither Gutierrez nor any other health care provider associated with the Defendants bothered to properly prepare patients or performed any pre-test screening. Accordingly, whatever data was obtained from the VNG testing was unreliable and medically useless.

332.    Moreover, the results of the VNG tests never changed the treatment a patient received because the purpose of the test was to financially benefit the Defendants not to provide any kind of health benefit for the patient.


I.    **Fraudulent Billing for Brainstem Auditory Evoked Potential Testing**

333.    The Defendants' billing scheme also includes submission of fraudulent bills for brainstem auditory evoked potential ("BAEP") tests.

334.    A BAEP test measures how the brain processes the sounds a person hears. The BAEP test records brainwaves in response to clicks or other audio tones.  The BAEP test is performed by placing electrodes on the patient's scalp and earlobes.  Clicking noises or other tones are then delivered to the patient's ears through earphones while the electrodes record the brain's activity.

335.    A BAEP test can diagnose hearing ability and can indicate the presence of brain stem tumors and multiple sclerosis, among certain other things.  However, the test has no valid function regarding the soft-tissue injuries the Defendants' patients allegedly suffered in car accidents.

336.    Further highlighting the uselessness of the BAEP tests, none of the results were ever incorporated into a patient's treatment plan or changed a patient's course of treatment in any way.

337.    The Defendants' billed for BAEP tests allegedly performed by Compas and Guttierez either under their own names and taxpayer identification numbers or through Alleviation Medical, Compas Medical and JCC Medical.  The BAEP tests were billed under CPT Code 92585 resulting in charges of $245.81 per test.

338.    On information and belief, at an EUO held by another carrier, Compas admitted that (i) he never interpreted any of the BAEP tests he ordered; (ii) none of the hundreds of BAEP tests he ordered ever came back positive; and (iii) he could not determine from looking at a BAEP report whether it was administered correctly or even what it meant.

339.    The BAEP tests were performed, when they were performed at all, solely pursuant to the Defendants' fraudulent, pre-determined treatment protocol for the Defendants' financial benefit.

**J.    Fraudulent Billing for Outcome Assessment Tests**

340.    Outcome Assessment Tests are another component of the Defendants' fraudulent billing scheme.

341.    Gutierrez and Parisien usually perform the Outcome Assessment Tests, either under their own names and taxpayer identification numbers or through Alleviation Medical.

342.    The Outcome Assessment Test is administered at or around the time of a patient's initial or follow-up examination or consultation.

343.    The Defendants routinely bill for Outcome Assessment Tests under CPT Code 99358 resulting in charges of $204.41 for each session.

344.    The Outcome Assessment Tests are nothing more than pre-printed questionnaires on which patients check off alleged symptoms and the degree to which those symptoms are purportedly affecting them.

345.    However, the information obtained by the Outcome Assessment Tests is the same information obtained during a patient's initial or follow-up examinations.

346.    The Outcome Assessment Test is an intentional and unnecessary duplication of the patient's history and examinations supposedly conducted during the patient's initial or follow-up examination or consultation.

347.    Pursuant to the Fee Schedule, a health care provider cannot bill for an initial or follow-up examination and then bill again for the same procedure re-labeled as an "Outcome Assessment Test."

348.    The Defendants' use of CPT Code 99358 for the Outcome Assessment Tests was also fraudulent as it misrepresented and exaggerated the level of service provided.

349.    For example, the use of CPT Code 99358 represents that the physician spent at least one hour performing some prolonged evaluation and management service,

such as a review of extensive records and tests or communicating with other professionals, the patient or the patient's family.

350.    In actuality, quite apart from spending an hour administering or reviewing the Outcome Assessment Tests, neither Gutierrez, Parisien nor any other health care provider associated with the Provider Defendants ever spent any time at all administering or reviewing the tests.

351.    On information and belief, Gutierrez testified at an EUO held on February 7, 2012 by another carrier that the Outcome Assessment Test "is just a questionnaire.  It is a piece of paper that is handed to the patient.  The patient fills it out."

352.    The billing submitted for the Outcome Assessment Tests was also fraudulent as it misrepresented who actually administered the tests.

353.    Gutierrez further testified that he did not perform the Outcome Assessment Tests billed in his name.

354.    The tests were performed by a technician named "Arthur" whose last name Gutierrez did not know (although Gutierrez claimed to have hired him).

355.    Gutierrez admitted that Alleviation Medical would not be able to bill for the Outcome Assessment Tests "conducted" by Arthur so the tests were billed under Gutierrez' name.


**K.    Fraudulent Billing for Acupuncture Services**

356.    Part of the Defendants' fraudulent treatment and billing protocol also consisted of subjecting patients to useless and unnecessary acupuncture treatment.

357.    In general terms, acupuncture is a complementary health care practice involving the insertion of dry needles into the skin at specific locations called acupuncture points.

358.    The basic idea behind acupuncture is that energy flows within the human body and can be stimulated to create balance and health.  The energy flow (called "qi") moves throughout the body along twelve main channels known as "meridians."  These meridians represent the major organs and functions of the body (although they do not follow the exact pathways of nerves or blood flow).

360.    The goal of acupuncture is to correct imbalances of flow and restore health through stimulation, generally by inserting needles through the skin at points along the meridians of the body.

361.    Current acupuncture information lists up to 400 different acupuncture points for various health problems.

362.    Examination of the tongue and the pulse are the principal diagnostic methods in acupuncture.

363.    The Defendants submitted bills to Liberty for acupuncture treatments that were purportedly provided by Deng through Deng Acupuncture.

364.    However, the acupuncture "treatment" billed by the Defendants was not medically necessary.

365.    To drive up their profits, the Defendants took a "one size fits all" approach to acupuncture treatment that had no benefit for the patients they were "treating."

366.    For example, the Defendants failed to examine patients' tongues and pulses and when they did, the results had no effect on the treatment provided.

367.    The acupuncture billing submitted also inflated and exaggerated the level of services provided.

368.    The Defendants typically billed Liberty for acupuncture treatment allegedly performed on a single insured on a single date of service under two CPT Codes: (i) CPT Code 97810, resulting in charges of $65.10 and (ii) CPT Code 97811, resulting in charges of $45.50 for a total charge of $110.60 per session.

369.    However, use of CPT Code 97810 represents that the acupuncturist spent "15 minutes of personal one-on-one contact with the patient" while use of CPT Code 97811 further represents that the acupuncturist spent an "additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needles."

370.    In reality, neither Deng nor any other acupuncturist associated with the Defendants ever spent more than a couple of minutes with a patient, let alone half an hour of personal one-on-one contact.

371.    The Defendants' acupuncture protocol involved Deng or another acupuncturist inserting needles into a patient — which merely took a couple of minutes to do — leaving the room and returning when it was time to remove the needles.

372.    Neither Deng nor anyone else ever spent 15 minutes with the patient, actively engaged in stimulating and repositioning needles, then another 15 minutes with the patient, including reinserting new needles.

373.    Further, because no acupuncturist associated with the Defendants ever spent an *initial* 15 minutes one-on-one with a patient, the Defendants were not entitled to bill under CPT Code 97811 for the supposed *additional* 15 minutes spent one-on-one with the patient.

374.    The Defendants were well aware that their acupuncture billing was fraudulent and took several steps to hide this fact by omitting any reference to the amount of time the acupuncturist spent one-on-one with the patient, how many needles the acupuncturist used and whether needles were re-positioned and new needles reinserted.

## L.    Fraudulent Billing for Chiropractic and Physical Therapy

375.    Another component of the Defendants' enterprise consists of extensive billing for medically unnecessary and useless chiropractic and physical therapy treatments.

376.    The Defendants submitted bills to Liberty for chiropractic and physical therapy purportedly performed by Super, Flatbush Chiropractic, T&J Chiropractic, Mollo, Island Life Chiropractic, Action Potential Chiropractic, Laga, Adelaida PT, Masigla, Masigla PT and Parisien.

377.    In the majority of claims, the Defendants subjected each Liberty-insured patient to extensive chiropractic and physical therapy purportedly rendered over the course of months.

378.    However, virtually none of the Liberty-insured patients "treated" by the Defendants suffered any serious injury — or any injury at all — from involvement in minor automobile collisions.

379.    Indeed, most of these patients never went to a hospital after their alleged automobile accidents.  Those that did go to a hospital or visited a legitimate medical doctor were observed on an outpatient basis and discharged in a matter of hours.

380.    Nothing justified the Defendants' provision of extensive and extended chiropractic and physical therapy treatments to these patients.

381.     Compas Medical, Laga and Masigla also routinely billed for three modalities of physical therapy for the same date of service, in addition to billing separately for synaptic treatment.   The billed modalities were for CPT Code 97110 (therapeutic exercise); CPT Code 97124 (therapeutic massage); and CPT Code 97010 (cold packs).   However, the physical therapist SOAP notes show that only one or two modalities were actually provided on any corresponding date of service, not three.[12]

382.     The Defendants' billing for chiropractic and physical therapy treatments was merely part of their pre-determined, fraudulent treatment protocol designed solely to financially enrich the Defendants.

