UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY
MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE
CORP., LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY
COUNTY MUTUAL, THE FIRST LIBERTY INSURANCE CORP.,
LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE CORP., PEERLESS INS. CO.,
AMERICAN STATES INSURANCE CO., GENERAL INSURANCE
CO. OF AMERICA, SAFECO INSURANCE CO. OF AMERICA,
AND SAFECO INSURANCE OF INDIANA,

                              Plaintiffs,

                         - against —                         Case  No.:

COMPAS MEDICAL, P.C., et al.,                                2:14-cv-03680

                                                             (LDW)(GRB)

                              Defendants

---

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT
FOR FAILURE TO STATE A CLAIM AND TO STAY THE CASE PENDING
ADJUDICATION BY NEW YORK STATE AGENCIES UNDER THE DOCTRINE OF
PRIMARY JURISDICTION

Gary Tsirelman, P.C.
*Attorneys for Defendants*
*Jaime Gutierrez, M.D.,*
*Alleviation Medical, P.C., and*
*JGG Medical, P.C.*
By:  Gary Tsirelman, Esq.
Stefan Belinfanti, Esq.
Nicholas Bowers, Esq.
129 Livingston Street
Second Floor
Brooklyn, NY 11238
(718) 438-1200

# Contents

TABLE OF AUTHORITIES .................................................................................... i

I.   PLAINTIFFS' FRAUD CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE ACTION PROPERLY SOUNDS IN BREACH OF CONTRACT ............................... 1

   A.   Preliminary Statement Regarding Breach of Contract ................................ 1

      Plaintiffs' Fraud/RICO Cause of Action Should Be Dismissed Since It Is Based ................ 4

   B.   Entirely on Allegations of Breaches of Contract ........................................ 4

   C.   The alleged misrepresentations concern contractual provisions ...................... 6

   D.   The Allegedly Fraudulent Statements Were Made on Contractually Prescribed  Forms  7

   E.   All Payments By Plaintiffs Were Made Pursuant to Contract ......................... 8

   F.   Federal and State Case Law Support Defendants' Arguments ........................ 8

II.   THIS ACTION SHOULD BE STAYED PURSUANT TO THE DOCTRINE OF PRIMARY JURISDICTION ................................................................................ 15

   A.   Preliminary Statement Regarding Primary Jurisdiction ............................... 15

   B.   The New York Departments of Health, Education and Financial Services Have Primary Jurisdiction Over Plaintiffs' Core Allegations ............................... 16

   C.   The Departments of Financial Services, Health and Education Have Jurisdiction and Discretion Over Plaintiffs' Core allegations ........................................ 18

   D.   Primary Jurisdiction Ensures Uniform Outcomes of Court Cases and Regulatory Actions ................................................................................... 21

   E.   Plaintiffs' Core Allegations Involve Technical And Policy Considerations With the New York Departments of Financial Services, Health and Education's Fields of Expertise... 24

   F.   It Is Not Clear Whether There Has Been any Prior Application to New York State Agencies on the Issues at Bar ............................................................. 26

   G.   The Cases Cited by Plaintiffs in Their Opposition to Defendants' Request for a Pre- Motion Conference are Inapposite ....................................................... 26

PLAINTIFFS' DECLARATORY JUDGMENT CAUSE OF ACTION MUST BE DIMISSED ........................................................................................... 27

i

III................................................................................................................................... 27

    There is No Cognizable Independent Cause of Action For a Declaratory Judgment........... 27

    A.............................................................................................................................. 27

B.    Plaintiffs' Unjust Enrichment, Fraud and RICO Causes of Action Regarding Pending No-Fault Claims Are Not Yet Ripe .................................................................................... 28

C.    Payments Tendered By JGG Medical and Doctor Gutierrez Moot Causes of Action Eight, Nine, Twelve and Thirteen.................................................................................... 29

IV.    Plaintiffs' Claims Against Moving Defendants are Barred by the Doctrine of Res Judicata ....................................................................................................................................31

CONCLUSION................................................................................................................. 33

# TABLE OF AUTHORITIES

**Federal Cases**

*Allstate Ins. Co. v. Tanella,*
11 CV 6364 CBA RML, 2012 WL 7188685 (E.D.N.Y. Aug. 28, 2012) .................................20

*Bernhardt v. Pfizer, Inc.,*
 00 CIV. 4042 LMM, 2000 WL 1738645 (S.D.N.Y. Nov. 22, 2000)...................................21

*Bernstein v. Misk,*
948 F.Supp. 228 (E.D.N.Y 1997) ................................................................................... 1, 8

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,*
98 F.3d 13 (2d Cir.1996) ............................................................................................... 9, 10

*Chamberlin v. Hartford Financial Services, Inc.,*
 2005 WL 2007894 (S.D.N.Y. 2005) ................................................................................... 1

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) .............................................................................................................25

*Crabtree vs. Tristar Automotive Group, Inc.,*
776 F.Supp. 155 (S.D.N.Y. 1991) .....................................................................................10

*D.R.S. Trading Co. v. Fisher,*
2002 WL 1482764 (S.D.N.Y. 2002) ................................................................................ 1, 8

*Danna v. Air France,*
463 F.2d 407 (2d Cir. 1972)................................................................................................25

*Denny v. Deutsche Bank AG,*
443 F.3d 253 (2d Cir. 2006).................................................................................................28

*DLJ Mortg. Capital, Inc. v. Kontogiannis,*
726 F. Supp. 2d 225 (E.D.N.Y. 2010)..............................................................................28

*Ellis v. Tribune Television Co.,*
443 F.3d 71 (2d Cir. 2006).............................................................................. 18, 22, 25, 26

*Erie v. Pap's A.M.,*
529 U.S. 277 (2000) .............................................................................................................30

*Fed. Mar. Bd. v. Isbrandtsen Co.,*
356 U.S. 481 (1958) .............................................................................................................17

i

*Fernando v. Fernando,*
09-CV-1390 KAM SMG, 2010 WL 3119729 (E.D.N.Y. Aug. 5, 2010) ...............................10

*First Nationwide Bank v. Gelt Funding Corp.,*
27 F.3d 763 (2d Cir. 1994) ...............................................................................................28

*Fulton Cogeneration Associates v. Niagara Mohawk Power Corp.,*
84 F.3d 91 (2d Cir. 1996) .................................................................................................16

*Garrity v. Lyle Stuart, Inc.,*
40 N.Y.2d 354 (1976) .......................................................................................................30

*Gen. Am. Tank Car Corp. v. El Dorado T. Co.,*
308 U.S. 422 (1940) ..........................................................................................................16

*General Elec. Co. v. M.V. Nedlloyd,*
817 F.2d 1022 (2d Cir.1987) ........................................................................................16, 17

*Golden Hill Paugussett Tribe of Indians v. Weicker,*
39 F.3d 51 (2d Cir. 1994) .................................................................................................17

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC,*
347 Fed.Appx. 711 (2d Cir.2009) ....................................................................................29

*Hecht v. Commerce Clearing House, Inc.,*
897 F.2d 21 (2d Cir. 1990) ...............................................................................................28

*Iconix Brand Grp., Inc. v. Bongo Apparel, Inc.,* 06 CIV. 8195 (DLC),
2008 WL 2695090 (S.D.N.Y. July 8, 2008) ......................................................................9

*Ikea North American Services, Inc. v. Northeast Graphics, Inc.,*
56 F.Supp.2d 340 (S.D.N.Y. 1999) ....................................................................................8

*In re American Tobacco Co.,*
880 F.2d 1520 (2d Cir.1989) ............................................................................................31

*In re Joint E & So. Dist. Asbestos Litig.,*
14 F.3d 726 (2d Cir.1993) .................................................................................................27

*Johnson v. Nyack Hosp.,*
964 F.2d 116 (2d Cir. 1992) .........................................................................................16, 24

*KM Enterprises, Inc. v. McDonald,*
2012 WL 4472010 (E.D.N.Y. Sept. 25, 2012) .................................................................28

ii

*Knox v. Serv. Employees Int'l Union, Local 1000,*
132 S. Ct. 2277 (2012) ........................................................................................30

*Lenard v. Design Studio,*
889 F.Sup.2d 518 (S.D.N.Y. 2012) ........................................................................9

*Lewis v. Cont'l Bank Corp.,*
494 U.S. 472 (1990) ...........................................................................................30

*Long Island Lighting Co. v. Transamerica Delaval, Inc.,*
646 F.Supp. 1442 (S.D.N.Y. 1986) ......................................................................10

*Los Angeles v. Lyons,*
461 U.S. 95 (1983) .............................................................................................30

*Motorola Credit Corp. v. Uzan,*
322 F.3d 130 (2d Cir. 2003) ...........................................................................28, 29

*Murphy v. Hunt,*
455 U.S. 478 (1982) ...........................................................................................30

*Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.,*
46 F.3d 220 (2d Cir. 1995) ..................................................................................26

*Oasis Petroleum Corp. v. U.S. Dep't of Energy,*
718 F.2d 1558 (Temp.Emer.Ct.App.1983) .............................................................26

*Papa's-June Music, Inc. v. McLean,*
921 F.Supp. 1154 (S.D.N.Y. 1996) ........................................................................9

*Pharm. Research & Mfrs. of Am. v. Walsh,*
538 U.S. 644 (2003) ...........................................................................................27

*Reiter v. Cooper,*
507 U.S. 258 (1993) ...........................................................................................17