## BILLING FOR SERVICES RENDERED BY INDEPENDENT CONTRACTORS

383.     Another component of the Defendants' fraudulent billing enterprise consists of submitting bills to Liberty for services that were performed by independent contractors.

384.     However, the use of independent contractors or other non-employees by a health care provider renders the health care provider ineligible to receive reimbursement of assigned No-Fault Benefits.

385.     In this case, at all relevant times, the Defendant professional corporations and limited liability companies actually had no professional employees other than their supposed owners or, in the case of sole proprietorships, themselves.

386.     For example, on information and belief, at an EUO held by another carrier on June 14, 2011, Gutierrez testified that the only professional employee he ever had was a physician assistant he claimed to have hired to perform trigger point injections.

---

[12] "SOAP note" is an acronym for "subjective, objective, assessment and plan."  The SOAP note is designed to facilitate communication among the various providers caring for a patient and to display patient assessment, problems and plans in an organized and standardized format.

387.    Although he claimed to have hired the physician assistant, he did not know her last name and could identify her only as "Natasha."  He could not recall whether he found Natasha through an ad on Craigslist or from another physician assistant.

388.    Gutierrez testified that Natasha was employed for "one week, maybe three days, that's it" and was terminated because of her performance.  Gutierrez also admitted that he was not always there to supervise Natasha when she was injecting patients.

389.    At an EUO conducted by Liberty of one of its insureds under Claim No. 01999901782, the patient testified that an individual other than Gutierrez administered the trigger point injections to her, yet it was Gutierrez' name that appeared on the bill submitted to Liberty.  Liberty was billed for 60 trigger point injections by Gutierrez in that case, however the insured testified that she received only four injections.

390.    In an affidavit executed by chiropractor William Knodel in the action American Commerce Ins. Co. v. Robert Super, D.C. et al., Index No. 1542438/12 (Sup. Ct. N.Y. Co.), Dr. Knodel testified, among other things, that he was an independent contractor paid on a tax form 1099 basis and that he provided services as an independent contractor for Super, Flatbush Chiropractic and T&J Chiropractic.

400.    Dr. Knodel emphasized that he was never an employee of any of those providers despite the fact that his name and license number were fraudulently affixed to various bills and reports submitted.

401.    On information and belief, Compas gave testimony at a September 27, 2011 EUO held by another carrier indicating that the NCV tests at Compas Medical were performed by a technician, although the billing for the NCV tests listed Compas as the treating provider.

402.    On information and belief, Compas gave testimony at a February 8, 2012 EUO indicating that NCV tests, computerized range of motion tests and computerized muscle tests at JCC Medical were performed by technicians although the technicians names were not listed on the bills submitted for the tests they performed.  Compas' name was listed.

403.    The Defendants regularly submitted to Liberty bills for services that were provided by independent contractors.

404.    On information and belief, the Defendants paid these independent contractor physicians, chiropractors, physical therapists, acupuncturists and technicians, in whole or in part, on a 1099 basis, not a W-2 basis.

405.    On information and belief, the Defendants did not withhold federal, state or local taxes for these independent contractor physicians, chiropractors, physical therapists, acupuncturists and technicians.

406.    On information and belief, the Defendants did not provide these independent contractor physicians, chiropractors, physical therapists, acupuncturists and technicians with any employee benefits.

407.    On information and belief, the Defendants did not cover these independent contractor physicians, chiropractors, physical therapists, acupuncturists and technicians for unemployment benefits or workers' compensation benefits.

408.    By using independent contractors to perform services billed by the Provider Defendants, the Defendants could avoid paying taxes, workers' compensation and malpractice insurance, thereby maximizing their illicit gains.

409.    By fraudulently concealing their use of independent contractors, the Defendants were able to collect No-Fault Benefits which they were not entitled to receive under the No-Fault Laws.

## DEFENDANTS' MAILING OF FRAUDULENT BILLS TO LIBERTY

410.    Although they are not eligible to receive No-Fault payments, the Defendants regularly mail bills to Liberty for No-Fault Benefits using the claim forms prescribed by the No-Fault Laws (the "NF-3 Forms") or on HCFA-1500 forms (collectively, the "Claim Forms").

411.    However, the Defendants' Claim Forms are fraudulent in four key respects:

412.    First, the Claim Forms uniformly misrepresent that the Provider Defendants are properly licensed and eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12).   In reality, the Provider Defendants are not properly licensed because (i) they are illegally owned and/or controlled by the unlicensed Dada; (ii) they unlawfully pay kickbacks to Dada for patient referrals; and (iii) they improperly split professional fees with unlicensed persons.  The Defendants are, in fact, not eligible to receive No-Fault Benefits.

413.    Second, the Claim Forms uniformly misrepresent to Liberty that the subject health care services were medically necessary and were actually performed.  In reality, neither representation is true.  The services billed to Liberty are often not performed at all and when they are performed, they are performed (i) according to a pre-determined, fraudulent protocol designed only to financially benefit the Defendants, not to benefit the patient; and/or (ii) pursuant to illegal kickbacks paid to Dada or fees paid to runners.

414.    Third, the Claim Forms and the reports submitted in support of the Claim Forms uniformly misrepresent and exaggerate the level and nature of the services purportedly provided.

415. Fourth, except for the services performed by the Nominal Owners, the Claim Forms misrepresent the identity of the individuals actually performing the services and conceal that they were performed by independent contractors or other non-employees.

## THE DEFENDANTS' FRAUDULENT CONCEALMENT OF MATERIAL FACTS

416. The Defendants are legally bound to submit to Liberty and other insurers only truthful and accurate billing for legitimate services. However, all of the billing the Defendants have submitted to Liberty is fraudulent. Discussed above, every bill that the Defendants submit to Liberty misrepresents that the Provider Defendants are eligible to bill for and to collect No-Fault Benefits when they are, in fact, not eligible to do so.

417. The Defendants have knowingly misrepresented and concealed material facts to prevent Liberty from discovering that they are not eligible to receive No-Fault payments and that they have submitted fraudulent charges for No-Fault reimbursement.

418. In order to induce Liberty to pay for the Provider Defendants' fraudulent services, the Defendants undertook elaborate and extensive measures to conceal their fraud from Liberty.

419. For example, to conceal Dada's illegal ownership or control of the providers at 1468 Flatbush Avenue, the Defendants filed false documents with the New York State Department of State and Department of Education which hid Dada's interest in the Provider Defendants and falsely represented that the Nominal Owners were the corporate Provider Defendants' sole owners.

420. To avoid scrutiny and conceal from Liberty any identifying pattern of fraudulent charges, the Defendants created a revolving door of multiple professional practices with different straw owners and taxpayer identification numbers to reduce the amount of billing

any one health care provider submitted to Liberty.

421.   To conceal the true nature of the kickbacks from Liberty, the Defendants engineered a complex cover-up and falsely characterized illegal kickbacks as legitimate "rental" payments.

422.   To collect the fraudulent charges they submitted to Liberty, the Defendants retained law firms to commence costly and time-consuming lawsuits against Liberty if the Provider Defendants' bills were not paid promptly and in full.

423.   The Defendants took advantage of the fact that Liberty is required by statute to pay No-Fault claims promptly within 30 days.  The Defendants exploited this strict timeframe by submitting documents designed to appear facially valid in support of their fraudulent billing.  These seemingly valid documents, together with the Defendants' material misrepresentations, affirmative concealment and fraudulent litigation, were designed to, and did, cause Liberty to rely on them.

424.   As a result of the Defendants' misrepresentations and affirmative acts of concealment, Liberty paid more than $283,185.14 to the Defendants in reliance on the fraudulent charges that the Defendants submitted.

425.   Because of the Defendants' material misrepresentations and other affirmative acts of concealment, Liberty did not discover, and could not reasonably have discovered, that its damages were attributable to the Defendants' fraud until shortly before it commenced this action.

### FIRST CAUSE OF ACTION
**(Against the Provider Defendants)**
**(Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 and 2202)**

426.   Liberty repeats and realleges each and every allegation contained in Paragraphs "1" through "425" of this Complaint as if fully set forth at length herein.

427.   There is an actual case in controversy between Liberty and the Defendants relating to more than $1,431,372.31 in pending fraudulent No-Fault billing submitted by the Defendants to Liberty.

428.   The Provider Defendants are not entitled to payment for No-Fault Benefits for any professional health services because (i) the Provider Defendants are illegally owned and/or controlled by the unlicensed Dada; (ii) the Provider Defendants unlawfully share professional fees with unlicensed persons; (iii) the health care services that are billed through Provider Defendants are not medically necessary; (iv) the health care services that are billed through Provider Defendants are performed pursuant to a pre-determined, fraudulent treatment protocol; (v) the health care services billed through the Provider Defendants are performed pursuant to illegal "kickback" arrangements between the Defendants and others; (vi) the bills submitted by the Provider Defendants misrepresent and exaggerate the services purportedly rendered in order to inflate the charges billed to Liberty; (vii) some or most of the services billed by the Provider Defendants were performed by independent contractors; and (vi) the health care services billed through the Provider Defendants are frequently not provided at all.