*Ricci v. Chicago Mercantile Exch.,*
409 U.S. 289 (1973) ...........................................................................................18

*Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC,* No. 07 Civ. 3494,
2007 WL 2044656 (S.D.N.Y. July 17, 2007) ..........................................................9

*S. Utah Wilderness Alliance v. Bureau of Land Mgmt.,*
425 F.3d 735 (10th Cir.2005) ..............................................................................17

iii

*Schiller v. Tower Semiconductor Ltd.,*
449 F.3d 286 (2d Cir. 2006) ..................................................................................17

*Sky Med. Supply Inc. v SCS Support Claims Services, Inc.,*
17 F Supp 3d 207 (E.D.N.Y. May 7, 2014) ..............................................................29

*State Farm Mut. Auto. Ins. Co. v. Rabiner,*
749 F.Supp.2d 94 (E.D.N.Y. 2010) .....................................................................26, 27

*Tassy v. Brunswick Hosp. Ctr., Inc.,*
296 F.3d 65 (2d Cir. 2002) ..................................................................................17

*TVT Records v. Island Def Jam Music Grp.,*
412 F.3d 82 (2d Cir. 2005) ..................................................................................31

*United States Parole Comm'n v. Geraghty,*
445 U.S. 388 (1980) ...........................................................................................30

*United States v W. Pac. R. Co.,*
352 U.S. 59 (1956) .........................................................................................16, 17

*Vista Company v. Columbia Pictures Industries, Inc.,*
725 F.Supp 1286 (S.D.N.Y. 1989) .........................................................................10

*Vitoro v. Mentor H/S, Inc.,*
426 F.Supp.2d 28 (E.D.N.Y. 2006) ..........................................................................8

*Wyly v. CA, Inc.,*
2009 WL 8691097 (E.D.N.Y. Sept. 2, 2009) ...........................................................27

**State Cases**
*A.M. Med. Servs., P.C. v. Progressive Cas. Ins. Co.,*
953 N.Y.S.2d 219 (N.Y. App. Div. 2012) ................................................................12

*Allstate Ins. Co. v. Belt Parkway Imaging, P.C.,*
914 N.Y.S.2d 5 (N.Y. App. Div. 2010) ...................................................................19

*Benson v. Boston Old Colony Ins. Co.,*
521 N.Y.S.2d 14 (N.Y. App. Div. 1987) .................................................................11

*Chester Med. Diagnostic, P.C. v. Kemper Cas. Ins. Co.,*
873 N.Y.S.2d 232 (N.Y. Civ. Ct. 2008) ...................................................................11

*Dana Woolfson LMT v. Government Employees Ins. Co.,*
20 Misc. 3d 948 (N.Y. Civ. Ct., 2008) ......................................................................5

*Dover Acupuncture, P.C. v. State Farm Mut. Auto. Ins. Co.*,
958 N.Y.S.2d 60 (N.Y. App. Term 2010)...................................................................5

*Fair Price Med. Supply Corp. v. Travelers Indem. Co.*,
10 N.Y.3d 556 (N.Y. 2008)..................................................................................12, 14

*Gurnee v Aetna Life & Cas. Co.*
55 N.Y.2d 184 (N.Y.1982)........................................................................................11

*Hosp. for Joint Diseases v. NY and Presbyt. Hosp.*,
9 N.Y.3d 312 (N.Y. 2007).........................................................................................13

*Lexington Acupuncture, P.C. v. Gen. Assur. Co.*,
35 Misc. 3d 42, 43, 944 N.Y.S.2d 686 (App. Term 2012).......................................23

*Mandarino v. Travelers Prop. Cas. Ins. Co.*,
37 A.D.3d 775 (N.Y. App. Div. 2007).......................................................................11

*Matter of Co-operative Law Corp.*,
198 N.Y. 479 (N.Y. 1910).........................................................................................25

*Metro Transp. Auth. v. Triumph Adver. Prods., Inc.*,
116 A.D.2d 526 (N.Y. App. Div. 1986).....................................................................10

*Miller v. Volk & Huxley Inc.*,
355 N.Y.S.2d 605 (N.Y. App. Div. 1974)..................................................................10

*New York Cent. Mut. Ins. Co. v. McGee*,
906 N.Y.S.2d 774 (N.Y. Sup. Ct. 2009)...................................................................21

*NYU Hosp. for Joint Diseases v. State Farm Mut. Auto. Ins. Co.*,
8 Misc.3d 41 (N.Y. App.Term, 2012).........................................................................7

*Roggio v. Nationwide Mut. Ins. Co.*,
66 N.Y.2d 260 (1985)...............................................................................................23

*Romano v. Astoria Fed. Sav. & Loan Ass'n*,
490 N.Y.S.2d 244 (N.Y. App. Div. 2d Dept. 1985)..................................................31

*State Farm Mut. Auto. Ins. Co. v Mallela*,
4 N.Y.3d 313 (N.Y. 2005).........................................................................13, 15, 20, 21

*State Farm Mut. Ins. Co. v. Anikeyeva*,
950 N.Y.S.2d 726 (N.Y. Sup. Ct. 2012)...................................................................12

*Trizzano v. Allstate Ins. Co.,*
7 A.D. 3d 783 (N.Y. App. Div. 2004) ................................................................5

*Urban Radiology, P.C. v. GEICO Ins. Co.,*
958 N.Y.S.2d 64 (Civ. Ct. 2010) ....................................................................23

**Statutes**

N.Y. Business Corporation Law § 1507 ............................................................15

N.Y. Education Law § 6507 ..............................................................................15

N.Y. General Business Law §349 ......................................................................12

N.Y. Insurance Law § 5101 ..............................................................................19

N.Y. Insurance Law § 5108 ......................................................................15, 18, 26

N.Y. Insurance Law § 5109 ..........................................................................19, 20

N.Y. Insurance Law 5102 ..................................................................................6

**Regulations**

N.Y. Comp. Codes R. & Regs. tit. 11, § 65...............2, 4, 5, 6, 7, 9, 11, 17, 19, 20, 32

C.F.R. § 1030 ..................................................................................................21

vi

## I.   PLAINTIFFS' FRAUD CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE ACTION PROPERLY SOUNDS IN BREACH OF CONTRACT
### A.   Preliminary Statement Regarding Breach of Contract

By filing the underlying Complaint, Plaintiffs attempt to convert rudimentary no-fault insurance contract disputes – the likes of which are the subject of thousands of lawsuits every year in New York's state courts – into a federal action in order to gain access to the "treble damages" cudgel available in RICO actions. The amounts of money Plaintiffs claim that they paid to the GTPC Defendants as a result of the alleged fraud are paltry - $296 to Defendant JGG Medical Services, PC; $987 to Defendant Jaime Gutierrez, MD; and $13,345 to Defendant Alleviation Medical Services PC.[1] Plaintiffs themselves admit that those payments, which they now seek recoup, were made pursuant to the insurance contracts that existed between Plaintiffs and GTPC Defendants' assignors. Moreover, the remaining "pending" cases that involve GTPC Defendants – upon which Plaintiffs base their declaratory judgment causes of action - are the subject of *active* lawsuits between the same parties in state court. *See* Bowers Decl. **Exhibit A.** Absent the underlying contracts of insurance, the alleged fraud could never have been effectuated in the first place. In fact, Plaintiffs fail to allege a single payment that was *not* made pursuant to the terms of existing contracts. Therefore Plaintiffs' contract-based claims cannot properly be converted into RICO claims. *See Chamberlin v. Hartford Financial Services, Inc.* 2005 WL 2007894 (S.D.N.Y. 2005); *D.R.S. Trading Co. v. Fisher*, 2002 WL 1482764 (S.D.N.Y. 2002); *Bernstein v. Misk*, 948 F.Supp. 228 (E.D.N.Y 1997).

Additionally, the documents containing the purportedly fraudulent statements are literally contractual documents. Specifically, the "NF-3" billing forms alleged by Plaintiffs to be fraudulent are designated by statute to be used by health care providers seeking reimbursement of No-Fault benefits under the policies of insurance. As per the Complaint, the NF-3 forms contain a section

---

[1] The Complaint is defective in that Plaintiffs do not affirmatively state whether those payments were made voluntarily, as opposed to being made pursuant to stipulations of settlement or judgments obtained in court action actions.

1

wherein the health provider places its name as the entity to be reimbursed.  In essence, Plaintiffs allege that by placing "P.C." on the NF-3 forms (identifying themselves as professional corporations), GTPC Defendants represented that they were properly licensed professional service entities, when they were really not. However, the NF-3 forms are the statutory claim forms that the Department of Financial Services has prescribed for treatment providers - whether or not they are corporate entities - to submit for reimbursement purposes.  By operation of law, these NF-3 forms and the other forms contained within Appendix 13 to N.Y. Comp. Codes R. & Regs. tit. 11, § 65 were incorporated into each contract of insurance issued by Plaintiffs. Therefore, even the medium utilized to create the alleged deception originated from the insurance policy contracts issued by Plaintiffs.

Moreover, all of the allegations contained in the Complaint (including that GTPC Defendants rendered medically unnecessary services, provided excessive treatment, overbilled Plaintiffs, and are fraudulently incorporated), are the same allegations routinely made by insurers in breach of contract actions in state court and readily disposed of by state judiciary.  In light of this, it becomes abundantly clear that Plaintiffs are attempting to recoup *contractual* payments (No-Fault benefits) made pursuant to breach of *contractual* terms (N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16 – requiring health care providers to meet all licensing requirements as a precondition to reimbursement), from misrepresentations that were allegedly effectuated through the use of *contractual* documents (NF-3 forms). Thus there is simply no question that Plaintiffs' claims lie in breach of contract, requiring dismissal of the RICO fraud claims.