429.   Accordingly, Liberty requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

A.     (i) the Provider Defendants are unlawfully incorporated, organized and/or controlled by an unlicensed person and are not entitled to receive payment for any pending bills which they have submitted to Liberty; (ii) Liberty is not obligated to pay the Provider Defendants, their assignors or their patients for any health services purportedly rendered by the Provider Defendants; and (iii) the Provider Defendants are enjoined from submitting to Liberty any request for payment for any professional health care service, and from initiating or prosecuting against Liberty any lawsuits, arbitrations or other proceedings seeking payment for any such service;

B.     (i) the Provider Defendants and the Nominal Owners unlawfully share professional fees with unlicensed persons and are not entitled

to receive payment for any pending bills which they have submitted to Liberty; (ii) Liberty is not obligated to pay the Provider Defendants and the Nominal owners, or their assignors or their patients, for any health services purportedly provided by the Provider Defendants or the Nominal Ownes; and (iii) the Provider Defendants and the Nominal Owners are enjoined from submitting to Liberty any request for payment for any professional health care service, and from initiating or prosecuting against Liberty any lawsuits, arbitrations or other proceedings seeking payment for any such service;

C.     (i) the services billed by the Provider Defendants and/or the Nominal Owners are rendered pursuant to illegal kickback arrangements between the Defendants and others; ii) Liberty is not obligated to pay the Provider Defendants and the Nominal Owners, or their assignors or their patients, for any health services purportedly provided by the Provider Defendants or the Nominal Owners; and (iii) the Provider Defendants and the Nominal Owners are enjoined from submitting to Liberty any request for payment for any professional health care service, and from initiating or prosecuting against Liberty any lawsuits, arbitrations or other proceedings seeking payment for any such service;

D.     (i) the Provider Defendants and the Nominal Owners have no right to receive payment for any pending bills submitted to Liberty because the health care services that are billed through the Provider Defendants and/or the Nominal Owners are not medically necessary and/or are performed pursuant to pre-determined fraudulent treatment protocols designed solely to financially enrich the Defendants; (ii) Liberty is not obligated to pay the Provider Defendants and the Nominal Owners, or their assignors or their patients, for any health services purportedly provided by the Provider Defendants or the Nominal Owners; and (iii) the Provider Defendants and the Nominal Owners are enjoined from submitting to Liberty any request for payment for any professional health care service, and from  initiating or prosecuting against Liberty any lawsuits, arbitrations or other proceedings seeking payment for any such service;

E.     (i) the Provider Defendants and the Nominal Owners have no right to payment for any pending bills submitted to Liberty because the billing codes used by the Provider Defendants and the Nominal Owners misrepresent and exaggerate the level of services provided in order to inflate the charges submitted to Liberty; (ii) Liberty is not obligated to pay the Provider Defendants and the Nominal Owners, or their assignors or their patients, for any health services purportedly provided by the Provider Defendants or the Nominal Owners; and (iii) the Provider Defendants and the Nominal Owners are enjoined from submitting to Liberty any request for payment for any professional health care service, and from initiating or

prosecuting against Liberty any lawsuits, arbitrations or other proceedings seeking payment for any such service;

F.    (i) the Provider Defendants and the Nominal Owners utilize the services of independent contractors and are not entitled to collect No-Fault Benefits for any charges submitted to Liberty where the professional health services were provided by an independent contractor or other non-employee of the Provider Defendants and/or the Nominal Owners; (ii) Liberty is not obligated to pay the Provider Defendants and the Nominal Owners, or their assignors or their patients, for any health services provided by independent contractors or other non-employees of the Provider Defendants and/or Nominal Owners; and (iii) the Provider Defendants and the Nominal Owners are enjoined from submitting to Liberty any request for payment for any professional health care service performed by an independent contractor or other non-employee, and from initiating or prosecuting against Liberty any lawsuits, arbitrations or other proceedings seeking payment for any such service;

G.    (i) the Provider Defendants and the Nominal Owners have no right to receive payment for any pending bills submitted to Liberty because the health care services billed to Liberty by the Provider Defendants and/or the Nominal Owners are in many cases not provided; (ii) Liberty is not obligated to pay the Provider Defendants and the Nominal Owners, or their assignors or their patients, for any health services purportedly provided by the Provider Defendants and/or the Nominal Owners; and (iii) the Provider Defendants and the Nominal Owners are enjoined from submitting to Liberty any request for payment for any professional health care service, and from initiating or prosecuting against Liberty any lawsuits, arbitrations or other proceedings seeking payment for any such service.

## SECOND CAUSE OF ACTION
### (Against Compas and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

430.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "429" of this Complaint as if fully set forth at length herein.

431.    Compas Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

432.    Compas and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Compas Medical's affairs through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that Compas Medical was not eligible to receive under the No-Fault Laws because (i) Compas Medical is unlawfully incorporated and owned and controlled by an unlicensed person; (ii) Compas Medical engaged in fee splitting with unlicensed persons; (iii) Compas Medical billed for services that were not medically necessary; (iv) Compas Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) Compas Medical billed Liberty for services performed by independent contractors; (vi) the bills Compas Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by Compas Medical were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "1"**.

433.    Compas Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Compas and Dada operate Compas Medical, insofar as Compas Medical is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Compas Medical to function.

434.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact

that the Defendants continue to attempt collection on the fraudulent billing submitted through Compas Medical to the present day.

435.    Compas Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by Compas Medical in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

436.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $152,311.00 pursuant to the fraudulent bills submitted by the Defendants through Compas Medical.

437.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**(Against Compas and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

438.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "437" of this Complaint as if fully set forth at length herein.

439.    Compas Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

440.    Compas and Dada are employed by and/or associated with the Compas Medical enterprise.

441.    Compas and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Compas Medical

enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that Compas Medical was not eligible to receive under the No-Fault Laws because (i) Compas Medical is unlawfully incorporated and owned and controlled by an unlicensed person; (ii) Compas Medical engaged in fee splitting with unlicensed persons; (iii) Compas Medical billed for services that were not medically necessary; (iv) Compas Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) Compas Medical billed Liberty for services performed by independent contractors; (vi) the bills Compas Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by Compas Medical were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "1".**  Each such mailing was made in furtherance of the mail fraud scheme.

442.    Compas and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

443.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $152,311.00 pursuant to the fraudulent bills submitted by the Defendants through Compas Medical.

444.    By reason of its injury, Liberty is entitled to treble damages, costs, and

reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
#### (Against Compas and Dada)
#### (Violation of RICO, 18 U.S.C. § 1962(c))

445.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "444" of this Complaint as if fully set forth at length herein.

446.    JCC Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

447.    Compas and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of JCC Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that JCC Medical was not eligible to receive under the No-Fault Laws because (i) JCC Medical is unlawfully incorporated and owned and controlled by an unlicensed person; (ii) JCC Medical engaged in fee splitting with unlicensed persons; (iii) JCC Medical billed for services that were not medically necessary; (iv) JCC Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) JCC Medical billed Liberty for services performed by independent contractors; (vi) the bills JCC Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by JCC Medical were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to

Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "2"**.

448.    JCC Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Compas and Dada operate JCC Medical, insofar as JCC Medical is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for JCC Medical to function.

449.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JCC Medical to the present day.

450.    JCC Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by JCC Medical in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

451.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,632.00 pursuant to the fraudulent bills submitted by the Defendants through JCC Medical.

452.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (Against Compas and Dada)
### (Violation of RICO, 18 U.S.C § 1962(d))

453.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "452" of this Complaint as if fully set forth at length herein.

454.    JCC Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

455.    Compas and Dada are employed by and/or associated with the JCC Medical enterprise.

456.    Compas and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the JCC Medical enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that JCC Medical was not eligible to receive under the No-Fault Laws because (i) JCC Medical is unlawfully incorporated and owned and controlled by an unlicensed person; (ii) JCC Medical engaged in fee splitting with unlicensed persons; (iii) JCC Medical billed for services that were not medically necessary; (iv) JCC Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) JCC Medical billed Liberty for services performed by independent contractors; (vi) the bills JCC Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by JCC Medical were not performed at all. These acts of mail fraud include, but are not limited to, those that are described in the chart attached as

**Exhibit "2".** Each such mailing was made in furtherance of the mail fraud scheme.

457.    Compas and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

458.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,632.00 pursuant to the fraudulent bills submitted by the Defendants through JCC Medical.

459.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### (Against Gutierrez and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

460.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "459" of this Complaint as if fully set forth at length herein.

461.    Alleviation Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

462.    Gutierrez and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Alleviation Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that Alleviation Medical was not eligible to receive under the No-Fault Laws because (i) Alleviation Medical is unlawfully incorporated and owned and controlled by an

unlicensed person; (ii) Alleviation Medical engaged in fee splitting with unlicensed persons; (iii) Alleviation Medical billed for services that were not medically necessary; (iv) Alleviation Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) Alleviation Medical billed Liberty for services performed by independent contractors; (vi) the bills Alleviation Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by Alleviation Medical were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "3"**.