Moreover, as discussed below, cases from this District and the Second Circuit Court of Appeals clearly support Defendants' assertion that Plaintiffs' action cannot be converted into a fraud claim. This point is strengthened by the fact that failing to dismiss the fraud cause of action on the

2

grounds enumerated herein would require an interpretation of a state regulation that would be incompatible with decisions issued by New York's Appellate Divisions and the Court of Appeals.

Finally, Plaintiffs' attempt to disguise clear-cut breach of contract claims as RICO actions is abusive and casts an unreasonably wide net. Plaintiffs' strategy could conceivably be applied to *any* portions of the "NF-3" billing forms that they disagree with, bar none. For example:

1) The No-Fault regulations generally preclude a corporate entity from obtaining reimbursement for medical services provided by an independent contractor. The NF-3 forms include a section for stating whether the service provider is an employee or independent provider of the entity seeking reimbursement However, since the determination whether somebody is an employee or independent contractor requires a fact-specific analysis, a genuine dispute as to this issue could be framed as a RICO complaint in much the same way as the instant case;

2) The No-Fault regulations require insurers to pay only those services that are medically necessary. The NF-3 forms contain a section where the health care provider must designate whether the injured party has sustained a permanent injury, a factor that is sometimes considered for determining medical necessity. In light of this, Plaintiffs who disagree with a provider who selects "Yes" or "Not Yet Determinable" can assert that the provider is making false statements in order to induce payments of the services rendered and subject the same provider to a RICO complaint;

3) The No-Fault regulations require providers to bill for services using the proper amounts contained in the applicable Workers' Compensations fee schedule. The amounts billed may also depend on how much supervision, if any a physician had over a technician or non-physician therapist. In light of this, fee schedule disputes

3

could be recast as RICO actions based on misrepresentations on the NF-3s concerning whether the fee codes or amounts accurately reflect services rendered.

Should Plaintiffs have their way, disputes involving compliance with *any* contractual provision in the controlling insurance policies would be converted into RICO fraud claims. Pursuant to the above-mentioned arguments, which are more fully set forth below, this Court should reject Plaintiffs' transparent attempt to dress up a breach of contract action in RICO clothing.

### B. Plaintiffs' Fraud/RICO Cause of Action Should Be Dismissed Since It Is Based Entirely on Allegations of Breaches of Contract

Plaintiffs themselves concede, specifically at ¶8-13 of the Complaint and more generally throughout, that the damages they allegedly sustained resulted solely from Defendants' submission of claim forms, as assignees to the insurance policy contracts between Plaintiffs and Defendants' assignors. According to Plaintiffs, the insured parties purchased insurance contracts from the Plaintiffs pursuant to the mandates of Article 51 of the Insurance Law of New York. Subsequently, after becoming injured as a result of motor vehicle collisions, the insured parties assigned their rights to reimbursement under the contracts to the Defendants in order to obtain medical treatment. *Id.* Plaintiffs also concede that, pursuant to these contractual assignments, Defendants mailed the statutorily prescribed No-Fault claim forms to Plaintiffs, which in turn paid the outstanding bills. Under the statutory scheme set forth in Regulation 68 (N.Y. Comp. Codes R. & Regs. tit. 11, § 65), this is *exactly* how the claims submission and payment process is supposed to work pursuant to each contract of insurance. *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 65.

However, Plaintiffs *now* allege that Defendants committed "fraud" because, among other things, they were not properly licensed in accordance with state laws as required under the insurance policies. Ironically, the consistent theme throughout the Complaint is that while Plaintiffs accuse

4

Defendants of committing fraud by misrepresenting their compliance with New York's licensing laws, *all* of the contracts under which the payments were made require Defendants to meet those requirements in order obtain reimbursement in the first place. For this reason and the other reasons listed below, Plaintiffs' Complaint must be dismissed.

By operation of law, every insurance policy contract written since September 1, 2001, incorporates the terms contained in Regulation 68, which is also referred to as the "Mandatory Personal Injury Protection Endorsement" (hereinafter "Endorsement"). See *Trizzano v. Allstate Ins. Co.*, 7 A.D. 3d 783, 785 (N.Y. App. Div. 2004) ("Applicable provisions of the Insurance Law are deemed to be part of an insurance contract as though written into it."); *see also Dana Woolfson LMT v. Government Employees Ins. Co.*, 20 Misc. 3d 948, 950 (N.Y. Civ. Ct., 2008). In fact, Regulation 68 itself makes this clear, stating:

> (a) Every owner's policy of liability insurance issued in satisfaction of the minimum requirements of article 6 or 8 of the Vehicle and Traffic Law and article 51 of the Insurance Law shall contain provisions providing minimum first-party benefits equal to those set out below in the mandatory personal injury protection endorsement (New York), or mandatory personal injury protection endorsement - motorcycles (New York), respectively.
> (b) **The Mandatory Personal Injury Protection Endorsement** (New York) and the Mandatory Personal Injury Protection Endorsement - Motorcycles (New York) set out below are approved and promulgated for use by an insurer and, except as provided in subdivision (c) of this section and section 65-1.7 of this Subpart, must be:
> (1) furnished to all new insureds with policies effective on and after September 1, 2001; and
> (2) enclosed with the first renewal policies renewed on and after September 1, 2001. [*Emphasis added*].

N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1. Moreover, even if Plaintiffs' insurance policies had failed to include the Endorsement (which itself would be a violation of the law), "the polic[ies] would have been construed as though [they] did." *Dover Acupuncture, P.C. v. State Farm Mut. Auto. Ins. Co.*, 958 N.Y.S.2d 60 (N.Y. App. Term 2010). Here, Plaintiffs allege that the fraud stemming from the insurance policies in question began in 2009. Compl. ¶ 115. Therefore there can be no dispute

5

that said insurance policies were all issued or renewed after September 1, 2001, and that they included the Endorsement as required by law. This is fatal to Plaintiffs' fraud/RICO claim, since the policy contracts already explicitly require health care providers assignees (such as Defendants) to be properly licensed in order to be eligible for reimbursement. The truth is that it is not just this aspect of Plaintiffs' Complaint that originates from a contractual dispute. Rather, as discussed below, every facet of Plaintiffs' RICO and fraud causes of action implicate an alleged breach of contract, leading to the unavoidable conclusion that Plaintiffs cannot now convert a contractual dispute into an action based on fraud.

### C.    The alleged misrepresentations concern contractual provisions

Every insurance contract issued by Plaintiffs, pursuant to which they allegedly made payments to Defendants, contains the following clause: "(12) A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed." N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16. Section 65-3.16 is broadly written, deeming health care providers, as assignees to the insurance contracts, ineligible for reimbursement should they fail to meet "any" applicable state or local licensing requirements necessary to perform the medical services in question. Plaintiffs allege that, since Defendants were in fact "owned, operated and/or controlled" by unlicensed parties in violation of the New York's Education Laws and the Business Corporation Law, they misrepresented their licensing status in contravention of the above-quoted clause. In fact, every "fraudulent statement" pled by Plaintiffs in the Predicate Acts chart incorporated into its complaint is an alleged violation of the above condition.

6

Since the "fraud" Plaintiffs accuse Defendants of perpetrating simply involves whether or not Defendants satisfied a clause that is part and parcel of every contract of insurance under which the claims were paid, Plaintiffs' attempt to creatively plead these contract violations as RICO claims must fail.[3]

### D.     The Allegedly Fraudulent Statements Were Made on Contractually Prescribed Forms

A review of the allegations regarding the misrepresentations provides further evidence that Plaintiffs' action lies in breach of contract as opposed to fraud.  Notably, Plaintiffs allege that they were duped into making payments to Defendants because the NF-3 claim forms submitted for reimbursement falsely represented Defendants' licensing status.  However, there are two key aspects to the NF-3 forms that require analysis: (1) the forms are statutorily prescribed claim forms that must be used by health care providers seeking reimbursement of No-Fault benefits under the policy contracts; and (2) they are incorporated as a matter of law into every policy of insurance written in New York. *See NYU Hosp. for Joint Diseases v. State Farm Mut. Auto. Ins. Co.*, 8 Misc.3d 41 (N.Y. App.Term, 2012).  "NF-3" is the official name for the specific billing form that the Department of Financial Services publishes for treatment providers to submit for reimbursement purposes.  These forms and the other forms contained within *Appendix 13* to the No-Fault Regulations are incorporated by statute into each contract of insurance issued by Plaintiffs after September 1, 2001. *See* N.Y. Comp. Codes R. & Regs. tit. 11, §65-3.4.

---

[3] It also bears noting that every fraudulent statement alleged by Plaintiffs stems directly from the insurance policy contract that was assigned by the patients to the Defendants. For instance, as is alleged, the type of notice that Defendants must give to the Plaintiffs, submission of bills in a timely manner (N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1, 65-2.4), submission of accurate bills, and complying with proof of claim are all part of the Defendants' rights and obligations that arise solely from the contract. Furthermore, it is not only the Defendants' rights and obligation under the contract that are pleaded, but so are the Plaintiffs. The right to request a verification of proof of claim (N.Y. Comp. Codes R. & Regs. tit. 11, §65-3.5, 65-3.11) or the obligation to pay the claim within 30 days (N.Y. Comp. Codes R. & Regs. tit. 11, §65-3.8) are likewise the bedrock of the insurance contracts at issue. Allegations of untruthfulness or mislabeling of the bills, which Plaintiffs alleges were concealed, are nothing more than a request by the contracted party for a good faith and fair dealing within the terms of the contract expressed or implied.