463.    Alleviation Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gutierrez and Dada operate Alleviation Medical, insofar as Alleviation Medical is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Alleviation Medical to function.

464.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Alleviation Medical to the present day.

465.    Alleviation Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by Alleviation Medical in pursuit

of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

466. Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,345.00 pursuant to the fraudulent bills submitted by the Defendants through Alleviation Medical.

467. By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### (Against Gutierrez and Dada)
### (Violation of RICO, 18 U.S.C § 1962(d))

468. Liberty repeats and realleges the allegations set forth in paragraphs "1" through "467" of this Complaint as if fully set forth at length herein.

469. Alleviation Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

470. Gutierrez and Dada are employed by and/or associated with the Alleviation Medical enterprise.

471. Gutierrez and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Alleviation Medical enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that Alleviation Medical was not eligible to receive under the No-Fault Laws because (i) Alleviation Medical is unlawfully

incorporated and owned and controlled by an unlicensed person; (ii) Alleviation Medical engaged in fee splitting with unlicensed persons; (iii) Alleviation Medical billed for services that were not medically necessary; (iv) Alleviation Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) Alleviation Medical billed Liberty for services performed by independent contractors; (vi) the bills Alleviation Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by Alleviation Medical were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "3"**.  Each such mailing was made in furtherance of the mail fraud scheme.

472.    Gutierrez and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

473.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,345.00 pursuant to the fraudulent bills submitted by the Defendants through Alleviation Medical.

474.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
#### (Against Gutierrez and Dada)
#### (Violation of RICO, 18 U.S.C. § 1962(c))

475.    Liberty repeats and realleges the allegations set forth in paragraphs "1"

through "474" of this Complaint as if fully set forth at length herein.

476.    JGG Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

477.    Gutierrez and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of JGG Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that JGG Medical was not eligible to receive under the No-Fault Laws because (i) JGG Medical is unlawfully incorporated and owned and controlled by an unlicensed person; (ii) JGG Medical engaged in fee splitting with unlicensed persons; (iii) JGG Medical billed for services that were not medically necessary; (iv) JGG Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) JGG Medical billed Liberty for services performed by independent contractors; (vi) the bills JGG Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by JGG Medical were not performed at all.    A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "4"**.

478.    JGG Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gutierrez and Dada operate JGG

Medical, insofar as JGG Medical is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for JGG Medical to function.

479.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JGG Medical to the present day.

480.    JGG Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by JGG Medical in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

481.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $296.00 pursuant to the fraudulent bills submitted by the Defendants through JGG Medical.

482.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### (Against Gutierrez and Dada)
### (Violation of RICO, 18 U.S.C § 1962(d))

483.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "482" of this Complaint as if fully set forth at length herein.

484.    JGG Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

485.    Gutierrez and Dada are employed by and/or associated with the JGG Medical enterprise.

486.    Gutierrez and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the JGG Medical enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that JGG Medical was not eligible to receive under the No-Fault Laws because (i) JGG Medical is unlawfully incorporated and owned and controlled by an unlicensed person; (ii) JGG Medical engaged in fee splitting with unlicensed persons; (iii) JGG Medical billed for services that were not medically necessary; (iv) JGG Medical billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) JGG Medical billed Liberty for services performed by independent contractors; (vi) the bills JGG Medical submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by JGG Medical were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "4"**.  Each such mailing was made in furtherance of the mail fraud scheme.

487.    Gutierrez and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

488.    Liberty has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $296.00 pursuant to the fraudulent bills submitted by the Defendants through JGG Medical.

489.     By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### (Against Compas and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

490.     Liberty repeats and realleges the allegations set forth in paragraphs "1" through "489" of this Complaint as if fully set forth at length herein.

491.     Compas' medical practice (the "Compas Enterprise") is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

492.     Compas and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Compas Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that the Compas Enterprise was not eligible to receive under the No-Fault Laws because (i) the Compas Enterprise is controlled by an unlicensed person; (ii) the Compas Enterprise engaged in fee splitting with unlicensed persons; (iii) the Compas Enterprise billed for services that were not medically necessary; (iv) the Compas Enterprise billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Compas Enterprise billed

Liberty for services performed by independent contractors; (vi) the bills the Compas Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Compas Enterprise were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "5"**.

493.    The Compas Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.

494.    The predicate acts of mail fraud are the regular way in which Compas and Dada operate the Compas Enterprise, insofar as the Compas Enterprise is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for the Compas Enterprise to function.

495.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Compas Enterprise to the present day.

496.    The Compas Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers. These inherently unlawful acts are taken by the Compas Enterprise in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

497.    Liberty has been injured in its business and property by reason of the

above-described conduct in that it has paid at least $5,671.00 pursuant to the fraudulent bills submitted by the Defendants through the Compas Enterprise.

498.   By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
### (Against Compas and Dada)
### (Violation of RICO, 18 U.S.C § 1962(d))

499.   Liberty repeats and realleges the allegations set forth in paragraphs "1" through "498" of this Complaint as if fully set forth at length herein.

500.   The Compas Enterprise is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

501.   Compas and Dada are employed by and/or associated with the Compas Enterprise.

502.   Compas and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Compas Enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for medical services that the Compas Enterprise was not eligible to receive under the No-Fault Laws because (i) the Compas Enterprise is unlawfully controlled by an unlicensed person; (ii) the Compas Enterprise engaged in fee splitting with unlicensed persons; (iii) the Compas Enterprise billed for services that were not medically necessary; (iv) the Compas Enterprise billed for services that were performed pursuant to a pre-determined,

fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Compas Enterprise billed Liberty for services performed by independent contractors; (vi) the bills the Compas Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Compas Enterprise were not performed at all. These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "5"**. Each such mailing was made in furtherance of the mail fraud scheme.

503.     Compas and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

504.     Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $5,671.00 pursuant to the fraudulent bills submitted by the Defendants through the Compas Enterprise.

505.     By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
#### (Against Gutierrez and Dada)
#### (Violation of RICO, 18 U.S.C. § 1962(c))

506.     Liberty repeats and realleges the allegations set forth in paragraphs "1" through "505" of this Complaint as if fully set forth at length herein.

507.     Gutierrez' medical practice (the "Gutierrez Enterprise") is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

508.    Gutierrez and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Gutteriez Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that the Gutteriez Enterprise was not eligible to receive under the No-Fault Laws because (i) the Gutteriez Enterprise is unlawfully controlled by an unlicensed person; (ii) the Gutteriez Enterprise engaged in fee splitting with unlicensed persons; (iii) the Gutteriez Enterprise billed for services that were not medically necessary; (iv) the Gutteriez Enterprise billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Gutteriez Enterprise billed Liberty for services performed by independent contractors; (vi) the bills the Gutteriez Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Gutteriez Enterprise were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "6"**.

509.    The Gutteriez Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gutierrez and Dada operate the Gutteriez Enterprise, insofar as the Gutteriez Enterprise is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for the Gutteriez Enterprise to

function.

510.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Gutteriez Enterprise to the present day.

511.    The Gutteriez Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by the Gutteriez Enterprise in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

512.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $987.00 pursuant to the fraudulent bills submitted by the Defendants through the Gutteriez Enterprise.

513.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
#### (Against Gutierrez and Dada)
#### (Violation of RICO, 18 U.S.C § 1962(d))

514.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "513" of this Complaint as if fully set forth at length herein.

515.    The Gutteriez Enterprise is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

516.    Gutteriez and Dada are employed by and/or associated with the Gutteriez

Medical enterprise.

517.    Gutteriez and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Gutteriez Enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for medical services that the Gutteriez Enterprise was not eligible to receive under the No-Fault Laws because (i) the Gutteriez Enterprise is unlawfully controlled by an unlicensed person; (ii) the Gutteriez Enterprise engaged in fee splitting with unlicensed persons; (iii) the Gutteriez Enterprise billed for services that were not medically necessary; (iv) the Gutteriez Enterprise billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Gutteriez Enterprise billed Liberty for services performed by independent contractors; (vi) the bills the Gutteriez Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Gutteriez Enterprise were not performed at all.   These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "6".**  Each such mailing was made in furtherance of the mail fraud scheme.

518.    Gutteriez and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

519.    Liberty has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $987.00 pursuant to the fraudulent bills submitted by the Defendants through the Gutteriez Enterprise.

520.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### FOURTEENTH CAUSE OF ACTION
### (Against Compas, Gutierrez and Dada)
### (Violation of RICO, 18 U.S.C § 1962(c))

537.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "536" of this Complaint as if fully set forth at length herein.

538.    Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise constitute together an "association-in-fact enterprise" (the "Compas-Gutierrez Enterprise") as that term is defined under 18 U.S.C. § 1961(4).

539.    The members of the Compas-Gutierrez Enterprise have been and are (i) associated through time; (ii) joined in purpose; and (iii) organized in a manner amenable to hierarchal and consensual decision making with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose.