> "(c) Attached is an appendix (Appendix 13, infra), which includes the following prescribed claim forms that must be used by all insurers, and shall not be altered unless approved by the superintendent: (4) Verification of Treatment by Attending Physician or Other Provider of Health Service (NYS Form NF-3)".

Therefore the forms containing the alleged misrepresentation regarding Defendants' licensing status cannot possibly be considered collateral to the contracts. In fact, Plaintiffs do not specify a single statement made on a form *other than* an "NF-3" or any other contractually prescribed document that it relied upon in paying Defendants' bills. Notably, the column entitled "Document Mailed" on the list of predicate acts depicted in the Complaint's Appendix establishes that all of the allegedly fraudulent statements were made on the bill/NF-3 form. This reconfirms the inescapable conclusion that Defendants' action lies in breach of contract.

### E.   All Payments By Plaintiffs Were Made Pursuant to Contract

Furthermore, the Complaint admits that all of the payments Plaintiffs now seek to recoup were made pursuant to NF-3 forms that they received. Compl. ¶ 410-15. These forms were submitted under the terms of the subject policy contracts. Plaintiffs have not alleged that any payments were made that did not arise out of the insurance contracts. Absent the contracts, the "fraud" alleged by Plaintiffs could never have been effectuated and payments would never have been made. Consequently, Plaintiffs' claims are completely grounded in contractual relations, and cannot be converted into RICO claims. *See Chamberlin* 2005 WL 2007894; *D.R.S. Trading Co.*, 2002 WL 1482764; *Bernstein* 948 F.Supp. 228.

### F.   Federal and State Case Law Support Defendants' Arguments

It is well settled that misrepresentations concerning a contract do not rise to the level of fraud unless they concern a matter which is "collateral or extraneous" to the contract. *See Ikea North American Services, Inc. v. Northeast Graphics, Inc.*, 56 F.Supp.2d 340 (S.D.N.Y. 1999). *See also Vitoro v. Mentor H/S, Inc.*, 426 F.Supp.2d 28 (E.D.N.Y. 2006); *Lenard v. Design Studio*, 889 F.Sup.2d 518

8

(S.D.N.Y. 2012); *Iconix Brand Grp., Inc. v. Bongo Apparel, Inc.*, 06 CIV. 8195 (DLC), 2008 WL 2695090 (S.D.N.Y. July 8, 2008). Here, because Plaintiffs' alleged injuries resulted from alleged misrepresentations regarding Defendants' eligibility to be assignees to the contracts in question, and since those supposedly false statements were made on the contractual forms prescribed by statute for reimbursement purposes, these misrepresentations simply cannot be considered collateral or extraneous to the policies. It is undisputed that the injury alleged by Plaintiffs occurred only as a result of submission of bills and nothing more. Even Plaintiffs' own exhibits, purporting to show the predicate acts of mail fraud that triggered the payments to Defendants, make this fact clear. For example, Plaintiffs annexed and incorporated into the Complaint an *Appendix*, purporting to show the circumstances surrounding each instance of "mail fraud" that triggered the payments. However, a review of the five statements listed in the *Appendix* reveals that they are merely variations of the same exact theme – that by placing the name of the P.C.s and the P.C.'s owner on the N-F3 forms, Defendants allegedly misrepresented whether they were in compliance with New York's licensing requirements as mandated by the contracts of insurance under N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16. However, since proper licensing is explicitly listed in the Plaintiff's insurance policies as a condition that must be met in order to trigger their obligation to reimburse incurred medical expenses, Plaintiffs cannot now forego their contractual relief in order to sue under RICO.

Additionally, New York law requires that a fraud claim, raised in a case that stems from breach of contract be "sufficiently distinct from the breach of contract claim." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (citing *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996)); *see Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *7 (S.D.N.Y. July 17, 2007)(dismissing the fraud claim where it appeared "to rest entirely on the subjects covered in the representations and warranties contained in the agreements"). Moreover, in New York, "a cause of action for fraud will not arise

9

when the only fraud charged relates to a breach of contract." *Miller v. Volk & Huxley Inc.,* 355 N.Y.S.2d 605, 606-07 (N.Y. App. Div. 1974). *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F. Supp. 1442 (S.D.N.Y. 1986). *See also Vista Company v. Columbia Pictures Industries, Inc.,* 725 F. Supp 1286 (S.D.N.Y. 1989); *Crabtree vs. Tristar Automotive Group, Inc.,* 776 F.Supp. 155, 162 (S.D.N.Y. 1991)("[t]he well accepted rule is that a cause of action does not arise when alleged fraud relates to a breach of contract."); *and Fernando v. Fernando,* 09-CV-1390 KAM SMG, 2010 WL 3119729 (E.D.N.Y. Aug. 5, 2010)

The Court of Appeals for the Second Circuit has more explicitly set forth rules for determining whether actions that are contractual in nature can be converted into fraud actions. In *Bridgestone/Firestone,* the Court identified three instances in which a party could distinguish its fraud claim from its breach of contract claim. *Bridgestone/Firestone,* 98 F.3d 13. A plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20 (citations omitted). As discussed below, Plaintiffs fail to meet any of these exceptions.

Insofar as this matter is concerned, none of the three prongs mentioned above have been met. Plaintiffs have not "demonstrated a legal duty separate from the duty to perform under the contract." In fact, the Complaint does not even allege that any of the Defendants owed a duty to Plaintiffs separate from the duty to perform under the contract. With respect to the second prong, "[t]o determine whether the fact is collateral to the contract, courts look to whether the contract implicitly addresses the issue. *Id.* (citing *Metro Transp. Auth. v. Triumph Adver. Prods., Inc.,* 116 A.D.2d 526 (N.Y. App. Div. 1986)). Here, the contract itself does in fact address the issue. As noted above, the misrepresentations alleged by Plaintiffs concerns Defendants' eligibility to be parties to the contract in the first place, as assignees of the injured parties. The No-Fault Endorsement, including

10

the clause entitled "Measurement of No-Fault Benefits" was included in every insurance policy Plaintiffs themselves issued in this matter. N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16. This clause specifically requires Defendants to comply with all of New York's licensing requirements in order to be eligible for No-Fault benefits. With respect to the third prong, Plaintiffs have not alleged that they cannot recoup the money they paid out via a claim for breach of contracts. Thus Plaintiffs have failed to satisfy any of the prongs set forth by the Court of Appeals.

Rulings from New York's state courts also support Defendants' position. Courts in this state have repeatedly confirmed that disputes regarding the right to obtain payment of No-Fault benefits are fundamentally breach of contract matters, regardless of which provision either side is accused of breaching. *See Chester Med. Diagnostic, P.C. v. Kemper Cas. Ins. Co.,* 873 N.Y.S.2d 232 (N.Y. Civ. Ct. 2008); *see also Benson v. Boston Old Colony Ins. Co.,* 521 N.Y.S.2d 14 (N.Y. App. Div. 1987); *Mandarino v. Travelers Prop. Cas. Ins. Co.,* 37 A.D.3d 775 (N.Y. App. Div. 2007). Significantly, the no fault law's origin as a creature of statute does not diminish the fact that the rights of the parties are derived from the contracts of insurance in which the regulations are incorporated. Therefore, the issue as to whether or not a health care provider is eligible for reimbursement of No-Fault benefits is rooted in the insurance policies in question. See *Mandarino, id.,* stating:

> In *Gurnee v Aetna Life & Cas. Co.* (55 NY2d 184, 193 [1982], *cert denied* 459 US 837 [1982]), the Court of Appeals recognized, albeit in dicta, that the six-year statute of limitations, as provided in CPLR 213, applied to a cause of action based upon wrongfully withheld first-party benefits. This Court has followed that rule in the past on the theory that *a no-fault claimant's right (or that of his or her assignee) to recover first-party benefits derives primarily from the terms of the relevant contract of insurance* ... These cases demonstrate that the inclusion of terms in an insurance contract, which might be mandated by various statutes or regulations, *does not necessarily alter the fundamentally contractual nature of the dispute* between the insured (or his or her assignee), on the one hand, and his or her "no-fault insurer, on the other hand. [*Emphasis added*].

11

Consequently, Plaintiffs' attempt to recast this matter as a fraud case based purely on statutory violations, as opposed to a breach of contract matter, must fail.

Recent New York state court decisions have addressed issues bearing sufficient similarities to the instant matter as to be persuasive. In *State Farm Mutual Ins. Co. v. Anikeyeva, et al.*, the defendant health care provider countersued the No-Fault insurer, alleging fraud, violations of General Business Law §349 and additional claims. *State Farm Mut. Ins. Co. v. Anikeyeva*, 950 N.Y.S.2d 726 (N.Y. Sup. Ct. 2012). Specifically, the defendant maintained that State Farm had used fraudulent documents, such as medical reports, investigative reports and denial forms, which misrepresented facts in order to avoid making payments to the defendant under the same No-Fault insurance regulations that are at issue in this matter. In dismissing the counterclaims, the Court held that "both the alleged pre-accident promises and post-accident misrepresentations arise out of the State Farm's contractual obligation to honor its policies and make No-Fault payments as required by the No-Fault regulations." *Id.* The Court further held that "No separate obligation or tort duty to pay No-Fault claims exists. On this record defendants have no cause of action against State Farm for fraud, and accordingly dismissal of the third cause of action for common law fraud must be granted." *Id.* Thus, if a healthcare provider cannot convert a breach of contract claim into a fraud claim under the No-Fault regulations, an insurer must be precluded from doing the same thing.