540.    Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise are purportedly independent entities and unincorporated medical practices, with different names and taxpayer identification numbers, that were created as vehicles to achieve a common purpose:  to facilitate the submission of fraudulent charges to Liberty and other insurers.

541.    The Compas-Gutierrez Enterprise was operated under four separate corporate names and two sole proprietorships in order to reduce the amount of fraudulent billing

submitted by any one of the members. By minimizing the billing submitted by any one

member, the Compas-Gutierrez Enterprise attempted to avoid scrutiny by Liberty and prevent

Liberty from detecting the volume and pattern of fraudulent charges submitted by the Compas-

Gutierrez Enterprise. No single member of the Compas-Gutierrez Enterprise would have been

able to carry out this scheme alone or without the aid of each other.

542.    The Compas-Gutierrez Enterprise is distinct from and has an existence apart

from the pattern of racketeering detailed herein, specifically by recruiting, hiring and

overseeing numerous professionals and non-professionals who have performed an array of

administrative and professional functions beyond the acts of mail fraud by (i) creating and

maintaining patient files; (ii) recruiting and supervising personnel; (iii) negotiating and

executing various contracts; (iv) maintaining bookkeeping and accounting functions necessary

to manage the receipt and distribution of insurance proceeds; and (v) retaining attorneys whose

services were also used to generate payments from insurance companies to support the

aforementioned functions.

543.    Compas, Gutierrez and Dada were employed and/or associated with the

Compas-Gutierrez Enterprise.

544.    Compas, Gutierrez and Dada knowingly conducted and/or participated,

directly or indirectly, in the conduct of the Compas-Gutierrez Enterprise's affairs through a

pattern of racketeering activity consisting of repeated violations of the 18 U.S.C. § 1341, the

federal mail fraud statute, based upon the use of the United States mails to submit or cause to

be submitted hundreds of fraudulent bills on a continuous basis seeking payments that the

Compas-Gutierrez Enterprise was ineligible to receive under the No-Fault Laws because: (i)

Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise

and the Gutierrez Enterprise were unlawfully incorporated and/or controlled by a non-

physician; (ii) Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise engaged in fee splitting with unlicensed persons; (iii) Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise billed Liberty and other insurers for services rendered by independent contractors; (iv) Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise pay for patient referrals; (v) Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise submitting billing that misrepresented the services performed and inflated the charges submitted to Liberty and other insurers; (vi) Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise billed Liberty and other insurers for services that were not medically necessary and were performed pursuant to a fraudulent, pre-determined treatment protocol; and (vii) Compas Medical, Alleviation Medical, JCC Medical, JGG Medical, the Compas Enterprise and the Gutierrez Enterprise often billed Liberty and other insurers for services that were never actually performed.

545. The Compas-Gutierrez Enterprise's business is racketeering activity as the enterprise exists for the purpose of submitting fraudulent charges to insurers.

546. The predicate acts of mail fraud are the regular way in which Compas, Gutierrez and Dada operate the Compas-Gutierrez Enterprise as the Compas-Gutierrez Enterprise is not and never has been eligible to collect No-Fault Benefits. Acts of mail fraud are therefore necessary for the Compas-Gutierrez Enterprise to function.

547. Moreover, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the Defendants continued attempts to collect on the fraudulent billing submitted through the Compas-Gutierrez

Enterprise to the present date.

548.    The Compas-Gutierrez Enterprise is engaged in inherently unlawful acts as its very existence is an unlawful act.  Its existence depends on continuing misrepresentations made to the New York State Department of State and the New York State Department of Education.

549.    These unlawful acts were undertaken by the Compas-Gutierrez Enterprise to achieve the unlawful goal of stealing money from Liberty and other insurance companies.

550.    Liberty has been injured in its business and property by reason of the conduct described above in that it has paid at least $179,242.00 in connection with the fraudulent bills submitted by the Compas-Gutierrez Enterprise.

551.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief as the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Compas, Gutierrez and Dada
### (Violation of RICO, 18 U.S.C. § 1962(d))

552.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "551" of this Complaint as if fully set forth at length herein.

553.    Compas, Gutierrez and Dada knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Compas-Gutierrez Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. § 1341, the federal mail fraud statute, based upon the use of the United State mails to submit hundreds of fraudulent bills to Liberty.  These acts of mail fraud include but are not limited to those that are described in the charts attached to this Complaint as **Exhibits "1" through "6"**.

554.    Each member of the Compas-Gutierrez Enterprise knew of, agreed to and acted in furtherance of the common and overall objective of defrauding Liberty and other insurers by submitting or facilitating the submission of fraudulent charges to Liberty.

555.    Liberty has been injured in its business and property by reason of the conduct described above in that it has paid at least $179,242.00 in connection with the fraudulent bills submitted by the Compas-Gutierrez Enterprise.

556.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief as the Court deems just and proper.

### SIXTEENTH CAUSE OF ACTION
#### (Against Mollo and Dada)
#### (Violation of RICO, 18 U.S.C. § 1962(c))

557.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "556" of this Complaint as if fully set forth at length herein.

558.    Island Life Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

559.    Mollo and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Island Life Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that Island Life Chiropractic was not eligible to receive under the No-Fault Laws because (i) Island Life Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) Island Life Chiropractic engaged in fee splitting with unlicensed persons; (iii) Island Life

Chiropractic was owned and/or controlled by unlicensed persons; (iv) Island Life Chiropractic billed for services that were not medically necessary; (v) Island Life Chiropractic billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Island Life Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills Island Life Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Island Life Chiropractic were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "7"**.

560.    Island Life Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mollo and Dada operate Island Life Chiropractic, insofar as Island Life Chiropractic is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Island Life Chiropractic to function.

561.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Island Life Chiropractic to the present day.

562.    Island Life Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty

and other insurers. These inherently unlawful acts are taken by Island Life Chiropractic in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

563.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,059.00 pursuant to the fraudulent bills submitted by the Defendants through Island Life Chiropractic.

564.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
**(Against Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

565.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "564" of this Complaint as if fully set forth at length herein.

566.    Island Life Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

567.    Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada are employed by and/or associated with Island Life Chiropractic.

568.    Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Island Life Chiropractic enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted bills to Liberty on a continuous basis seeking payment for

health care services that Island Life Chiropractic was not eligible to receive under the No-Fault Laws because (i) Island Life Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) Island Life Chiropractic engaged in fee splitting with unlicensed persons; (iii) Island Life Chiropractic was owned and/or controlled by unlicensed persons; (iv) Island Life Chiropractic billed for services that were not medically necessary; (v) Island Life Chiropractic billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Island Life Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills Island Life Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Island Life Chiropractic were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "7".**  Each such mailing was made in furtherance of the mail fraud scheme.

569.    Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

570.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $4,059.00 pursuant to the fraudulent bills submitted by the Defendants through Island Life Chiropractic.

571.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the

Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### (Against Mollo and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

572. Liberty repeats and realleges the allegations set forth in paragraphs "1" through "571" of this Complaint as if fully set forth at length herein.

573. Action Potential Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

574. Mollo and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Action Potential Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that Action Potential Chiropractic was not eligible to receive under the No-Fault Laws because (i) Action Potential Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) Action Potential Chiropractic engaged in fee splitting with unlicensed persons; (iii) Action Potential Chiropractic was owned and/or controlled by unlicensed persons; (iv) Action Potential Chiropractic billed for services that were not medically necessary; (v) Action Potential Chiropractic billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Action Potential Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills Action Potential Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Action Potential Chiropractic

were not performed at all.   A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "8"**.

575.    Action Potential Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mollo and Dada operate Action Potential Chiropractic, insofar as Action Potential Chiropractic is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Action Potential Chiropractic to function.

576.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Action Potential Chiropractic to the present day.

577.    Action Potential Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.   These inherently unlawful acts are taken by Action Potential Chiropractic in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

578.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,734.34 pursuant to the fraudulent bills submitted by the Defendants through Action Potential Chiropractic.

579.    By reason of its injury, Liberty is entitled to treble damages, costs and

reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
**(Against Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

580.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "579" of this Complaint as if fully set forth at length herein.

581.    Action Potential Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce. Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada are employed by and/or associated with Island Life Chiropractic.

582.    Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Action Potential Chiropractic enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that Action Potential Chiropractic was not eligible to receive under the No-Fault Laws because (i) Action Potential Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) Action Potential Chiropractic engaged in fee splitting with unlicensed persons; (iii) Action Potential Chiropractic was owned and/or controlled by unlicensed persons; (iv) Action Potential Chiropractic billed for services that were not medically necessary; (v) Action Potential Chiropractic billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Action Potential

Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills Action Potential Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Action Potential Chiropractic were not performed at all. These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "8".** Each such mailing was made in furtherance of the mail fraud scheme.

583. Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

584. Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,734.34 pursuant to the fraudulent bills submitted by the Defendants through Action Potential Chiropractic.

585. By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
### (Against Laga and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

586. Liberty repeats and realleges the allegations set forth in paragraphs "1" through "585" of this Complaint as if fully set forth at length herein.