In another state court case, a healthcare provider submitted an NF-3 form, improperly indicating on the claim form its relationship with the employee. *A.M. Med. Servs., P.C. v. Progressive Cas. Ins. Co.*, 953 N.Y.S.2d 219 (N.Y. App. Div. 2012). Under that insurance contract, as in this case, the Appellate Division for the Second Department ruled that the insurer must reimburse the health care provider under the breach of contract cause of action. And in *Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 10 N.Y.3d 556 (N.Y. 2008), the Court Of Appeals decided that under the insurance contract even if the services were not provided at all, the insurer must still reimburse the

12

health care provider for the services performed if it failed to satisfy its own obligations under the contract by issuing timely denial of claim forms. In light of this, it is unfathomable that on one hand the insurer is bound by its contractual obligations to pay bills even when they are *actually* fraudulent, while on the other hand is able to utilize the Federal Courts to escape those very same contractual obligations in order to seek damages - in triplicate - for bills that are merely *allegedly* fraudulent. No State or Federal court has ever stood for such a proposition and it should be rejected by this Court.

To be clear, even the Court of Appeals case heavily relied upon by Plaintiffs does not support its position. *State Farm Mut. Auto. Ins. Co. v Mallela*, 4 N.Y.3d 313 (N.Y. 2005) does not hold that an insurer may sue the health care provider on a fraudulent based theory, let alone RICO. In fact, the *Mallela* court explicitly held that no cause of action for *fraud* would lie for any payments made by insurer before April 2002 date. As to payments made after April 2002, the Court answered only the certified question and <u>declined</u> to consider "whether State Farm alleged sufficient facts to support causes of action *fraud* or unjust enrichment." *Id.* at 322 (*Emphasis added*).

After *Mallela*, there is no doubt that an insurer has a breach of contract claim, but not a fraud or RICO claim as the Plaintiffs plead. Several New York Court of Appeals decisions issued after *Mallela* lend further support to Defendants' position. For instance, in this action Plaintiffs attack Defendants' standing as valid assignees of No-Fault benefits, alleging that the injured parties' rights to payment cannot be assigned to corporate entities that are not properly licensed. In *Hosp. for Joint Diseases v. NY and Presbyt. Hosp.*, 9 N.Y.3d 312 (N.Y. 2007) the Court of Appeals met this issue head on when it ruled:

> "Upon receipt of a no-fault claim, the regulations shift the burden to the carrier to obtain further verification or deny or pay the claim. When, as here, an insurer does neither, but instead waits to be sued for nonpayment, the carrier should bear the consequences of its nonaction. To allow an insurance company to later challenge a hospital's standing as an assignee merely encourages the carrier to ignore the prescribed statutory scheme. As we observed in *Presbyterian*: *No-fault reform was enacted to provide prompt uncontested, first-*

13

> party insurance benefits. That is part of the price paid to eliminate the common-law contested lawsuits . . . The tradeoff of the no-fault reform still allows carriers to contest ill-founded, illegitimate and fraudulent claims, but within a strict, short-leashed contestable period and process designed to avoid prejudice and red-tape dilatory practices" (id.at 285 [internal citations omitted]).'

Subsequently, the Court of Appeals ruled on this issue again, this time with respect to *billing fraud*, where (as alleged here) the bills mailed by health care providers contain misrepresentations on their face in order to induce payments that the health providers are not entitled to. In *Fair Price Med. Supply. Corp.* 10 N.Y.3d 556, the Court ruled that an insurance company that fails to engage its contractual rights may be forced to pay bills for services that were not even performed. The Court of Appeals reiterated the fact that the No-Fault regulations were promulgated "to provide prompt uncontested, first-party insurance benefits", creating a "tradeoff" that "still allows carriers to contest ill-founded, illegitimate and fraudulent claims", but within its contractual rights in "a strict, short-leashed contestable period and process designed to avoid prejudice and red-tape dilatory practices". *Id.* at 566-567.

In light of the above, allowing Plaintiffs to convert a cause of action sounding in contract into one sounding in fraud – with the possibility of treble damages – would do more than just destroy the tradeoff created by the regulations under which it is suing. It would actually discourage insurers from satisfying their contractual duties and enforcing their contractual rights by providing an end-run through the federal courts to a more economically attractive option. For these reasons, Plaintiffs' Complaint should be dismissed.

## II. THIS ACTION SHOULD BE STAYED PURSUANT TO THE DOCTRINE OF PRIMARY JURISDICTION

### A. Preliminary Statement Regarding Primary Jurisdiction

Plaintiffs' RICO allegations against Defendants are: (1) Defendant PCs are fraudulently incorporated or owned and controlled by Defendant Principals; (2) Defendant PCs split fees with management and billing companies; (3) Defendants paid and received kickbacks in exchange for referrals; (4) Defendant PCs billed for services rendered by independent contractors rather than employees; (5) that Defendants improperly billed Plaintiffs for medical services that were not medically necessary or never provided; and (6) Defendants used improper billing codes when billing Plaintiffs. Compl. ¶3. Plaintiffs argue that each allegation independently deprives Defendant PCs the right bill insurers for treatment provided pursuant to No-Fault, although Defendants appear to base their case in chief on the core allegations that Defendant PCs were owned and controlled by laypersons and that the Defendants split fees with laypersons.[4]

In making their first core allegation, Plaintiffs rely on the seminal *Mallela* case. 4 N.Y.3d 313. In *Mallela*, the Court of Appeals found that No-Fault providers fraudulently incorporated under N.Y. Business Corporation Law § 1507, 1508, and N.Y. Education Law § 6507(4)(c) are not entitled to No-Fault reimbursement. *Id.* Here, Plaintiffs allege that Doctor, Acupuncturist and Chiropractor Defendants were only "nominal" owners of PC Defendants and that the Principal Defendants were the "true" owners of PC Defendants. Compl. ¶¶ 12-13, 80-177.

Plaintiffs further allege that PC Defendants entered into fee-splitting arrangements with third party laypeople, separate and apart from their allegations of fraudulent incorporation and lay ownership. Compl. ¶ 186-193. Plaintiffs' final core allegation is that Defendants paid and received

---

[4] Unlike the core allegations, Plaintiffs' remaining allegations regarding specific bills and whether they were properly coded and reflect services actually performed that were medically necessary do not deprive Defendants from billing under No-Fault in general. Rather, these remaining allegations relate to each specific bill submitted by Defendants to Plaintiffs and whether Plaintiff is obligated to pay each bill independently.

15

kickbacks in return for patient referrals. Compl. ¶¶ 178-185. The instant suit must be stayed and the adjudication of these three core allegations should be referred to the Departments of Financial Services, Health and Education under the doctrine of primary jurisdiction.

**B.  The New York Departments of Health, Education and Financial Services Have Primary Jurisdiction Over Plaintiffs' Core Allegations**

The essential questions of whether Defendant PCs are fraudulently incorporated, whether Defendants improperly split fees with management and billing companies, and whether Defendants paid and received kickbacks in exchange for referrals must be determined by the New York Departments of Financial Services, Health and Education under the doctrine of primary jurisdiction. "'Primary jurisdiction,' . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 63-64 (1956) (citing *Gen. Am. Tank Car Corp. v. El Dorado T. Co.*, 308 U.S. 422, 431 (1940)). "The aim of the doctrine, then, is to ensure that courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes." *Fulton Cogeneration Associates v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996) (citing *General Elec. Co. v. M.V. Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir.1987)).

Furthermore, while "most primary jurisdiction cases involve questions of whether the district court should defer to a federal agency's determination of factual questions . . . [a] holding that the district court must wait for a state agency to resolve the complicated factual questions . . . is not inconsistent with the rationale behind the primary jurisdiction doctrine. *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir. 1992) (holding that the doctrine of primary jurisdiction applies to both state and federal agencies and administrative bodies).

16

Primary jurisdiction does not rest upon an agency's absolute and mandatory jurisdiction over factual determinations but rather upon whether that agency has been granted "special competence" by the appropriate legislature. *See W. Pac. R. Co.*, 352 U.S. at 63-64; *see also Reiter v. Cooper*, 507 U.S. 258, 268 (1993). Furthermore, the Second Circuit holds that "[e]ven when primary jurisdiction is not statutorily required, however, courts may still apply the doctrine as a prudential matter." *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 294-95 (2d Cir. 2006) (citing *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 750 (10th Cir.2005)). Primary jurisdiction is thus a "device to prepare the way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court." *Fed. Mar. Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 498 (1958).

There is no bright-line rule or concrete test to determine whether primary jurisdiction applies in a given case, "since the inception of the doctrine [of primary jurisdiction], courts have resisted creating any fixed rules or formulas for its application." *Tassy v. Brunswick Hosp. Ctr., Inc.*, 296 F.3d 65, 68 (2d Cir. 2002) (citing *W. Pac. R.R. Co.*, 352 U.S. at 64). Thus, courts must analyze whether or not primary jurisdiction applies "on a case-by-case basis." *Nedlloyd*, 817 F.2d at 1026.