587. Adelaida PT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Laga and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Adelaida PT's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis for approximately a year seeking payments that Adelaida PT was not eligible to receive under the No-Fault Laws because (i) Adelaida PT paid illegal kickbacks in exchange for patient referrals; (ii) Adelaida PT engaged in fee splitting with unlicensed persons; (iii) Adelaida PT was owned and/or controlled by unlicensed persons; (iv) Adelaida PT billed for services that were not medically necessary; (v) Adelaida PT billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Adelaida PT billed Liberty for services performed by independent contractors; (vii) the bills Adelaida PT submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Adelaida PT were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "9"**.

588.    Adelaida PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Laga and Dada operate Adelaida PT, insofar as Adelaida PT is not engaged in a legitimate physical therapy practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Adelaida PT to function.

589.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact

that the Defendants continue to attempt collection on the fraudulent billing submitted through Adelaida PT to the present day.

590.    Adelaida PT is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by Adelaida PT in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

591.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $20,515.00 pursuant to the fraudulent bills submitted by the Defendants through Island Adelaida PT. By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
**(Against Laga, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

592.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "591" of this Complaint as if fully set forth at length herein.

593    Adelaida PT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce. Laga, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada are employed by and/or associated with Adelaida PT.

594.    Laga, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Adelaida PT enterprise's affairs, through a pattern of

racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that Adelaida PT was not eligible to receive under the No-Fault Laws because (i) Adelaida PT paid illegal kickbacks in exchange for patient referrals; (ii) Adelaida PT engaged in fee splitting with unlicensed persons; (iii) Adelaida PT was owned and/or controlled by unlicensed persons; (iv) Adelaida PT billed for services that were not medically necessary; (v) Adelaida PT billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Adelaida PT billed Liberty for services performed by independent contractors; (vii) the bills Adelaida PT submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Adelaida PT were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "9"**.  Each such mailing was made in furtherance of the mail fraud scheme.

595.    Laga, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

596.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $20,515.00 pursuant to the fraudulent bills submitted by the Defendants through Adelaida PT.

597.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### TWENTY-SECOND CAUSE OF ACTION
### (Against Laga and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

598.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "597" of this Complaint as if fully set forth at length herein.

599.    Laga's physical therapy practice (the "Laga Enterprise") is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

600.    Laga and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Laga Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that the Laga Enterprise was not eligible to receive under the No-Fault Laws because (i) the Laga Enterprise is controlled by an unlicensed person; (ii) the Laga Enterprise engaged in fee splitting with unlicensed persons; (iii) the Laga Enterprise billed for services that were not medically necessary; (iv) the Laga Enterprise billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Laga Enterprise billed Liberty for services performed by independent contractors; (vi) the bills the Laga Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Laga Enterprise were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached

as **Exhibit "10"**.

601.    The Laga Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.

602.    The predicate acts of mail fraud are the regular way in which Laga and Dada operate the Laga Enterprise, insofar as the Laga Enterprise is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for the Laga Enterprise to function.

603.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Laga Enterprise to the present day.

604.    The Laga Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by the Laga Enterprise in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

605.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,095.00 pursuant to the fraudulent bills submitted by the Defendants through the Laga Enterprise.

606.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

## TWENTY-THIRD CAUSE OF ACTION
### (Against Laga and Dada)
### (Violation of RICO, 18 U.S.C § 1962(d))

607. Liberty repeats and realleges the allegations set forth in paragraphs "1" through "606" of this Complaint as if fully set forth at length herein.

608. The Laga Enterprise is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

609. Laga and Dada are employed by and/or associated with the Laga Enterprise.

610. Laga and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Laga Enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for medical services that the Laga Enterprise was not eligible to receive under the No-Fault Laws because (i) the Laga Enterprise is unlawfully controlled by an unlicensed person; (ii) the Laga Enterprise engaged in fee splitting with unlicensed persons; (iii) the Laga Enterprise billed for services that were not medically necessary; (iv) the Laga Enterprise billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Laga Enterprise billed Liberty for services performed by independent contractors; (vi) the bills the Laga Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Laga Enterprise were not performed at all. These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "10"**. Each such mailing was made in furtherance of the mail fraud scheme.

611.    Laga and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

612.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $8,095.00 pursuant to the fraudulent bills submitted by the Defendants through the Laga Enterprise.

613.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### TWENTY-FOURTH CAUSE OF ACTION
#### (Against Masigla and Dada)
#### (Violation of RICO, 18 U.S.C. § 1962(c))

614.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "613" of this Complaint as if fully set forth at length herein.

615.    Masigla PT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

616.    Masigla and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Masigla PT's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that Masigla PT was not eligible to receive under the No-Fault Laws because (i) Masigla PT paid illegal kickbacks in exchange for patient referrals; (ii) Masigla PT engaged in fee splitting with unlicensed persons; (iii) Masigla PT was owned and/or controlled by unlicensed persons; (iv) Masigla PT billed for services that were not medically necessary; (v) Masigla PT

billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Masigla PT billed Liberty for services performed by independent contractors; (vii) the bills Masigla PT submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Masigla PT were not performed at all.    A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "11"**.

617.    Masigla PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Masigla and Dada operate Masigla PT, insofar as

618.    Masigla PT is not engaged in a legitimate physical therapy practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Masigla PT to function.

619.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Masigla PT to the present day.

620.    Masigla PT is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by Masigla PT in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

621.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $246.40 pursuant to the fraudulent bills submitted by the Defendants through Masigla PT.

622.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**(Against Masigla, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

623.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "622" of this Complaint as if fully set forth at length herein.

624.    Masigla PT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

625.    Masigla, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada are employed by and/or associated with Masigla PT. Masigla, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Masigla PT enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that Masigla PT was not eligible to receive under the No-Fault Laws because (i) Masigla PT paid illegal kickbacks in exchange for patient referrals; (ii) Masigla PT engaged in fee splitting with unlicensed persons; (iii) Masigla PT was owned and/or controlled by unlicensed persons; (iv) Masigla PT billed for

services that were not medically necessary; (v) Masigla PT billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Masigla PT billed Liberty for services performed by independent contractors; (vii) the bills Adelaida PT submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Masigla PT were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "11"**.  Each such mailing was made in furtherance of the mail fraud scheme.

626.    Masigla, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

627.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $246.40 pursuant to the fraudulent bills submitted by the Defendants through Masigla PT.

628.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### TWENTY-SIXTH CAUSE OF ACTION
**(Against Masigla and Dada)**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

629.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "628" of this Complaint as if fully set forth at length herein.

630.    Masigla's physical therapy practice (the "Masigla Enterprise") is an

ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

631.    Masigla and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Masigla Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that the Masigla Enterprise was not eligible to receive under the No-Fault Laws because (i) the Masigla Enterprise is controlled by an unlicensed person; (ii) the Masigla Enterprise engaged in fee splitting with unlicensed persons; (iii) the Masigla Enterprise billed for services that were not medically necessary; (iv) the Masigla Enterprise billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Masigla Enterprise billed Liberty for services performed by independent contractors; (vi) the bills the Masigla Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Masigla Enterprise were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "12"**.

632.    The Masigla Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.

633.    The predicate acts of mail fraud are the regular way in which Masigla and Dada operate the Masigla Enterprise, insofar as the Masigla Enterprise is not engaged in

a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for the Masigla Enterprise to function.

634.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Masigla Enterprise to the present day.

635.    The Masigla Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by the Masigla Enterprise in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

636.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $14,707.40 pursuant to the fraudulent bills submitted by the Defendants through the Masigla Enterprise.

637.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### TWENTY-SEVENTH CAUSE OF ACTION
#### (Against Masigla and Dada)
#### (Violation of RICO, 18 U.S.C § 1962(d))

638.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "637" of this Complaint as if fully set forth at length herein.

639.    The Masigla Enterprise is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

640. Masigla and Dada are employed by and/or associated with the Masigla Enterprise.

641. Masigla and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Masigla Enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for medical services that the Masigla Enterprise was not eligible to receive under the No-Fault Laws because (i) the Masigla Enterprise is unlawfully controlled by an unlicensed person; (ii) the Masigla Enterprise engaged in fee splitting with unlicensed persons; (iii) the Masigla Enterprise billed for services that were not medically necessary; (iv) the Masigla Enterprise billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) the Masigla Enterprise billed Liberty for services performed by independent contractors; (vi) the bills the Masigla Enterprise submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (vii) in many cases, the services billed by the Masigla Enterprise were not performed at all. These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "12"**. Each such mailing was made in furtherance of the mail fraud scheme.

642. Masigla and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

643. Liberty has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $14,707.40 pursuant to the fraudulent bills submitted by the Defendants through the Masigla Enterprise.

644.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

### TWENTY-EIGHTH CAUSE OF ACTION
#### (Against Deng and Dada)
#### (Violation of RICO, 18 U.S.C. § 1962(c))

645.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "644" of this Complaint as if fully set forth at length herein.