Nonetheless, the Second Circuit holds that purpose of the primary jurisdiction doctrine is "twofold: the desire for uniformity and the reliance on administrative expertise." *Tassy*, 296 F.3d 65. "Thus, in determining whether to apply the primary jurisdiction doctrine, we must examine whether doing so would serve either of these purposes." *Id.; see also Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994). The Second Circuit's inquiry into the applicability of primary jurisdiction focuses on four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made."

17

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82-83 (2d Cir. 2006).  All four factors weigh in favor of primary jurisdiction.

**C.     The Departments of Financial Services, Health and Education Have Jurisdiction and Discretion Over Plaintiffs' Core allegations**

The Supreme Court of the United States has long held that the doctrine of primary jurisdiction is applicable even when the case at bar is based on causes of action outside of the ambit of any regulatory agency. *See Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 302 (1973) (staying an antitrust pending adjudication of underlying contract claims by the Secretary of Agriculture of the Commodity Exchange Commission). Here, the agencies retain primary adjudication over Plaintiffs' core allegations rather than over the federal causes of action.

New York state law and regulations provide a framework by which the Departments of Health, Education and Financial Services may investigate a No-Fault medical provider for wrongdoing.  New York state law first mandates that "[e]very insurer shall report to the commissioner of health any patterns of overcharging, excessive treatment or other improper actions by a health provider within thirty days after such insurer has knowledge of such pattern." N.Y. Ins. Law § 5108(c). Plaintiffs do not state whether or not they have reported the alleged improper actions at issue in the instant suit to the Commissioner of Health as required by the law.

New York state law also demands that New York state agencies prescribe a specialized process to determine whether a No-Fault provider is, in fact, authorized to bill for medical services.:

> The superintendent, in consultation with the commissioner of health and the commissioner of education, shall by regulation, promulgate standards and procedures for investigating and suspending or removing the authorization for providers of health services to demand or request payment for health services as specified in paragraph one of subsection (a) of section five thousand one hundred two of this article upon findings reached after investigation pursuant to this section.

18

N.Y. Ins. Law § 5109 (McKinney).   To comply with this statutory mandate, the New York Department of Financial Services adopted No-Fault Regulation 68-E (N.Y. Comp. Codes R. & Regs. tit. 11, § 65-5.2). Regulation 68-E provides a framework for the New York Departments of Health, Education and Financial Services to investigate No-Fault medical providers, such as Defendants, based upon "allegations [made by insurers against medical providers], or other information in the superintendent's possession, regarding providers of health services engaging in any of the unlawful activities set forth in Insurance Law section 5109(b)." *Id.* Plaintiffs' core allegations squarely fall under the activities described in section 5109(b).

The New York Department of Insurance promulgated Regulation 68-E in a series of emergency rulemakings beginning in March of 2012. The Department of Insurance formally adopted Regulation 68-E effective November 14, 2013. Older cases holding that suits seeking recovery of  money paid to  No-Fault providers based on allegations of fraudulent incorporation cannot be referred to agency determination because the Superintendent of Insurance has issued no regulations pursuant to N.Y. Insurance Law § 5109(a) are now stale. *Allstate Ins. Co. v. Belt Parkway Imaging, P.C.*, 914 N.Y.S.2d 5, 6 (N.Y. App. Div. 2010).

Insurance Law section 5109(b)(1) includes any "professional or other misconduct or incompetency in connection with medical services rendered under this article."[5] Plaintiffs repeatedly admit that such alleged misconduct lies at the heart of their allegations. Compl. ¶ 191(regarding fee-splitting), and ¶ 64-177 (regarding fraudulent incorporation).

Insurance Law section 5109(b)(2) prohibits No-Fault medical providers from "knowingly [making] a false statement or representation as to a material fact in any medical report made in connection with any claim under this article." Plaintiffs' RICO cause of action hangs upon

---

[5] Article 51 is titled "Comprehensive Motor Vehicle Insurance Reparations Act" and encompasses New York State's No-Fault statutes. N.Y. Ins. Law § 5101 et. seq.

allegations that Defendants made false statements when submitting the proof of their claims to Plaintiffs. Compl. ¶¶410-415. Indeed, Plaintiffs allege that every No-Fault claim submitted by Defendants amounts to a material misrepresentation to the effect that the Defendant PCs are properly licensed and eligible for No-Fault reimbursement. . Compl. ¶ 412.

Insurance Law section 5109(b)(2) prohibits No-Fault medical providers from "solicit[ing], or [] employ[ing] another to solicit for himself or herself or for another, professional treatment, examination or care of an injured person in connection with any claim under this article." Plaintiffs repeatedly allege that Defendants paid and accepted kickbacks for referrals. Compl. ¶¶ 178-185. The kickback scheme Plaintiffs describe in their complaint amounts to allegations that Defendants employ each other to solicit each other's patients for professional treatment in exchange for kickbacks.

Plaintiffs here claim that the core right to sue for payments already made to No-Fault medical providers arises from the New York Court of Appeals' holding in *Mallela* that insurers may recover payments made to fraudulently incorporated No-Fault medical providers. Compl. ¶66 (citing *Mallela*, 4 N.Y.3d 313)[6]. The *Mallela* court is clear that the "Superintendent of Insurance promulgated N.Y. Comp. Codes R. & Regs. tit. 11, § 65–3.16(a) (12) (effective April 4, 2002) and excluded from the meaning of 'basic economic loss" payments made to unlicensed or fraudulently licensed providers, thus rendering them ineligible for reimbursement." *Id.* at 320. Courts in the Eastern District of New York have found that RICO suits seeking recovery of fees paid to improperly licensed professional corporations other than No-Fault medical providers are improper absent regulatory authority. *See Allstate Ins. Co. v. Tanella*, 11 CV 6364 CBA RML, 2012 WL 7188685 (E.D.N.Y. Aug. 28, 2012) *report and recommendation adopted*, 11-CV-06364 CBA RML, 2013 WL

---

[6] Notwithstanding that the *Mallela* court expressly "decline[d] to consider whether [plaintiff] has alleged sufficient facts to support causes of action for fraud or unjust enrichment" against the defendant No-Fault medical providers and only considered whether insurance companies could withhold pending payments to such businesses. *Mallela*, 4 N.Y.3d at 322.

663924 (E.D.N.Y. Feb. 22, 2013) (holding "there is no authority for the proposition that the remedy for a malformed [law firm] is to deny reimbursement for its legal services or to disgorge fees where they have previously been paid."). The allegations of fraudulent incorporation leveled by Plaintiffs against Defendants here thus lie squarely within the ambit of the Superintendent of the Department of Financial Services.

Courts in the Second Circuit have found that an agency has primary jurisdiction over factual issues when plaintiffs have failed to apply to an agency for non-mandatory adjudication of disputed issues. *Bernhardt v. Pfizer, Inc.*, 00 CIV. 4042 LMM, 2000 WL 1738645 (S.D.N.Y. Nov. 22, 2000) (holding that the Food and Drug Administration has primary jurisdiction in an action seeking an injunction forcing defendant drug manufacturer to issue a warning about the safety of one of its products when such agency could issue a warning on its own or plaintiffs could have petitioned the agency to take such action under C.F.R. § 1030).

It is thus clear that New York State law and regulations establish that the Departments of Financial Services, Health and Education have jurisdiction over Plaintiffs' core allegations in the instant case.

**D.    Primary Jurisdiction Ensures Uniform Outcomes of Court Cases and Regulatory Actions**

Staying the instant case pending a determination of the essential underlying facts would promote uniform outcomes from the courts and regulatory agencies. This uniformity is of particular importance with regards to Plaintiffs' allegations of fraudulent incorporation because "[n]o appellate court [or state agency] has given further meaning to the 'actual control' requirement, or has otherwise elaborated on the concept of 'fraudulent incorporation,' in the four-plus years since *Mallela* was decided." *New York Cent. Mut. Ins. Co. v. McGee*, 906 N.Y.S.2d 774 (N.Y. Sup. Ct. 2009) *aff'd as modified*, 928 N.Y.S.2d 360 (2011) (collecting cases). In the four years since the *McGee*

21

decision, no appellate court or New York state agency clarified or elaborated upon the "actual control" requirement or the nature of "fraudulent incorporation." However, Regulation 68-E provides a means for the New York Departments of Financial Services, Education and Health to speak clearly as to what practices amount to fraudulent incorporation.

Staying the case under the doctrine of primary jurisdiction would also prevent inconsistent rulings regarding the same No-Fault provider. *See Ellis*, 443 F.3d at 87 (finding that inconsistent rulings by the Federal Communication Commission and the courts warranted court's recognition of the Commission's primary jurisdiction). Here, there is a real risk that the agencies or separate courts would rule differently on whether Defendants engage in conduct that render them ineligible to bill for No-Fault reimbursement. The chief risk is that a court determines that a particular No-Fault medical provider is ineligible to bill a plaintiff insurance company prior to a determination by another court or the Departments of Financial Services, Health, or Education that the same provider is eligible to bill for No-Fault services. The risk of inconsistent judgments as to Defendants here is heightened because Defendants submit bills to many different insurance companies, each of which is a potential plaintiff in a separate suit.

There is the further risk that the courts and agencies would adopt different tests for determining whether any provider is fraudulently incorporated. Staying this case pending a determination by the New York Departments of Financial Services, Health and Education would significantly lower the risk of inconsistent rulings. The instant suit should thus be stayed pending a determination of the underlying facts by the New York Departments of Health, Education and Financial Services.