646.    Deng Acupuncture is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

647.    Deng and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Deng Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that Deng Acupuncture was not eligible to receive under the No-Fault Laws because (i) Deng Acupuncture paid illegal kickbacks in exchange for patient referrals; (ii) Deng Acupuncture engaged in fee splitting with unlicensed persons; (iii) Deng Acupuncture was owned and/or controlled by unlicensed persons; (iv) Deng Acupuncture billed for services that were not medically necessary; (v) Deng Acupuncture billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Deng Acupuncture billed Liberty for services performed by independent contractors; (vii) the bills Deng Acupuncture

submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Deng Acupuncture were not performed at all.  A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "13"**.

648.    Deng Acupuncture business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Deng and Dada operate Deng Acupuncture, insofar as Deng Acupuncture is not engaged in a legitimate physical therapy practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Deng Acupuncture to function.

649.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Deng Acupuncture to the present day.

650.    Deng Acupuncture is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by Deng Acupuncture in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

651.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,545.00 pursuant to the fraudulent bills submitted by the Defendants through Deng Acupuncture.

652.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### TWENTY-NINTH CAUSE OF ACTION
**(Against Deng, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

653.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "652" of this Complaint as if fully set forth at length herein.

654.    Deng Acupuncture is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

655.    Deng, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada are employed by and/or associated with Deng Acupuncture. Deng, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Deng Acupuncture enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that Deng Acupuncture was not eligible to receive under the No-Fault Laws because (i) Deng Acupuncture paid illegal kickbacks in exchange for patient referrals; (ii) Deng Acupuncture engaged in fee splitting with unlicensed persons; (iii) Deng Acupuncture was owned and/or controlled by unlicensed persons; (iv) Deng Acupuncture billed for services that were not medically necessary; (v) Deng Acupuncture billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Deng Acupuncture

118

billed Liberty for services performed by independent contractors; (vii) the bills Deng Acupuncture submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Deng Acupuncture were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "13".**  Each such mailing was made in furtherance of the mail fraud scheme.

656.    Deng, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

657.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,545.00 pursuant to the fraudulent bills submitted by the Defendants through Deng Acupuncture.

658.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

## THIRTIETH CAUSE OF ACTION
### (Against Super and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

659.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "658" of this Complaint as if fully set forth at length herein.

660.    Flatbush Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

661.    Super and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of Flatbush Chiropractic's affairs through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that Flatbush Chiropractic was not eligible to receive under the No-Fault Laws because (i) Flatbush Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) Flatbush Chiropractic engaged in fee splitting with unlicensed persons; (iii) Flatbush Chiropractic was owned and/or controlled by unlicensed persons; (iv) Flatbush Chiropractic billed for services that were not medically necessary; (v) Flatbush Chiropractic billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Flatbush Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills Flatbush Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Flatbush Chiropractic were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "14"**.

662.   Flatbush Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Super and Dada operate Flatbush Chiropractic, insofar as Flatbush Chiropractic is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for Flatbush Chiropractic to function.

663.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Flatbush Chiropractic to the present day.

664.    Flatbush Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers.  These inherently unlawful acts are taken by Flatbush Chiropractic in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

665.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,091.00 pursuant to the fraudulent bills submitted by the Defendants through Flatbush Chiropractic.

666.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### THIRTY-FIRST CAUSE OF ACTION
**(Against Super, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

667.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "666" of this Complaint as if fully set forth at length herein.

668.    Flatbush Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

669.    Super, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada are employed by and/or associated with Flatbush Chiropractic.

Super, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Flatbush Chiropractic enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that Flatbush Chiropractic was not eligible to receive under the No-Fault Laws because (i) Flatbush Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) Flatbush Chiropractic engaged in fee splitting with unlicensed persons; (iii) Flatbush Chiropractic was owned and/or controlled by unlicensed persons; (iv) Flatbush Chiropractic billed for services that were not medically necessary; (v) Flatbush Chiropractic billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) Flatbush Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills Flatbush Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by Flatbush Chiropractic were not performed at all.  These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "14".**  Each such mailing was made in furtherance of the mail fraud scheme.

670.    Super, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

671.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,091.00 pursuant to the fraudulent bills submitted by the Defendants through Flatbush Chiropractic.

672.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

## THIRTY-SECOND CAUSE OF ACTION
### (Against Super and Dada)
### (Violation of RICO, 18 U.S.C. § 1962(c))

673.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "672" of this Complaint as if fully set forth at length herein.

674.    T&J Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

675.    Super and Dada knowingly have conducted and/or participated, directly or indirectly, in the conduct of T&J Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payments that T&J Chiropractic was not eligible to receive under the No-Fault Laws because (i) T&J Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) T&J Chiropractic engaged in fee splitting with unlicensed persons; (iii) T&J Chiropractic was owned and/or controlled by unlicensed persons; (iv) T&J Chiropractic billed for services that were not medically necessary; (v) T&J Chiropractic billed for services that were performed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the

Defendants; (vi) T&J Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills Flatbush Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by T&J Chiropractic were not performed at all. A representative sample of the fraudulent bills and corresponding mailings submitted to Liberty that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached as **Exhibit "15"**.

676.    T&J Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Super and Dada operate Flatbush Chiropractic, insofar as T&J Chiropractic is not engaged in a legitimate medical practice and has never has been eligible to bill for or collect No-Fault benefits and acts of mail fraud are therefore essential in order for T&J Chiropractic to function.

677.    Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through T&J Chiropractic to the present day.

678.    T&J Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty and other insurers. These inherently unlawful acts are taken by T&J Chiropractic in pursuit of the inherently unlawful goal of defrauding money from Liberty and other insurers through fraudulent No-Fault billing.

679.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $46,950.00 pursuant to the fraudulent

bills submitted by the Defendants through T&J Chiropractic.

680.    By reason of its injury, Liberty is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18. U.S.C. § 1964(c), together with any other relief the Court deems just and proper.

### THIRTY-THIRD CAUSE OF ACTION
**(Against Super, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada)**
**(Violation of RICO, 18 U.S.C § 1962(d))**

681.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "680" of this Complaint as if fully set forth at length herein.

682.    T&J Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

683.    Super, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada are employed by and/or associated with T&J Chiropractic.

684.    Super, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the T&J Chiropractic enterprise's affairs, through a pattern of racketeering activity, consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent bills to Liberty on a continuous basis seeking payment for health care services that T&J Chiropractic was not eligible to receive under the No-Fault Laws because (i) T&J Chiropractic paid illegal kickbacks in exchange for patient referrals; (ii) T&J Chiropractic engaged in fee splitting with unlicensed persons; (iii) T&J Chiropractic was owned and/or controlled by unlicensed persons; (iv) T&J Chiropractic billed for services that were not medically necessary; (v) T&J Chiropractic billed for services that were performed pursuant to a

pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (vi) T&J Chiropractic billed Liberty for services performed by independent contractors; (vii) the bills T&J Chiropractic submitted to Liberty misrepresented and exaggerated the services purportedly rendered in order to inflate the charges; and (viii) in many cases, the services billed by T&J Chiropractic were not performed at all. These acts of mail fraud include, but are not limited to, those that are described in the chart attached as **Exhibit "15"**. Each such mailing was made in furtherance of the mail fraud scheme.

685.    Super, Compas, Gutierrez, Parisien, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada knew of, agreed to, and acted in furtherance of the common and overall objective (i.e. to defraud Liberty and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty.

686.    Liberty has been injured in its business and property by reason of the above-described conduct in that it has paid at least $46,950.00 pursuant to the fraudulent bills submitted by the Defendants through T&J Chiropractic.

687.    By reason of its injury, Liberty is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), together with such other relief the Court deems just and proper.

**THIRTY-FOURTH CAUSE OF ACTION**
**(Against All Defendants)**
**(Common Law Fraud)**

688.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "687" of this Complaint as if fully set forth at length herein.

689.    The Defendants are jointly and severally liable for the acts and omissions set forth in paragraphs "1" through "620" of this Complaint.

690     The Defendants intentionally, knowingly, fraudulently, and with an intent

to deceive Liberty, patients and the general public, omitted material facts and made material misrepresentations (i) intending to hold out the Provider Defendants as legal and lawfully operating professional service corporations and limited liability companies when they were not and (ii) intending to fraudulently induce Liberty to make payments to which Defendants were not entitled.