Absent a finding of fraudulent incorporation by the Departments of Financial Services, Health, or Education, it is likely that courts will reach inconsistent outcomes with regards to no-fault providers. This risk is heightened because No-Fault providers, including GTPC Defendants,

22

routinely bill multiple insurance companies. It is thus possible that a court determination that a particular No-Fault medical provider is ineligible to bill a plaintiff insurance company prior to a determination by another court or the Departments of Financial Services, Health, or Education that the same provider is eligible to bill for No-Fault services. This risk is heightened further because No-Fault providers routinely sue insurance companies for payment of No-Fault bills and in each such suit the defendant insurance companies may raise a fraudulent incorporation defense. *See, e.g.,* *Lexington Acupuncture, P.C. v. Gen. Assur. Co.,* 35 Misc. 3d 42, 43, 944 N.Y.S.2d 686 (App. Term 2012); *see also Urban Radiology, P.C. v. GEICO Ins. Co.,* 958 N.Y.S.2d 64 (Civ. Ct. 2010). It is thus foreseeable that a particular insurer defendant may prove its fraudulent incorporation defense in a suit brought by a provider seeking payment on No-Fault bills in New York City Civil Court while a different insurer suing the same No-Fault provider in New York state or federal courts would fail to prove that the same provider is fraudulently incorporated and therefore ineligible to receive No-Fault reimbursement. Indeed, the New York Court of Appeals has long been wary of "inviting inconsistent judgments" in No-Fault cases as undermining the efficacy of the court system. *Roggio v. Nationwide Mut. Ins. Co.,* 66 N.Y.2d 260, 263, 487 N.E.2d 261, 262-63 (1985) (holding that once a No-Fault claimant has selected either the courts or arbitration for the adjudication of No-Fault bills, the No-Fault claimant may not select a different forum for subsequent claims arising out of the same accident). Thus, staying the case under the doctrine of primary jurisdiction and allowing the Departments of Financial Services, Health and Education determine whether GTPC Defendants are fraudulently incorporated would prevent inconsistent rulings from separate courts and serve the interests articulated by the *Roggio* Court. *Id.*

23

E.   **Plaintiffs' Core Allegations Involve Technical And Policy Considerations With the New York Departments of Financial Services, Health and Education's Fields of Expertise**

The doctrine of primary jurisdiction recognizes that even though an agency may not be empowered "to pass on the *legal* issues presented by a case raising issues of federal law, the agency's expertise may, nevertheless, prove helpful to the court in resolving difficult *factual* issues". *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir. 1992) *(Emphasis in original)*. Plaintiffs' core allegations implicate such difficult factual issues, in particular the abstract question of what practices amount to fraudulent incorporation. The vast majority of Plaintiffs' alleged indicia of fraudulent incorporation consist of conclusory allegations that Defendant Principals controlled the business affairs of PC Defendants. Compl. ¶¶ 80-177. Plaintiffs do not base these blanket assertions on the existence of any bill of sale or other document conclusively establishing that layperson Defendants retain ownership interests in PC Defendants. Rather, Plaintiffs weave a complicated tale alleging that "true ownership and control" of the Provider Defendants was "vested in" Management Defendants at "all times." Compl. ¶87. Plaintiffs allege that the Nominal Owner Defendants invested no money in their associated Provider Defendants, had no control over the finances of the Provider Defendants, did not supervise Provider Defendants' employees, and did not manage the business operations of the Provider Defendants. Compl. ¶¶132, 133, 136, 137, 139, and 140. Importantly, Plaintiffs admit that the Nominal Owner Defendants provided medical services to patients. Compl. ¶ 142, and 170. In essence, Plaintiffs allege that the Management Defendants controlled all aspects of the management of the Provider Defendants as businesses, not that Management Defendants actually attempted to diagnose and treat any patient. Thus, the court's inquiry will be directed at whether these indicia amount to fraudulent incorporation.

Such an inquiry is well within the ambit of the Department of Financial Services, as N.Y. Insurance Law section 401(b) grants the Superintendent "broad authority to investigate activities

24

which may be fraudulent and to develop evidence thereon." The Superintendent of Insurance has asserted broad authority to regulate No-Fault providers in his amicus curiae brief submitted to the New York Court of Appeals in the seminal No-Fault "fraudulent incorporation" case *Mallela III*. *See* Bowers Decl. **Exhibit B** (Brief of Gregory V. Serio, the Superintendent of Insurance of the State of New York, pp. 8-11, *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313 (N.Y. 2005) (No. 02-9407)). Superintendent Serio identifies the core issues in the instant suit; whether Moving Defendant Corporations are owned "'by laymen, organized simply to make money and not' to provide the highest-quality medical care."*Id.* (citing *Matter of Co-operative Law Corp.*, 198 N.Y. 479, 484 (1910)). Thus, the underlying policy determination to be made by the Departments of Financial Services, Health and Education is whether GTPC Defendants are organized not to provide high-quality medical care but only for profit.

This inquiry will require the fact-finder to weigh whether certain indicia weigh in favor of a finding of fraudulent incorporation more heavily than others. That is, unless Plaintiffs prove every single one of their blanket accusations against every single Defendant, the Court or jury will have to mark the line across which a No-Fault medical provider is fraudulently incorporated. The Departments of Financial Services, Health and Education possess the necessary policy expertise to make such demarcation, whether as bright-line rules or on a case-by-case basis. Such "policy considerations" weigh in favor of a stay pending a determination by the Departments of Education, Health or Financial Services. *See Ellis* 443 F.3d at 83-84 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984)) (holding that the weighing of the public interest requires administrative-rather than judicial-review under the doctrine of primary jurisdiction).

Whether such management amounts to fraudulent incorporation is necessarily "an abstract quality represented by an area rather than a pinpoint" requiring deference to adjudication by an agency. *Danna v. Air France*, 463 F.2d 407, 410 (2d Cir. 1972) (holding that a tariff's reasonableness is

25

abstract and therefore contingent on an agency's expertise); *see also Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 46 F.3d 220, 223 (2d Cir. 1995). The Departments of Financial Services, Health and Education must determine to what extent, if any, the alleged practices constitute fraudulent incorporation.

### F. It Is Not Clear Whether There Has Been any Prior Application to New York State Agencies on the Issues at Bar

New York state law places the burden of applying to the relevant state agencies on insurance companies: "[e]very insurer *shall* report to the commissioner of health any patterns of overcharging, excessive treatment or other improper actions by a health provider within thirty days after such insurer has knowledge of such pattern." N.Y. Ins. Law § 5108(c) (*Emphasis added*). Defendants have no knowledge whether Plaintiffs have made the required application to the Commissioner of Health.

If such application has been made, the instant suit must be stayed pending agency determination of Plaintiffs' core allegations. *See, e.g., Ellis* 443 F.3d at 89 (citing *Oasis Petroleum Corp. v. U.S. Dep't of Energy*, 718 F.2d 1558, 1566 (Temp.Emer.Ct.App.1983)).

If Plaintiffs have failed to report their allegations of wrongdoing to the Commissioner of Health, then Plaintiffs have failed to comply with their statutory duty. It is against public policy to allow recalcitrant Plaintiffs to end-run around the agency by willfully failing to comply with state law in order to gain access to Federal courts. This fourth factor thus weighs in favor of staying the instant suit under the doctrine of primary jurisdiction.

### G. The Cases Cited by Plaintiffs in Their Opposition to Defendants' Request for a Pre-Motion Conference are Inapposite

In opposing Defendants' request for a pre-motion conference, Plaintiffs misrepresent and misapply the holding in *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F.Supp.2d 94 (E.D.N.Y. 2010). In *Rabiner*, Judge Johnson clearly held that N.Y. Insurance Law "§ 5109 creates a mechanism to

26

decertify fraudulently incorporated practices, relieving insurance companies of the obligation to pay their claims; however, it does not provide a way for insurance companies to recoup funds that have already been paid out as a result of such fraud" and thus plaintiff insurers may file suits to recoup monies paid allegedly fraudulent No-Fault providers. *Id.* at 102.

However, GTPC Defendants do not argue that section 5109, or Regulation 68-E, abrogates common law causes of action, nor do they seek such a ruling. Rather, the doctrine of primary jurisdiction actually supplements common law causes of action and strengthens the judicial process by allowing authorized state agencies to apply their technical and policy expertise on issues of fact, producing a "better informed and uniform legal ruling." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673, (2003) (citation omitted). Furthermore, the *Rabiner* decision acknowledges that the Department of Financial Service is empowered to determine whether No-Fault providers are fraudulently incorporated and therefore ineligible to receive No-Fault reimbursement, which is precisely what Plaintiffs seek to obtain in the current suit. *Rabiner* 749 F.Supp.2d at 102. Thus, the *Rabiner* decision bolsters GTPC Defendants' request for a stay under the doctrine of primary jurisdiction.