691. The Defendants intentionally, knowingly, fraudulently and with an intent to deceive Liberty, patients and the general public, concealed, omitted and made false representations of material facts, including, but not limited to, the following: (i) falsely setting forth the name of each Provider Defendant as a professional corporation or limited liability company owned by a licensed health care professional in bills and reports intended to deceive and mislead Liberty into believing that the Provider Defendants were properly licensed and lawfully operating professional corporations and limited liability companies; (ii) providing false and misleading statements and information regarding who owned, controlled and operated the Provider Defendants; (iii) providing false and misleading statements and information intended to mislead Liberty into believing that the Provider Defendants were being operated by the licensed professional owners indicated in their respective certificates of incorporation or articles of organization; (iv) providing false and misleading statements and information intended to circumvent the laws of New York State that prohibit ownership by individuals not licensed to practice the profession for which a professional corporation or limited liability company was incorporated; (v) providing false and misleading statements and information intended to circumvent the laws of New York State that prohibit payment of kickbacks for patient referrals; (vi) providing false and misleading statements and information intended to circumvent the laws of New York State that prohibit sharing professional fees with unlicensed persons;

(vii) providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that the Provider Defendants were owned and controlled by an unlicensed person; (viii) providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that the Provider Defendants were billing for services that were medically unnecessary; (ix) providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that the Provider Defendants were illegally permitting unlicensed persons to make health care decisions; (x) providing false and misleading statements and information intended to deceive and conceal the fact that the services billed by the Provider Defendants were provided pursuant to illegal kickbacks paid to Dada and to runners, to the extent the services were provided at all; (xi) providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that the PC Defendants were providing treatment pursuant to a fraudulent, pre-determined treatment protocol designed solely to financially benefit the Defendants, to the extent such treatment was even rendered; (xii) providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that the Provider Defendants were billing for services rendered by independent contractors, to the extent such treatment was even rendered; and (xiii) providing false and misleading statements and information in the signed medical reports and claim submissions intended to deceive and conceal the fact that the Provider Defendants were billing for services that were frequently not provided at all.

692.    Defendants knew the foregoing material misrepresentations to be false

when made and made or facilitated these false representations with the intention and purpose of inducing Liberty to rely thereon.

693.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty to pay charges submitted through the Provider Defendants that were not compensable under the No-Fault Laws.

694.    The Defendants, individually, together and through the Provider Defendants, were engaged in a common scheme designed to defraud Liberty and other insurance companies.

695.    Liberty reasonably and justifiably relied on the foregoing material misrepresentations as a result of Defendants' acts of fraud and deception.

696.    In reliance upon these false representations and/or omissions, Liberty made substantial payments to the Provider Defendants.

697.    Liberty is entitled to recover the payments made to the Provider Defendants.

698.    The Defendants' extensive fraudulent conduct evinces a reckless disregard and indifference to the rights of the Plaintiffs, as well as the public. The conduct of the Defendants was aimed at the public generally and demonstrates a high degree of moral turpitude and wanton dishonesty implying a criminal indifference, which entitles Liberty to punitive damages. Liberty is entitled to an award of punitive damages to protect the public by deterring the Defendants and others from engaging in similar conduct in the future.

699.    Liberty is entitled to recover the payments made to the Provider Defendants in an amount to be determined at trial, but in no event less than $283,185.14

## THIRTY-FIFTH CAUSE OF ACTION
### (Against All Defendants)
### (Aiding and Abetting Fraud)

700.    Liberty repeats and realleges the allegations set forth in paragraphs "1" through "699 of this Complaint as if fully set forth at length herein.

701.    The Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty by Dada, the Provider Defendants and the Nominal Owners.

702.    The acts of Dada, the Provider Defendants and the Nominal Owners in furtherance of the fraudulent scheme include: (i) knowingly performing medically unnecessary services in exchange for payment of money from Dada, the Provider Defendants and the Nominal Owners; (ii) knowingly issuing fraudulent reports in exchange for payment of money from Dada, the Provider Defendants and the Nominal Owners; (iii) knowingly referring Liberty insureds for treatment in exchange for kickbacks, including in cases where such insureds did not sustain any injuries as a result of any automobile accident; and (iv) knowingly causing fraudulent billing to be issued in exchange for payment of money from Dada, the Provider Defendants and the Nominal Owners.

703.    The conduct of Dada, the Provider Defendants and the Nominal Owners in furtherance of the fraudulent scheme is significant and material.  The conduct of the Defendants is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent health care services, issuance of the fraudulent reports and participation in the fraudulent billing, there would be no opportunity or a materially diminished opportunity for Dada, the Provider Defendants and the Nominal Owners individually to obtain payment from Liberty and from other insurers.

704.    The Defendants aided and abetted the fraudulent scheme in a calculated effort to induce Liberty into paying charges to the Provider Defendants for medically unnecessary

130

services or illusory services that were not compensable under New York's No-Fault Laws because they sought to continue profiting through the fraudulent scheme.

705.    The conduct of the Defendants caused Liberty to pay more than $283,185.14 based upon the fraudulent charges submitted through the Provider Defendants.

706.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty to recover punitive damages.

707.    Accordingly, by virtue of the foregoing, Liberty is entitled to compensatory and punitive damages, together with interest and costs and any other relief the Court deems just and proper.

### THIRTY-SIXTH CAUSE OF ACTION
### (Against All Defendants)
### (Unjust Enrichment)

708.    Liberty repeats and realleges each and every allegation contained in Paragraphs "1" through "707" of this Complaint as if fully set forth at length herein.

709.    The Defendants are jointly and severally liable for the acts and omissions set forth in paragraphs "1" through "708" of this Complaint.

710.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty.

711.    When Liberty paid the bills and charges submitted by the Provider Defendants for No-Fault Benefits, Liberty reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

712.    Liberty's payments constituted a benefit that Defendants voluntarily

accepted, notwithstanding their improper, unlawful, and unjust scheme.

713.    Defendants' retention of Liberty's payments violated fundamental principles of justice, equity and good conscience.

714.    By reason of the above, defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the sum of $283,185.14.

## JURY DEMAND

715.    Pursuant to Federal Rule of Civil Procedure § 38(b), Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

A.    On the First Cause of Action, a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to Liberty;

B.    On the Second Cause of Action against Compas and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $152,311.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Compas and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $152,311.00, together with treble damages, costs and reasonable attorneys' fees pursuant to U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Compas and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $6,632.00, together with treble damages, costs and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c) plus interest;

      E.    On the Fifth Cause of Action against Compas and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $6,632.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      F.    On the Sixth Cause of Action against Gutierrez and Dada compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $13,345.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      G.    On the Seventh Cause of Action against Gutierrez and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $13,345.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      H.    On the Eighth Cause of Action against Gutierrez and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $296.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      I.    On the Ninth Cause of Action against Gutierrez and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $296.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      J.    On the Tenth Cause of Action against Compas and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $5,671.00, together with treble damages, costs and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c) plus interest;

      K.     On the Eleventh Cause of Action against Compas and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $5,671.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      L.     On the Twelfth Cause of Action against Gutierrez and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $987.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      M.     On the Thirteenth Cause of Action against Gutierrez and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $987.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      N.     On the Fourteenth Cause of Action against Compas, Gutierrez and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $179,242.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      O.     On the Fifteenth Cause of Action against Compas, Gutierrez and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $179,242.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      P.     On the Sixteenth Cause of Action against Mollo and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $4,059.00, together with treble damages, costs and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.      On the Seventeenth Cause of Action against Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $4,059.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Mollo and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $2,734.34, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Mollo, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $2,734.34, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.      On the Twentieth Cause of Action against Laga and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $20,515.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Laga, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $20,515.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Laga and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $8,095.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Laga and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $8,095.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Masigla and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $246.40, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.      On the Twenty-Fifth Cause of Action against Masigla, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $246.40, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Z.      On the Twenty-Sixth Cause of Action against Masigla and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $14,707.40, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.     On the Twenty-Fourth Cause of Action against Masigla and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $14,707.40, together with treble damages, costs and reasonable

136

attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.    On the Twenty-Eighth Cause of Action against Deng and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $3,545.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.    On the Twenty-Ninth Cause of Action against Deng, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $3,545.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

DD.    On the Thirtieth Cause of Action against Super and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $3,091.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EE.    On the Thirty-First Cause of Action against Super, Compas, Gutierrez, Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $3,091.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

FF.    On the Thirty-Second Cause of Action against Super and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $46,950.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.    On the Thirty-Third Cause of Action against Super, Compas, Gutierrez,

Compas Medical, Alleviation Medical, JCC Medical, JGG Medical and Dada, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $46,950.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      HH.    On the Thirty-Fourth Cause of Action against all Defendants, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $283,185.14, together with punitive damages, costs and interest;

      II.    On the Thirty-Fifth Cause of Action against all Defendants, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $283,185.14 together with punitive damages, costs and interest;

      JJ.    On the Thirty-Sixth Cause of Action against all Defendants, compensatory damages in favor of Liberty in an amount to be determined at trial but in no event less than $283,185.14 plus costs and interest;

      KK.    Awarding Liberty costs, attorneys' fees and such other, further and different relief as the Court deems just and proper under the circumstances.

Dated: Garden City, New York
       June 6, 2014

                         McDONNELL & ADELS, PLLC

               By:                                

                      Patrick J. McDonnell (PM 8062
                      Michael J. Giordano (MG 9958)
                      Attorneys for Plaintiffs
                      401 Franklin Avenue
                      Garden City, New York 11530
                      (516) 328-3500
                      File No.: LIB-0120(a)dj

# EXHIBIT "1"