### III.    PLAINTIFFS' DECLARATORY JUDGMENT CAUSE OF ACTION MUST BE DIMSISSED

#### A.    There is No Cognizable Independent Cause of Action For a Declaratory Judgment

A request for declaratory relief does not does not "provide an independent cause of action." *In re Joint E & So. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir.1993). "As a threshold matter, declaratory relief is not a claim but only a remedy that Congress created so that the court may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief could be sought . . . and does not create an additional cause of action." *Wyly v. CA, Inc.*, 2009 WL 8691097 at *15 (E.D.N.Y. Sept. 2, 2009) (collecting cases). Plaintiffs' First Cause

27

of Action seeking a declaration under 28 U.S.C. §§ 2201 and 2202 that Plaintiffs are not obligated to pay any amounts billed to them by any Defendant must therefore be dismissed as procedurally improper. *Id.* at *15-16; *accord KM Enterprises, Inc. v. McDonald*, 2012 WL 4472010 at *19 (E.D.N.Y. Sept. 25, 2012) (collecting cases).

As discussed below, the payments tendered to Plaintiffs by Defendants Gutierrez, M.D. and JGG Medical, P.C., extinguish the RICO, unjust enrichment, and fraud causes of action against them. Because those causes of action are extinguished, and there is no independent cause of action for a declaratory judgment, Plaintiffs' requests for declaratory relief as to those Defendants must also be dismissed.

**B.     Plaintiffs' Unjust Enrichment, Fraud and RICO Causes of Action Regarding Pending No-Fault Claims Are Not Yet Ripe**

In order to state a cause of action under the RICO Act, Plaintiffs must plead "'(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation.'" *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990)). Furthermore, "statutory standing under RICO incorporates an enhanced ripeness requirement." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010). That is, "'[a] RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation," and only when his or her 'actual loss becomes clear and definite'" *Denny v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)); *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (holding that "plaintiffs lack statutory standing under RICO because their claims are unripe" because the damages were not "clear and definite.").

28

Here, the declaratory judgment Cause of Action articulated by plaintiffs seeks a declaration regarding amounts for which Defendants have allegedly billed Plaintiffs but which Plaintiffs have not paid any monies to Defendants. Compl. ¶ 427. Plaintiffs admits that "more than $1,431,372.31" in No-Fault bills submitted by Defendants have not been paid by Plaintiffs. *Id.* Plaintiffs fail to alert the Court to the fact that a significant number of lawsuits have been filed by Defendants in New York City Civil Court seeking reimbursement for part or all of the alleged pending No-Fault bills. Courts in the Second Circuit have long held that a plaintiff's RICO damages are not "'clear and definite' so long as that plaintiff's damages could be mitigated or abated in pending litigation." *Sky Med. Supply Inc. v SCS Support Claims Services, Inc.,* 17 F Supp 3d 207, 232 (E.D.N.Y. May 7, 2014) (citing *Uzan,* 322 F.3d 130 and *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC,* 347 Fed.Appx. 711, 713 (2d Cir.2009)). Indeed, Plaintiff's alleged pending damages could be mitigated or abated through these pending actions, rendering the RICO claims against Defendants unripe.

Furthermore, Plaintiffs fail to specify how much of their pending damages are currently subject to active litigation. Such a failure to indicate how many actions regarding the No-Fault bills "underlying the RICO causes of action are currently pending in other fora" requires that Plaintiffs Complaint must be dismissed against Defendants in its entirety because Plaintiffs have failed to articulate a cognizable RICO injury. *Sky Med. Supply Inc.* 17 F. Supp 3d at 231.

## C.    Payments Tendered By JGG Medical and Doctor Gutierrez Moot Causes of Action Eight, Nine, Twelve and Thirteen

Attached as **Exhibit C** to the Bowers Declaration are two checks, accompanied by a letter addressed to Plaintiffs written and signed by Dr. Gutierrez, tendered to Plaintiffs by Defendants Dr. Gutierrez and JGG Medical, P.C., in the amounts of $2961.00 and $888.00, respectively. These

29

amounts are triple the amounts Plaintiffs allege to have paid to Defendants in their eighth, ninth, twelfth, and thirteenth causes of action. Compl. ¶¶ 481, 488, 512, and 519.  Acceptance of these payments by Plaintiffs moots their fraud, RICO, and unjust enrichment causes of action against JGG Medical, P.C., and Dr. Gutierrez insofar as they relate to bills submitted by these Defendants.

Article III of the United States Constitution restricts the power of federal courts to adjudicating actual "Cases" and 'Controversies." U.S. Const. Art. III, § 2, cl. 1. The Supreme Court of the United States has long held that, under Article III, "a case becomes moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980)). Furthermore, "[t]he parties must continue to have a 'personal stake in the outcome' of the lawsuit." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). Finally, a case becomes moot "when it is impossible for a court to grant 'any effectual relief whatever to the prevailing party.'" *Knox v. Serv. Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). Such is the case here in regards to Plaintiffs' RICO, Common Law Fraud and Unjust Enrichment causes of action against JGG Medical, P.C., and Dr. Gutierrez regarding bills submitted by Dr. Gutierrez under his own name.

Plaintiffs may argue that their claim for punitive damages survives payment of the alleged principal damages. However, it is well-settled law in New York that punitive damages are inappropriate when "only a private wrong, and not a public right, is involved." *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358 (1976). Here, there is no public right involved in the fraud alleged by Plaintiffs. Rather, Plaintiffs alleges a series of private wrongs. Rather, the alleged wrongs are congruent with a claim of breach of contract, as the Moving Defendants' right to bill Plaintiffs arises solely out of assigned rights under No-Fault contracts issued by Plaintiffs. The Second Circuit has

30

recognized that this is the applicable law in New York, holding that "punitive damages are not recoverable for breach of contract where, as here, the wrongful conduct is not directed at the public at large." *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 88 (2d Cir. 2005). Thus, Plaintiffs' punitive damages claims do not survive payment of the alleged principal damages.

Defendants' payment of the alleged damages renders the court unable to grant effectual relief on the underlying state common law claims, as Moving Defendants have paid exactly what Plaintiffs seek. Plaintiffs have thus been made whole as to the fraud and unjust enrichment claims and thus no longer have a "personal stake in the outcome of the lawsuit." *Lewis* 494 U.S. at 478. Thus, the eighth, ninth, twelfth, thirteenth, thirty-fourth, thirty-fifth, and thirty-sixth causes of action against JGG Medical, P.C. and Dr. Gutierrez must therefore be dismissed.

## IV. Plaintiffs' Claims Against Moving Defendants are Barred by the Doctrine of Res Judicata

The doctrine of res judicata bars the instant action, as the same parties have litigated cases wherein the same allegations underlying Plaintiff's complaint were litigated or could have been litigated in state court. It is axiomatic that "once a cause of action arising out of a 'factual grouping' and 'transaction' has been finally determined, all other claims arising out of the same 'factual grouping' or 'transaction' are also barred." *Seward v. Devine*, 888 F. 2d 957 (2d Circuit 1989); *Romano v. Astoria Fed. Sav. & Loan Ass'n*, 490 N.Y.S.2d 244, 245 (N.Y. App. Div. 2d Dept. 1985)(citations omitted); *In re American Tobacco Co.*, 880 F.2d 1520, 1526-27 (2d Cir.1989).

GTPC Defendants have filed at least 75 state court actions against Plaintiff seeking monetary judgments based on entitlement to no-fault insurance benefits. *See* **Exhibit A**. In each of those actions, which are matters of public record, GTPC Defendants alleged that they were licensed to do business in the state of New York and that they were entitled to no-fault benefits. Under 11

N.Y.C.R.R. 65-3.16(12)(a), "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed." It is this statutory provision under the governing no-fault regulations that insurers rely upon to challenge the eligibility of no-fault provider professional corporations that they believe to be "fraudulently incorporated." *See State Farm Mut. Auto. Inc. Co. v. Mallela*, 4 N.Y.3d 313, 321-22, (2005). As a result, GTPC Defendants and Plaintiff have litigated a large number of cases in which the question of GTPC Defendants' entitlement to payment of no-fault insurance benefits for claims submitted to Plaintiff was the primary issue in dispute.

In every one of the state court actions between Plaintiff and GTPC Defendants, the licensing status of GTPC Defendants was or could have been at issue based on the pleadings submitted. Thus the "fraudulent incorporation" allegations raised here by Plaintiff could have been raised in the state court actions at any time. The relevance is that a health provider cannot be both improperly licensed - such as being illegally owned and controlled by laypeople, as alleged here – and entitled to no-fault benefits. The two concepts are diametrically opposed.

Res judicata or claim preclusion "prevents a party from litigating any issue or defense that could have been raised or decided in a previous suit, even if the issue or defense was not actually raised or decided." It is unquestionable that Plaintiff in this action could have asserted "fraudulent incorporation" or fee-splitting as a defense or counterclaim in any one of the dozens of cases between the same parties before the state courts, some of which have been disposed of. In fact, the so called "Mallela" defense is one of the most oft-asserted affirmative defenses in no-fault state court actions, since the successful litigation of that defense would result in a complete bar to payment by the defending insurer for any claim submitted by the fraudulent health provider.

32

Thus, the causes of action based on any theory of fraudulent incorporation or fee-splitting against GTPC Defendants must be dismissed.

## CONCLUSION

For the reasons stated above, this Court should grant Defendants' motion to dismiss the Complaint or, in the alternative, to stay the instant suit pending adjudication of Plaintiffs' core allegations against the GTPC Defendants by the Departments of Financial Services, Health, or Education.

Dated: Brooklyn, NY
      May 15, 2015

GARY TSIRELMAN, PC

BY: Gary Tsirelman, Esq.
    Stefan Belinfanti, Esq.
    Nicholas Bowers, Esq.

/s/_____

129 Livingston Street
2nd and 3rd Floors
Brooklyn, NY 11201
(718)438-1200

33